UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANNY VALERIUS, Individually and On Behalf of Nominal Defendant HARLEYSVILLE NATIONAL CORPORATION, | ) ) ) ) | Civ. Action No. |
| | ) | PLAINTIFF'S SHAREHOLDER |
| | ) | COMPLAINT FOR VIOLATION OF §14(a) |
| | ) | OF THE SECURITIES EXCHANGE ACT |
| Plaintiff, | ) | OF 1934 AND DERIVATIVE COMPLAINT |
| | ) | FOR BREACH OF FIDUCIARY DUTY |
| vs. | ) | |
| | ) | |
| PAUL GERAGHTY, LEEANN B. BERGEY, WALTER E. DALLER, JR., HAROLD A. HERR, THOMAS C. LEAMER, STEPHANIE S. MITCHELL, A. ROSS MYERS, BRENT L. PETERS, JAMES A. WIMMER, JOHN J. CUNNINGHAM, III, JAMES E. McERLANE, and DEMETRA M. TAKES, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| HARLEYSVILLE NATIONAL CORPORATION, a Pennsylvania corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.      This is a stockholder action brought by a holder of the common stock of Harleysville National Corporation ("HNC" or the "Company") against the members of the Company's Board of Directors (the "Board" or the "Individual Defendants"), arising out of their violations of §14(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder in connection with the dissemination of a proxy statement in connection with the proposed merger ("Proposed Merger") of the Company with First Niagara Financial Group, Inc. ("FNFG"). This is an individual action that seeks injunctive relief only.

2.      This action is also brought derivatively under state law by plaintiff as a shareholder of nominal party HNC on behalf of the Company. The derivative action is brought against the Individual Defendants, arising out of their breaches of fiduciary duty in connection with the Proposed Merger.

3.      On July 27, 2009, the Company announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with FNFG, pursuant to which FNFG would acquire HNC in a stock-for-stock deal. The Proposed Merger would result in HNC shareholders receiving 0.474 FNFG shares for each share of HNC that they own. Based upon the five-day average closing price of $11.60 for FNFG stock as of July 22, 2009 (the method of calculation provided in the Merger Agreement), each share of HNC was initially valued at $5.50, with the aggregate value of the deal being $237 million.

4.      Thereafter, on or about December 14, 2009, the HNC Board caused a proxy statement to be filed with the SEC and disseminated in connection with a scheduled January 22, 2010 shareholder vote (the "Proxy"). The Proxy contains a number of false and misleading statements that are material to shareholders who are expected to rely upon the Proxy to determine whether to

approve the Proposed Merger. The most significant of these is the failure of the Proxy to indicate the substantial improvement in HNC's delinquent loans and balance sheet and the impact this improvement has had upon HNC's standing with regulators and the ability of HNC to carry on as a going-concern, a significantly more valuable proposition for HNC's shareholders.

5.    To put the improvement in context, HNC's delinquent loans dropped from $209.1 million on July 31, 2009 to $173.6 million on November 30, 2009, a nearly 20% reduction. To put this amount in further context, had the amount of the delinquent loans increased by $35 million (from an assumed base of $237.5 million), FNFG had a mechanism in place to pay approximately 7% less than its current offer. However, there is no corresponding mechanism whereby shareholders can expect to see any increase in the consideration they are to receive, despite the fact that HNC has become a substantially more attractive asset in the intervening five months.

6.    The Proxy omissions and misrepresentations are just the latest violation by defendants of the duties they owe to shareholders in connection with the Proposed Merger, which is the product of a flawed sales process. The process was also wrongful in other ways, not the least of which is that the Proposed Merger came to fruition not through the efforts of the Board seeking to maximize shareholder value, but through the wheeling-and-dealing of HNC's self-interested Chief Executive Officer ("CEO") Paul Geraghty ("Geraghty"). Geraghty along with the other Individual Defendants demonstrated more concern for their reputations, which were at risk as HNC came under greater regulatory scrutiny, than for maximizing shareholder value.

7.    By Geraghty's own admission, the Proposed Merger was the result of a "lunch-and-drive" meeting with FNFG's CEO John R. Koelmel ("Koelmel"), who was armed with an "analysis from an investment bank that [Geraghty] thought was on target so [Geraghty] felt [FNFG/Koelmel] would deliver on the price." Such indifference to valuation has run its course and resulted in a fairness opinion provided by J.P. Morgan Securities Inc. ("JP Morgan") in the Proxy, which is dated

as of July 26, 2009. However, as noted, the past five months have seen marked improvement in HNC's non-performing loans, directly impacting the loan loss reserves HNC is required to bear, which has tremendous impact on the valuations included in the fairness opinion. This 5-month lag renders the fairness opinion stale and unreliable as a guide for whether the Proposed Merger adequately compensates shareholders for their interest in HNC. Indeed, HNC's loan portfolio has improved so substantially in recent months that not only is the Proposed Merger unnecessary, it is an incredibly bad deal for shareholders, a fact which is not borne out by either the Proxy or the fairness opinion. Coupled with the fact that the Company traded well above the $5.50 merger price (the value when the deal was announced) as recently as June 8, 2009 and at nearly three times that price within the 12 months preceding the announcement of the Proposed Merger, it is evident that the Proposed Merger significantly undervalues HNC. Unless the Proposed Merger is enjoined, the false and misleading Proxy will be utilized to obtain shareholder approval of the sale of the Company to FNFG, despite the fact that such approval is not in the HNC shareholders' best interests.

8.      In light of the undervaluation of HNC and defective sales process, it is unsurprising that FNFG demanded that the Merger Agreement contain provisions designed to ensure the that another bidder could not threaten its offer. In particular, the Merger Agreement contains unlawful provisions that include a $10 million termination fee, as well as a "No Solicitation" provision whereby the Individual Defendants are contractually precluded from fulfilling their fiduciary obligation to act in the best interest of shareholders by soliciting other buyers who might be willing to offer more than FNFG. Should an alternate unsolicited purchaser offer enough to justify the payment of the termination fee, the Individual Defendants agreed to provide FNFG notice of any such alternative proposal within 24 hours and also granted FNFG three business days in order to match any other offer once the Company determines that it is superior, further chilling the market and reducing the likelihood of a forthcoming offer from other potential suitors. Finally, FNFG has

virtually eliminated the likelihood of any other bidder being able to overtake its offer by providing the Company a $35 million credit line secured by a pledge of over 2 million shares of Company stock (the "Pledge Security Agreement").

9.      The Proposed Merger is the product of a hopelessly flawed process that has resulted in the planned sale of HNC to FNFG on unfair terms that are the product of the Individual Defendants' attempts to protect their own professional reputations and to subvert the interests of HNC and the stockholders of the Company. In furtherance of this plan, defendants have issued the false and misleading Proxy in order to induce shareholders to approve the Proposed Merger, which is clearly not in their best interest.

10.     In pursuing the unlawful plan to sell HNC pursuant to a defective sales process, the Individual Defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing. Likewise, distribution of the false and misleading Proxy is in direct violation of federal law.

11.     Plaintiff's allegations and the Individual Defendants' actions demonstrate a specific showing that irreparable injury to the Company will result if plaintiff is required to make a demand upon the Board, therefore the demand is excused in this case. Plaintiff seeks solely to enjoin the Proposed Merger.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367, as plaintiff's claims arise in part out of the laws of Pennsylvania.

13.     Venue is proper in this District because HNC has its principle place of business in this District. Plaintiff's claims arose in this District, where most of the actionable conduct took

place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts with this District.

## PARTIES

14.    Plaintiff is and has been, at all relevant times, a shareholder of HNC.

15.    Nominal party HNC is a Pennsylvania corporation based in Harleysville, Pennsylvania. The Company is the parent company of Harleysville National Bank, which has been in business since 1909.  HNC is the third-largest bank holding company in southeastern Pennsylvania, with assets in excess of $5.5 billion, serving its clients through 85 branches in 9 counties of Pennsylvania. HNC offers a broad array of financial services and products, including banking, mortgage, credit, insurance, financial planning, investment management, compensation consulting and succession planning, to individuals, businesses, municipalities and community organizations.

16.    Defendant Geraghty is HNC's President and CEO.  Geraghty has been an HNC director since 2007.  Geraghty was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

17.    Defendant Leeann B. Bergey ("Bergey") has been an HNC director since 1999. Bergey was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

18.     Defendant Walter E. Daller, Jr. ("Daller") is Chairman of the Board of HNC and has been an HNC director since 1977. Daller was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

19.     Defendant Harold A. Herr ("Herr") has been an HNC director since 1987. Herr was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

20.     Defendant Thomas C. Leamer ("Leamer") has been an HNC director since 2003. Leamer was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

21.     Defendant Stephanie S. Mitchell ("Mitchell") has been an HNC director since 2002. Mitchell was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

22.     Defendant A. Ross Myers ("Myers") has been an HNC director since 2006. Myers was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated

to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

23.     Defendant Brent L. Peters ("Peters") has been an HNC director since 2007.  Peters was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

24.     Defendant James A. Wimmer ("Wimmer") has been an HNC director since 2000. Wimmer was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

25.     Defendant John J. Cunningham, III ("Cunningham") has been an HNC director since 2008.  Cunningham was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

26.     Defendant James E. McErlane ("McErlane") has been an HNC director since 2008. McErlane was a director throughout the relevant period and was responsible for the preparation, review and/or dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

27.     Defendant Demetra M. Takes ("Takes") has been an HNC director since 2005.  Takes was a director throughout the relevant period and was responsible for the preparation, review and/or

dissemination of the Proxy, which was false and misleading when filed with the SEC, disseminated to HNC shareholders and is to be voted upon by shareholders at the January 22, 2010 shareholder meeting.

28.     The defendants named in ¶¶16-27 are collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' DUTIES

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, participate in, authorize or acquiesce in the wrongful acts complained of herein.

30.     To discharge their duties, the officers and directors of the Company were further required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of their business;

(b)     ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including complying with rules and regulations issued by the SEC, state regulatory agencies and state and federal courts before which the Company appears as a party;

(c)     exercise good faith in ensuring that the Company had adequate internal controls such that it is capable of complying with federal law to report all material information to shareholders in the Company's filings with the SEC before shareholder approval of corporate action, and that the Company was actually complying with such laws;

(d)     exercise good faith in supervising the preparation and filing of all reports required by law, including reports filed with the SEC, and in examining and evaluating such reports and other information concerning the affairs of the Company; and

(e)     exercise good faith in remaining informed regarding the affairs of the Company, including, but not limited to, the Company's compliance with federal law pertaining to its obligations to shareholders, and, upon receipt of notice or information regarding imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith and take steps to correct such conditions or practices.

31.     Additionally, by reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with the Company, and owe the Company a duty of highest good faith, fair dealing, loyalty, and full, candid and adequate disclosure.

32.     The derivative claims are brought under Pennsylvania state law which requires every corporate director to act in good faith, in the best interests of the corporation and the corporation's shareholders, and to act with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  Where the officers and/or directors undertake a transaction that will result in either (i) a change in corporate control, (ii) a breakup of the corporation's assets, or (iii) sale of the corporation, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with their fiduciary duties, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits alternative offers to purchase the corporation or its assets; or

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders.

33.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of HNC, are obligated to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive or are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation;

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders; and/or

(d)     unjustly entrenching themselves as managers and/or officers of the Company by failing to give adequate consideration to legitimate bids for the Company.

34.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Merger, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to the Company. The Individual Defendants stand on both sides of the transaction, are engaging in self-dealing and abusing their control of HNC, and are obtaining for themselves personal benefits, including personal financial benefits, to the detriment of the Company.

35.     Because the Individual Defendants, knowingly or recklessly breached their duties of loyalty, good faith, fair dealing, independence and candor in connection with the Proposed Merger and/or aided and abetted others who did so, the burden of proving the inherent or entire fairness of the Proposed Merger (including all aspects of its negotiation, structure, price and terms) is placed upon the Individual Defendants as a matter of law. The Individual Defendants cannot meet that burden.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

36.     Plaintiff brings this action derivatively in the right and for the benefit of HNC to redress injuries suffered, and to be suffered, by HNC as a direct result of the breaches of fiduciary duty by the Individual Defendants.

37.     Plaintiff will adequately and fairly represent the interests of HNC and its shareholders in enforcing and prosecuting his rights.

38.     Plaintiff is and was an owner of the stock of HNC during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

39.     Plaintiff has not made a demand on the Board to file suit for the breaches of fiduciary duty alleged herein because such a demand would be a futile and useless act that would likely lead to HNC suffering irreparable injury, particularly for the following reasons:

(a)     If plaintiff is required to make demand on the Board, HNC would suffer irreparable injury were the Proposed Merger complained of herein consummated;

(b)     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein;

(c)     Each member of the Board has been named as a defendant to this lawsuit;

(d)    In order to bring this suit, all of the directors of HNC would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(e)    The acts complained of constitute violations of the fiduciary duties owed by HNC's officers and directors and these acts are incapable of ratification;

(f)    Any suit by the directors of HNC to remedy these wrongs would likely expose the Individual Defendants and HNC to further civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(g)    Each member of the HNC Board is, directly or indirectly, the recipient of remuneration paid by the Company, including benefits, stock options, and other emoluments by virtue of their Board membership and control over the Company, the continuation of which is dependent upon their cooperation with the other members of the Board, and their participation and acquiescence in the wrongdoing set forth herein, and are therefore incapable of exercising independent objective judgment in deciding whether to bring this action;

(h)    Because of their association as directors of the Company and their positions as present or former employees, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment;

(i)    By and through their efforts to knowingly disseminate the false and misleading Proxy, the Individual Defendants have further demonstrated their inability to exercise independent judgment as it relates to the Proposed Merger; and

(j)    HNC's current and past officers and directors are protected by directors' and officers' liability insurance against personal liability for their breaches of fiduciary duty alleged in this Complaint, which they caused the Company to purchase for their protection with corporate

funds, *i.e.*, monies belonging to the stockholders of HNC. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions which eliminate coverage for any action brought directly by HNC against the Individual Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of HNC, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and may provide a basis for the Company to effectuate recovery. If there is no coverage pursuant to directors' and officers' liability insurance, the defendant directors will not cause HNC to sue them, since they will face a large uninsured liability.

## BACKGROUND TO DEFENDANTS' WRONGDOING

**The Individual Defendants Agree to Sell the Company to FNFG Via an Unfair Process and at an Unfair Price**

40.     On July 27, 2009, the Company announced that it had entered into the Merger Agreement with FNFG, pursuant to which FNFG would acquire HNC in a stock-for-stock deal. The Proposed Merger would result in HNC shareholders (possibly) receiving 0.474 FNFG shares for each share of HNC that they own. Based upon the five-day average closing price of FNFG as of July 22, 2009, which was $11.60, each share of HNC would be valued at $5.50, with the aggregate value of the deal being $237 million.

41.     The Company announced the Proposed Merger in a press release which stated the following, in relevant part:

> First Niagara to Acquire Harleysville National Corporation, with
> $5.6 Billion in Assets and 83 Branches in the
> Philadelphia & Lehigh Valley Areas

*— 237 million acquisition to create a strong foothold in Pennsylvania, 3.15% statewide market share and 140 branches concentrated around Philadelphia and Pittsburgh —*

*— Continuation of strategy to selectively expand geographic footprint in contiguous markets with attractive demographics and long-term growth potential —*

. . . The boards of directors of First Niagara Financial Group, Inc. and Harleysville National Corporation announced that First Niagara has agreed to acquire the Philadelphia-area financial services company in an all-stock transaction valued at approximately $237 million or $5.50 per share.

The acquisition of the Harleysville-headquartered bank will provide First Niagara with $5.6 billion in assets including, $3.6 billion in loans and $4.1 billion in deposits in 83 bank branches across nine Eastern Pennsylvania counties. The parent company of Harleysville National Bank also operates East Penn Bank, Millennium Wealth Management and Cornerstone Companies.

"This move is a terrific next step in our strategy to leverage our strong capital position in markets with attractive demographics and long-term growth potential, where we can profitably play offense. The communities served by Harleysville are perfect complements to First Niagara's stable and resilient markets in Upstate New York and Western Pennsylvania," said First Niagara President and Chief Executive Officer John R. Koelmel. "We're also excited to offer Harleysville employees opportunities to further build their careers with our growing company, while giving them the resources they need to continue providing customers the high level of personalized service they've come to expect."

The companies signed a definitive purchase agreement for the transaction, which is expected to close in the first quarter of 2010 and be accretive to First Niagara diluted earnings per share by approximately 14% in 2011.

Under the terms of the agreement, each Harleysville shareholder will receive 0.474 shares of First Niagara common stock for each Harleysville share owned, representing a premium of about 37.5% based on the Pennsylvania bank's closing price on July 24, 2009 of $4.00 per share. The exchange ratio is based on First Niagara's five-day average closing stock price of $11.60 on July 22, 2009. The exchange ratio is subject to adjustment under certain circumstances if loan delinquencies at Harleysville exceed specified amounts.

*                    *                    *

"We're very pleased to have found an acquirer with experience in dealing with the integration and cultural issues that come with any two companies combining their businesses," said Harleysville President and Chief Executive Officer Paul D. Geraghty, who will continue to lead his in-market team. "In First Niagara, we have a strong and profitable partner that will allow us to maintain our focus on community banking customers, while offering employees and investors attractive growth

prospects. This is a great transaction for our customers, our employees, and our shareholders."

First Niagara intends to maintain all Harleysville National and East Penn branches, as well as the Pennsylvania company's growing commercial banking and wealth-management business. Harleysville's workforce currently totals over 1,100 employees.

\*          \*          \*

Upon closing of the Harleysville acquisition, on a pro forma basis, First Niagara expects to maintain well-capitalized Tier 1 and Total Risk Based Capital ratios as well as a tangible common equity ratio in excess of 6%. In order to maintain First Niagara's well-capitalized position, the merger agreement provides specific protections in the event of an increase in Harleysville's loan delinquencies prior to closing.

The transaction has received approvals from the parties' boards of directors, but remains subject to regulatory approval and other customary closing conditions, as well as the approval of Harleysville shareholders.

**The Individual Defendants Issue the False and Misleading Proxy**

42.    On December 17, 2009, the Individual Defendants caused the Proxy to be filed with the SEC and disseminated to shareholders in connection with a shareholder vote on the proposed sale of the Company to FNFG, which is scheduled to be held on January 22, 2010.

43.    The Proxy contains a number of false and misleading statements that are material to shareholders who are expected to rely upon the Proxy to determine whether to approve the Proposed Merger. The most significant of these is the failure of the Proxy to indicate the substantial improvement in HNC's delinquent loans and balance sheet and the impact this improvement has had upon HNC's standing with regulators and the ability of HNC to carry on as a going-concern, a significantly more valuable proposition for HNC's shareholders.

44.    To put the improvement in context, HNC's delinquent loans dropped from $209.1 million on July 31, 2009 to $173.6 million on November 30, 2009, a nearly 20% reduction. To put this amount in further context, had the amount of the delinquent loans increased by $35 million (from an assumed base of $237.5 million), FNFG had a mechanism in place to pay approximately

7% less than its current offer. However, there is no corresponding mechanism whereby shareholders can expect to see any increase in the consideration they are to receive, despite the fact that HNC has become a substantially more attractive asset in the intervening 5 months.

45.    Such indifference to protecting shareholder interests also resulted in the Individual Defendants permitting the Proxy to be disseminated with JP Morgan's fairness opinion that is predicated upon financial and valuation data that they know precedes HNC's dramatic improvement. The 5-month lag and failure to update the fairness opinion renders it stale and unreliable as a guide for whether the Proposed Merger adequately compensates shareholders for their interest in HNC. Indeed, HNC's loan portfolio has improved so substantially in recent months that not only is the Proposed Merger unnecessary, it is an incredibly bad deal for shareholders, a fact which is not borne out by either the Proxy or the fairness opinion.

46.    The Proxy is false and misleading because it omits and/or misrepresents the following material information about the Proposed Merger and the actual value of the Company and its assets:

(a)    that the conclusion by the Board of Directors and JP Morgan that the merger consideration was fair from a financial point of view was predicated upon stale and inaccurate financial data and performance projections that fail to incorporate the significant improvement in HNC's delinquent loans, which is material to a shareholders' determination that the consideration is fair and adequate;

(b)    HNC's management projections for calendar years 2009 to 2014 and the assumptions underlying those projections and estimates which were used by JP Morgan as the basis for its Stand-Alone Dividend Discount Analysis of HNC in support of the fairness opinion are not provided to shareholders, which directly undermines shareholders' ability to determine the reasonableness of both management's projections and JP Morgan's projections derived therefrom;

(c) the sources for the projections for FNFG for calendar years 2009 to 2014 and the assumptions underlying those projections, which were used by JP Morgan as the basis for its Stand Alone Dividend Discount Analysis of FNFG in support of the fairness opinion, are not provided to shareholders, which directly undermines shareholders' ability to determine the reasonableness of JP Morgan's selection and use of those sources and the projections derived therefrom;

(d) the fact that JP Morgan used a 16% discount rate to render the Stand Alone Dividend Discount Analysis of HNC, which it erroneously reported in the Proxy at 14% under the included assumptions, which renders the analysis materially false and misleading and useless to shareholders;

(e) the criteria for selection of the comparable companies used by JP Morgan in its Selected Companies Analysis for HNC failed to indicate the method for selection of the comparable companies, as well as the criteria utilized to designate a comparable company as "primary," which directly undermines shareholders' ability to determine the reasonableness of JP Morgan's selection and use of those comparable companies;

(f) the criteria for selection of the comparable companies used by JP Morgan in its Selected Companies Analysis for FNFG failed to indicate the method for selection of the comparable companies, as well the rationale for not designating any of the selected companies as "primary," which directly undermines shareholders' ability to determine the reasonableness of JP Morgan's selection and use of those comparable companies; and

(g) the criteria for selection of the comparable transactions used by JP Morgan in its Selected Transactions Analysis either (i) implies that there were only four comparable transactions from October 1, 2008 through the date of the opinion or (ii) that JP Morgan selected the four indicated transactions based upon unknown and undisclosed criteria, which undermines

shareholders' ability to determine the reasonableness of JP Morgan's selection and/or use of those comparable transactions as a basis for comparison to the Proposed Merger.

47.     The Proxy is also false and misleading because it omits and/or misrepresents the following material information about the process leading up to, and including, the Proposed Merger:

(a)     the role JP Morgan played after it was retained in the first quarter of 2009, especially as regards HNC's discussions and presentations to the Office of the Comptroller of the Currency (the "OCC"), which directly bears upon JP Morgan's potential conflicts of interest once it was charged with finding a buyer or equity investor, a fact that is material to shareholders in their consideration of JP Morgan's fairness opinion;

(b)     the rationale for withdrawing the Company's Troubled Asset Relief Program ("TARP") application after discussions with the OCC, the substance of those discussions and whether those discussions involved the Treasury, all of which directly bear upon shareholders' consideration of whether to approve the Proposed Merger or reject it because the Proposed Merger was not the best choice for maximizing shareholder value and/or because of the possibility that TARP relief is still a viable option for HNC;

(c)     the rationale for engaging JP Morgan in the first quarter of 2009, only to wait until June 8, 2009 (over a week after the OCC had formally notified HNC that it would be subject to individual minimum capital ratios ("IMCRs") as of July 31, 2009) to publicly announce the strategic initiatives designed to meet the IMCRs, which delay is material to shareholders' consideration of whether the Proposed Merger resulted from a fair process designed to ensure the maximization of shareholder value;

(d)     the rationale for initially focusing upon dilutive private equity transactions to the exclusion of any other strategic initiatives, which is material to shareholders' consideration of

whether the Proposed Merger resulted from a fair process designed to ensure the maximization of shareholder value;

(e)     the criteria used by JP Morgan to select the 16 private equity investors initially contacted, which is material to shareholders' consideration of whether the Proposed Merger resulted from a fair process designed to ensure the maximization of shareholder value;

(f)     the amount of the termination fee required by Investor X, which is material to shareholders' consideration of whether the decision of the Individual Defendants to not engage in negotiations with Investor X was reasonable under the circumstances and how that determination impacts the fairness of the process that resulted in the Proposed Merger;

(g)     the criteria used by JP Morgan to select the nine financial institutions considered for a merger transaction, which is material to shareholders' consideration of whether the Proposed Merger resulted from a fair process designed to ensure the maximization of shareholder value;

(h)     the actual price range of the offer in the "third proposal" made by the unnamed financial institution, especially in light of the unintelligible description that the offer range established an amount "only 25% of which was above the price offered by [FNFG]," how the range, assuming it was 25% above FNFG's offer price, can be reasonably be described as "only 25%" above, and the basis for JP Morgan's and/or management's "past experience" with this institution which led to the decision to not engage in negotiations with the institution, which is material to shareholders' consideration of whether the decision of the Individual Defendants to not engage in negotiations with the unnamed financial institution was reasonable under the circumstances and how that determination impacts the fairness of the process that resulted in the Proposed Merger;

(i)     the justification for conducting a single day of due diligence on FNFG, without the presence of JP Morgan at the due diligence meetings and permitting JP Morgan to rely

solely upon publicly available data to determine FNFG's value, which is material to shareholders' consideration of whether the determination of FNFG's value was sufficiently understood by the Individual Defendants when agreeing to the 0.474 exchange ratio and whether this exchange ratio reflects fair and adequate consideration in light of such cursory valuation and limited due diligence; and

    (j)  JP Morgan must elucidate its prior and ongoing transactional relationship with FNFG, especially as it relates to the fees earned for "providing securities, trading and foreign exchange services" to FNFG and any attendant counter-party risk JP Morgan bears for any services is has provided to either FNFG or HNC, because such fees and counter-party risks directly underscore potential conflicts of interest that JP Morgan might have when rendering its fairness opinion, which materially impacts shareholders' consideration of the veracity of the fairness opinion.

  48.  For the above-stated reasons, the information detailed in ¶¶46-47 is also information that a reasonable shareholder would consider material when deciding whether to approve the Proposed Merger because the information bears directly on (i) the actual value of the Company and its assets; (ii) the assumed value of FNFG and its assets; and (iii) whether the process that resulted in the Proposed Merger was fair and designed to maximize shareholder value.

  49.  The Individual Defendants were and are aware of their duty to disclose this material information in the Proxy, and acted with at least negligence in failing to ensure that this material information was disclosed in the Proxy. The Individual Defendants are further aware of and have failed to fulfill their obligation to have JP Morgan update its fairness opinion to incorporate the significant reduction in HNC's delinquent loans, among other things. Plaintiff (along with all of HNC's shareholders) cannot cast an informed vote in consideration of the sale of the Company to FNFG without this material information.

**The Individual Defendants Impermissibly Locked Up the Proposed Merger
with Preclusive Deal Protection Devices**

50.    Beyond the misstatements and omissions about the sales process noted above, the

sales process was also handicapped by a number of other significant issues, not the least of which is

that the Proposed Merger was agreed to not through the efforts of the Board seeking to maximize

shareholder value, but through the wheeling and dealing of Geraghty.  Geraghty along with the other

Individual Defendants demonstrated more concern for their reputations, which were at risk as HNC

came under greater regulatory scrutiny, than for maximizing shareholder value by agreeing to the

Proposed Merger.

51.    By Geraghty's own admission, the Proposed Merger was the result of a "lunch-and-

drive" meeting with FNFG's CEO Koelmel, who was armed with an "analysis from an investment

bank that [Geraghty] thought was on target so [Geraghty] felt [FNFG/Koelmel] would deliver on the

price."  In a recent *Business Journal* article, Geraghty's self-interest is readily apparent:

> "The CEO of Harleysville National Corp., which agreed Monday to be sold to
> First Niagara Financial Group, spent the past few months trying to raise money in
> order to ease regulators' concerns about the bank's capital ratios.
>
> Ultimately, the bank failed to meet a June 30 deadline imposed by federal
> bank regulators to improve the ratios.  But while Paul Geraghty was exploring
> opportunities with private equity firms, he received a call from John R. Koelmel,
> CEO of Buffalo, N.Y.-based First Niagara.
>
> "He said, 'I know you are exploring private equity but that could be dilutive.
> Why not consider a strategic deal?,'" Geraghty recalled in an interview the afternoon
> the $237 million deal was announced.
>
> Geraghty met Koelmel at Northeast Philadelphia Airport last month and the
> two CEOs spent several hours driving around to visit Harleysville National's
> suburban branches before grabbing lunch in Flourtown, Pa., not far from the bank's
> headquarters in Harleysville.  The initial meeting snowballed into Monday's
> announcement.
>
> "We had a great dialogue," Geraghty said.  "I came to believe that being part
> of a $20 billion-asset bank was best for our shareholders, employees and customers.
> [Koelmel] had analysis from an investment bank that I thought was on target so I felt
> they would deliver on the price."

That meeting occurred on a Wednesday and Geraghty said he recommended to the board the next Monday that it pursue the First Niagara deal. He said he cited three reasons: Having a broader array of products to offer customers; the ability to leverage technology because of scale; and First Niagara's favorable capital position.

\*       \*       \*

Geraghty said he will stay on with First Niagara through the systems conversion and integration. He said he did not want to recommend the deal to the Harleysville board while he had a job secured with the new owners. But he thinks there is a good possibility that something permanent could be in the works.

"I would like to work for 10 or 12 more years and I would just as soon have it be here," Geraghty said."

52.    As noted in the story in the *Business Journal*, the Company was under scrutiny from federal regulators concerned about HNC's capital cushion. This, however, was (and still is) the norm and no longer the exception, especially in the regional banking industry. Federal regulators are wont to act on these capital concerns, a notion buttressed by the fact that HNC operated with impunity for nearly four weeks after the June 30 "deadline." However, what was at play was FNFG's CEO looking to take advantage of a recent downturn in the value of HNC to steal a valuable asset for FNFG. Koelmel's production of a surreptitious investment banker's report aside, Geraghty along with the other Individual Defendants were willing participants in the charade that led to the signing of the Merger Agreement, as each of them acted out of concern for their own reputational and professional interests instead of maximizing shareholder value.

53.    Because of how the Proposed Merger came together and  in light of the undervaluation of HNC (which has been exacerbated by the recent improvement in HNC's delinquent loans) and the defective sales process, FNFG demanded that the Merger Agreement contain provisions designed to ensure that another bidder could not threaten its offer. To that end, the terms of the Merger Agreement are designed to ensure the sale of HNC to FNFG through the inclusion of a series of onerous terms that effectively lock out any other prospective bidders for the

Company and remove any opportunity for there to be a market check on the consideration FNFG is offering.

54.    Specifically, §6.10(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from attempting to procure a price in excess of the amount offered by FNFG. Indeed, this section even requires that the Company "cease and cause to be terminated any and all existing discussions, negotiations, and communications" with alternate suitors. Despite the fact that they have locked up the Company and bound it to not solicit alternative bids, the Merger Agreement provides other ways that guarantee the only suitor will be FNFG.

55.    Pursuant to §6.10(c) of the Merger Agreement, should an unsolicited bidder arrive on the scene, the Company must notify FNFG of the bidder's offer within 24 hours of receipt by the Company. Not only does FNFG get notice that there is another potential bidder, the Company is contractually bound to provide FNFG with a copy of the unsolicited offer. Thereafter, should the Board determine that the unsolicited offer is superior, FNFG is granted three days to amend the terms of the Merger Agreement to make a counteroffer that only needs to be at least as favorable to the Company's shareholder as the unsolicited offer.

56.    In other words, the Merger Agreement gives FNFG access to any rival bidder's information and allows FNFG a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for FNFG, because the Merger Agreement unfairly assures that any "auction" will favor FNFG and piggy-back upon the due diligence of the foreclosed second bidder.

57.    In addition, should the other bidder come unsolicited and overcome the right of first refusal, the Merger Agreement provides that a termination fee of $10 million must be paid to FNFG by HNC if the Company decides to pursue said other offer, thereby requiring that the alternate bidder

essentially agree to pay a naked 4.2% premium for the right to provide the shareholders with a superior offer.

58.    Finally, FNFG has virtually eliminated the likelihood of any other bidder being able to overtake its offer by providing the Company a $35 million credit line secured by a pledge of over 2 million shares of the Company stock through the Pledge Security Agreement. In concert with the Pledge Security Agreement, FNFG also entered into an agreement whereby it may cherry-pick $80 million of HNC's loans in order to reduce HNC's outstanding indebtedness, a transaction that necessarily makes HNC less valuable to any other acquirer.

59.    Ultimately, the "no solicitation" clause and the unlimited right of first refusal, coupled with the termination fee and the Pledge Security Agreement, illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which HNC's Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

60.    Adding the final insult to injury to HNC and its shareholders, the Merger Agreement also provides FNFG broad protection for additional loan losses as noted in Exhibit C to the Merger Agreement. Exhibit C provides a series of share price exchange reductions predicated upon the performance of HNC's loan portfolio. As noted previously, had HNC's delinquencies increased by $35 million (assuming a floor of $237.5 million) then FNFG could have expected a discount of more than 7% off of the 0.474 exchange rate. However, in the ultimate "heads-I win, tails-you-lose" scenario, the Individual Defendants did not garner for HNC and its shareholders a reciprocal right to an increase in value if HNC's loan losses improved. As noted, such improvement did occur, in the amount of $35 million, rendering HNC a significantly more valuable asset for FNFG with no

commensurate increase in consideration being offered HNC's shareholders. Without judicial intervention, the Proposed Merger will be approved despite this undervaluation because the Proxy materially misstates and omits substantial material information, preventing shareholders from casting an informed vote.

**COUNT I**

**Against the Individual Defendants for Violations of**
**§14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder**

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     During the relevant period, the Individual Defendants disseminated the false and misleading Proxy specified above which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants. It misrepresented and/or omitted material facts, including material information about the true value of the Company and the unfairness of the sales process.

64.     In so doing, the Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

65.     The Individual Defendants also failed to correct the Proxy as it became even clearer that HNC was recovering substantial amounts on its bad loans, rendering the assumed loan loss amounts inapposite and calling into question all of the projections predicated upon the prior loan loss amounts being projected at the time the Merger Agreement was signed. This failure to update and correct these knowingly false statements is also a violation of §14(a) of the 1934 Act and SEC Rule

14a-9 promulgated thereunder. By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy.

66. If the false and misleading statements in the Proxy are not corrected, plaintiff, who will be unaware of untruths and misinformation, will rely to his detriment on the Proxy and be induced to cast an uninformed vote in favor of the Proposed Merger. By reason of such misconduct, the Individual Defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### For Breach of Fiduciary Against the Individual Defendants

67. Plaintiff repeats and realleges each allegation as though fully set forth herein.

68. This claim is brought on behalf of HNC, which was harmed by the Individual Defendants' abdication of their fiduciary duties in connection with the sale of HNC, as detailed herein.

69. The Individual Defendants violated fiduciary duties of care, loyalty, good faith, fair dealing, candor and independence owed to HNC, engaged in unlawful self-dealing, acted to put their personal interests and/or the interests of FNFG ahead of the interests of HNC, and/or aided and abetted others in doing so.

70. By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as part of a common plan, unfairly deprived plaintiff and shareholders of the true value of their investment in HNC.

71. The Individual Defendants violated their fiduciary duties by entering into the Proposed Merger with FNFG without regard to the fairness of the Proposed Merger to HNC or its shareholders.

72.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, fair dealing, candor and independence owed to HNC, because, among other reasons:

(a)    they failed to take steps to maximize the value of HNC to its public shareholders and they took steps to avoid competitive bidding, to cap the price of HNC's stock and failed to solicit other potential acquirors or alternative transactions;

(b)    they ignored or did not protect against the numerous conflicts of interest resulting from the Individual Defendants' own inter-relationships and/or self-dealing in connection with the Proposed Merger; and

(c)    they failed to disclose material information and/or made material misrepresentations to shareholders regarding among other things, the true value of the Company and the true reason for entering into the Proposed Merger.

73.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have breached their fiduciary obligations owed to HNC.

74.    As a result of the actions of the Individual Defendants, plaintiff and HNC shareholders have been damaged in that they have not received their fair portion of the value of HNC's assets and businesses and have been prevented from obtaining a fair amount for their shares.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

B.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 31, 2009

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS

DEBORAH R. GROSS

Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
A. RICK ATWOOD, JR.
DAVID T. WISSBROECKER
AARON W. BEARD
655 W. Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)

KENDALL LAW GROUP, LLP
JOE KENDALL
HAMILTON LINDLEY
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

BONI & ZACK LLC
MICHAEL J. BONI
15 St. Asaphs Rd.
Bala Cynwyd, PA 19004
Telephone:  610/822-0201
610/822-0206 (fax)

DONOVAN SEARLES, LLC
MICHAEL D. DONOVAN
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone:  215/732-6067
215/732-8060 (fax)

Attorneys for Plaintiff

S:\CptDraft\Deal\CPT Harleysville_Fed.doc

# V E R I F I C A T I O N

I, Deborah R. Gross, Attorney for plaintiff Valerius, declares that I have reviewed the Complaint for Violations of §14(a) of the Securities Exchange Act of 1934 and a Derivative Complaint prepared on behalf of Harleysville National Corporation.  I am authorized by the Plaintiff to file this Complaint on his behalf.  Plaintiff is a current holder, and has been a holder, of common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

 **December 31,   2009**
**DATE**

**DEBORAH R. GROSS**