UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANNY VALERIUS, Derivatively on Behalf of HARLEYSVILLE NATIONAL CORPORATION,<br><br>                  Plaintiff,<br><br>vs.<br><br>PAUL D. GERAGHTY, et al.,<br><br>                  Defendants,<br><br>– and –<br><br>HARLEYSVILLE NATIONAL CORPORATION, a Pennsylvania corporation,<br><br>                  Nominal Defendant. | Civil Action No. 09-6208<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |

478603_2

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................................1

II. BACKGROUND ....................................................................................................................2

III. ARGUMENT..........................................................................................................................5

    A. Legal Standard for the Granting of a Preliminary Injunction .................................5

    B. There Is a Substantial Likelihood that Plaintiff Will Succeed on the Merits Because Defendants Made Material Omissions and False Statements in the Proxy ........................................................................................................................6

        1. The Failure of Defendants to Update the Proxy by Requiring JP Morgan to Update Its Fairness Opinion to Reflect the Reduced Amount of Delinquent Loans Is a Material Omission ...............................7

        2. The Proxy Omits Material Information Related to JP Morgan's Selection of the Pertinent Discount Rates Used in the Dividend Analysis........................................................................................................10

        3. The Proxy Omits Material Information About the Process Leading Up to the Proposed Merger .......................................................................11

        4. The Proxy Omits Material Information about the Preexisting Business Relationships Between HNC, FNFG and JP Morgan.................12

    C. Plaintiff Will Suffer Irreparable Harm if the Requested Relief Is Not Granted...................................................................................................................13

    D. The Balance of Equities Weighs Heavily in Favor of Granting Plaintiff's Requested Relief ....................................................................................................14

    E. Considerations of Public Policy Weigh in Favor of Granting Plaintiff's Requested Relief ....................................................................................................14

IV. CONCLUSION.....................................................................................................................15

**TABLE OF AUTHORITIES**

        **Page**

**CASES**

*AT&T v. Winback & Conserve Program*,
    42 F.3d 1421 (3d Cir. 1994).................................................................................5

*Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.*,
    825 F.2d 731 (3rd Cir. 1987)...............................................................................13

*David P. Simonetti Rollover IRA v. Margolis*,
    No. 3694-VCN, 2008 Del. Ch. LEXIS 78
    (Del. Ch. June 27, 2008).....................................................................................12

*First Union Nat'l Bank v. Quality Carriers, Inc.*,
    No. 2634, 2000 Pa. Dist. & Cnty. Dec. LEXIS 227
    (Pa. Com. Pl. Oct. 10, 2000)...............................................................................11

*Gen. Elec. Co. v. Cathcart*,
    980 F.2d 927 (3d Cir. 1992).................................................................................6

*Gilmartin v. Adobe Res. Corp.*,
    No. 12467, 1992 Del. Ch. LEXIS 80
    (Del. Ch. Apr. 6, 1992).......................................................................................14

*Gould v. American Hawaiian S.S. Co.*,
    351 F. Supp. 853 (D. Del. 1972)..........................................................................9

*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993).....................................................................................6

*In re MONY Group Inc. S'holder Litig.*,
    852 A.2d 9 (Del. Ch. 2004)...........................................................................13, 14

*In re Pure Res., Inc., S'holders Litig.*,
    808 A.2d 421 (Del. Ch. 2002)..................................................................10, 11, 13

*In re Stratosphere Corp. Sec. Litig.*,
    66 F. Supp. 2d 1182 (D. Nev. 1999)...................................................................10

*In re Verity, Inc. Sec. Litig.*,
    No. C 99-5337 CRB, 2000 U.S. Dist. LEXIS 11720
    (C.D. Cal. Aug. 11, 2000).....................................................................................9

*In re Worldcom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)...................................................................9

**Page**

*Irving Bank Corp. v. Bank of New York Co.*,
    692 F. Supp. 163 (S.D.N.Y. 1988) ...............................................................................13

*Krull v. SEC*,
    248 F.3d 907 (9th Cir. 2001) .......................................................................................15

*Lichtenberg v. Besicorp Group Inc.*,
    43 F. Supp. 2d 376 (S.D.N.Y. 1999)......................................................................13, 14

*McMullin v. Beran*,
    765 A.2d 910 (Del. 2000) .............................................................................................11

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970) ...................................................................................................2, 6

*QVC Network v. Paramount Commc'ns*,
    635 A.2d 1245 (Del. Ch. 1993).....................................................................................11

*Rubenstein v. IU Int'l Corp.*,
    506 F. Supp. 311 (E.D. Pa. 1980) ...................................................................................7

*Scattergood v. Perelman*,
    No. 9003451, 1990 U.S. Dist. LEXIS 6482
    (E.D. Pa. May 29, 1990) ...............................................................................................13

*Texas Partners v. Conrock Co.*,
    685 F.2d 1116 (9th Cir. 1982) .......................................................................................9

*TSC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976).......................................................................................................6

*Weiner v. Quaker Oats Co.*,
    129 F.3d 310 (3d Cir. 1997)...........................................................................................7

*Weiner v. Quaker Oats Co.*,
    No. 98 C 3123, 2000 U.S. Dist. LEXIS 16765
    (N.D. Ill. Nov. 9, 2000).................................................................................................9

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78n.................................................................................................................................6
    §78n(a) ..............................................................................................................1, 5, 6, 14

17 C.F.R.
    §240.14d-9 ..................................................................................................................1, 9

I.     **INTRODUCTION**

This is a critical juncture for the shareholders of Harleysville National Corporation ("HNC" or the "Company"), who will be asked whether they wish to effectively end the corporate existence of HNC at a shareholder meeting that is currently scheduled to occur on January 22, 2010. Barring the injunctive relief sought herein, these shareholders will be forced to render that decision without full and fair disclosure of all information that is material to their decision. In order to rectify that problem, plaintiff brings this motion to temporarily restrain HNC from holding the January 22, 2010 meeting and to prevent the vote that was to occur at that meeting, unless and until the Company's Board of Directors (the "Board" or "defendants") remedy the numerous and substantial material misstatements and omissions that are currently present in the definitive proxy that defendants caused HNC to disseminate on December 17, 2009 (the "Proxy").[1]

The underlying action is a stockholder action brought by a holder of HNC stock against the members of the Company's Board, arising out of their violations of §14(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder in connection with the dissemination of the Proxy statement in connection with the proposed merger ("Proposed Merger") of the Company with First Niagara Financial Group, Inc. ("FNFG"). The action also includes pendant derivative claims alleging breach of fiduciary duty by the Board under Pennsylvania law, which are brought on behalf of HNC.

One of the bedrocks of corporate governance is that when directors or management of a publicly-traded company undertakes to sell the company, they must disclose all material information to the company's shareholders. To that end, §14(a) of the 1934 Act was enacted "to promote 'the

---

[1] A true and correct copy of the Proxy is attached as Ex. A to the Declaration of Matthew Morris in Support of Plaintiff's Motion for Temporary Restraining Order (hereafter the "Morris Decl.").

478603_2

- 2 -

free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381 (1970).[2] The "real nature" of what HNC's shareholders are being asked to vote upon is obfuscated by the false and misleading Proxy. The potential for irreparable injury to plaintiff and HNC's shareholders in relying upon the false and misleading Proxy coupled with the lack of corresponding harm to FNFG, as well as the public interest and the substantial likelihood that plaintiff's claims would prevail at a final hearing, this Court should use its equitable power to order the injunctive relief sought.

## II.  BACKGROUND

On July 27, 2009, the Company announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement")[3] with FNFG, pursuant to which FNFG would acquire HNC in a stock-for-stock deal.  ¶5.[4]  The Proposed Merger would result in HNC shareholders receiving 0.474 FNFG shares for each share of HNC that they own.  *Id*.  Based upon the five-day average closing price of $11.60 for FNFG stock as of July 22, 2009 (the method of calculation provided in the Merger Agreement), each share of HNC was initially valued at $5.50, with the aggregate value of the deal being $237 million.  *Id*.

In furtherance of the Proposed Merger, on December 17, 2009, defendants caused HNC to issue the Proxy, which includes a number of material omissions and misstatements. ¶¶4, 42. Most critically the Proxy contains a stale fairness opinion of the Company's financial advisor, J.P. Morgan

---

[2]  All emphasis is added and citations and footnotes are omitted unless otherwise noted.

[3]  A true and correct copy of the Merger Agreement is attached as Ex. B to the Morris Decl.

[4]  "¶__" references are to Plaintiff's Shareholder Complaint for Violation of §14(a) of the Securities Exchange Act of 1934 and Derivative Complaint for Breach of Fiduciary Duty (the "Complaint").

Securities Inc. ("JP Morgan"), which is dated as of July 26, 2009. ¶¶7, 45. Since JP Morgan issued its fairness opinion HNC's delinquent loans dropped from $209.1 million on July 31, 2009 to $173.6 million on November 30, 2009, a nearly 20% reduction. ¶¶7, 44. This improvement materially impacts the value of HNC and shareholders would be justified in expecting an increase in the exchange ratio offered in the Proposed Merger. ¶¶44-45. However, despite granting FNFG a manner to automatically recalculate the exchange ratio if the delinquent loans increased, defendants did not secure a corresponding upside increase to benefit shareholders if the delinquent loans decreased.[5] *Id*.

The intervening six-month lag and failure to update the fairness opinion renders the Proxy materially unreliable as a guide for whether the Proposed Merger adequately compensates shareholders for their interest in HNC. ¶¶7, 44. This failure is amplified by the fact that defendants' stated motivation for the Proposed Merger was an underlying concern that the delinquent loans were placing HNC at risk of regulatory intervention. Morris Decl., Ex. A at 42-47. Indeed, HNC's loan portfolio has improved so substantially in recent months that even if the Proposed Merger is still a necessity, it has become a bad deal for shareholders. ¶¶7, 44; Morris Decl., ¶¶6-11.

Specifically, plaintiff alleges that the Proxy is false and misleading because it omits and/or misrepresents the following material information about the Proposed Merger:

1.   The fairness opinion and the Proxy rely upon stale and inaccurate financial data that fails to incorporate the significant improvement in both (i) the banking sector as a whole, and

---

[5]   Due to the structure of the Proposed Merger the consideration can only be reduced and not increased based on the amount of loan delinquencies, thus the improvement in the Company's loan portfolio will not result in increased consideration for HNC's shareholders. Morris Decl., ¶6. Had the exchange ratio been allowed to "float" with the amount of HNC's delinquent loans, rather than being capped at 0.474, the Proposed Merger consideration would be approximately 0.534 as of November 30, 2009, a difference of $0.70 per HNC share. *Id*. This would translate into aggregate additional consideration for HNC shareholders of approximately $30 million. *Id*.

- 3 -

(ii) HNC's delinquent loans, each of which is material to a shareholders' determination that the consideration is fair and adequate. Specifically, from March 5, 2009, to July 26, 2009, the KBW Bank Index rose from 18.62 to 37.32, an increase of 100%. Morris Decl., ¶11. Since July 26, 2009, this trend has continued with the KBW Bank Index now standing at 47.00, an increase of another 26%. *Id*. The level of delinquent loans is an important driver of the valuation of a lending institution like HNC as it directly impacts the amount of capital HNC has available to lend and HNC's ability to remain a viable stand-alone bank. *Id*. at ¶¶9-10. The fairness opinion also fails because the only valuation analysis measuring HNC's intrinsic per share value is the Stand Alone Dividend Discount Analysis (the "Dividend Analysis"). *Id*. The Dividend Analysis' sensitivity to loan delinquency changes provides further evidence that the fairness opinion requires updating. Morris Decl., Ex. A at 58-59. Otherwise, shareholders are unable to quantify the impact of the decrease in the loan delinquencies because the Dividend Analysis only analyzes the impact of an increase in delinquencies. Morris Decl., ¶¶9, 10.

2. The Dividend Analysis also suffers from the failure to include the rationale behind JP Morgan's selection of discount rates. *Id*. at ¶12. The exclusion of this information undermines shareholders' ability to determine the reasonableness of JP Morgan's projections derived in the Dividend Analysis and is exacerbated by the failure to update the analysis to reflect the decrease in loan delinquencies, given the previously noted sensitivity the Dividend Analysis has to a change in loan delinquencies. Morris Decl., Ex. A at 58-59.

3. The Proxy fails to adequately disclose and describe the "third proposal" made on July 6, 2009 in the "third proposal" which "provided a range of possible price [sic] per share, only 25% of which was above the price offered by [FNFG]." *Id*. at 46. This language is materially misleading insofar as it fails to indicate to shareholders the magnitude by which the offer exceeded FNFG's offer. Morris Decl., ¶15. Additionally, the Proxy does not adequately describe the reason or the

basis for JP Morgan's and/or management's "past experience" with this institution or how this experience led to the decision to not engage in negotiations with the institution. *Id*. All of these details are material to shareholders' consideration of whether the decision of defendants to not engage in negotiations with the unnamed institution was reasonable under the circumstances and how that determination impacts the fairness of the process that resulted in the Proposed Merger.

4. Finally, JP Morgan must elucidate its prior and ongoing relationship with FNFG, especially as it relates to the fees earned for "providing securities, trading and foreign exchange services" to FNFG and any attendant counter-party risk JP Morgan bears for any services is has provided to either FNFG or HNC. Morris Decl., Ex. A at 62. Such fees and counter-party risks directly underscore potential conflicts of interest that JP Morgan might have when rendering its fairness opinion.

Without the foregoing information, HNC's shareholders will be precluded from making a fully-informed decision as to whether to approve the Proposed Merger. The foregoing deficiencies render the Proxy materially deficient under §14(a) of the 1934 Act.

## III. ARGUMENT

### A. Legal Standard for the Granting of a Preliminary Injunction

In order to determine whether to issue a preliminary injunction this Court must consider "'(1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.'" *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 (3d Cir. 1994). As discussed below, all four of these factors weigh heavily in favor of plaintiff, justifying the granting of the preliminary injunctive relief sought.

478603_2

**B.     There Is a Substantial Likelihood that Plaintiff Will Succeed on the Merits Because Defendants Made Material Omissions and False Statements in the Proxy**

"To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury[6] and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'" *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (citing *Mills*, 396 U.S. at 385).  Since shareholders are expected to vote in reliance on the Proxy, the omissions discussed hereafter are an essential link to shareholders' pending approval.

The Supreme Court has held in the context of proxy solicitations under §14 of the 1934 Act that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  It need not be shown that the omitted fact would cause a shareholder to *change* his vote, only that it be important in the decision-making process.  *Id*.

The Court of Appeals of the Third Circuit has further held that:

> Although materiality is a mixed question of law and fact which the trier of fact ordinarily decides, "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law."

*In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 n.13 (3d Cir. 1993).  Each of the following omissions or misrepresentations is in no manner "'so obviously unimportant to [shareholders] that reasonable minds cannot differ on the question of materiality.'"  *Id.*

---

[6]   The irreparable injury to plaintiff is discussed below in §III.C.

**1.     The Failure of Defendants to Update the Proxy by Requiring JP Morgan to Update Its Fairness Opinion to Reflect the Reduced Amount of Delinquent Loans Is a Material Omission**

As disclosed in the Proxy, the fairness opinion is dated as of July 26, 2009, and coincided with HNC bearing nearly $210 million in delinquent loans. Morris Decl., Ex. A at 39; *id*. at ¶6. Out of a concern that this balance could increase, FNFG included a self-triggering reduction in the consideration upon an increase in delinquencies.[7] Morris Decl., Ex. A at 39-40; *id*. at ¶5. However, in the intervening six months, the delinquent loan balance has actually dropped to $173 million, a materially relevant 20% reduction, especially in light of the fact that defendants repeatedly cited the delinquent loans as an impetus for seeking the Proposed Merger. Morris Decl., Ex. A at 39, 42-47. The fact that the delinquent loans provided a motive for the Proposed Merger coupled with the material decrease in the delinquent loans created a duty to update the Proxy, which defendants failed to do.

The law in this Circuit is clear that affirmative disclosure of a motivation creates an obligation to update disclosures to the extent they materially deviate from the disclosed levels before shareholders are asked to rely upon the representations. For example, in *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317-18 (3d Cir. 1997), the Court found that Quaker's disclosure of self-imposed caps on the potential debt-to-total capitalization ratio created an obligation to update the disclosures once Quaker became aware that it was going to incur substantial debt to finance an acquisition (appreciably elevating the debt-to-total capitalization ratio). Likewise, the court in *Rubenstein v. IU*

---

[7]     Ironically, the only reason shareholders have any knowledge of the decrease in the delinquent loan levels is because defendants disclosed the reduction in reference to the aforementioned trigger. Morris Decl., Ex. A at 39. Otherwise, plaintiff and shareholders have no information available to assess the financial ramifications that this reduction in the delinquent loans means to the value of their equity interest in HNC. Plaintiff's financial expert estimates that this change would translate into aggregate additional consideration for HNC shareholders of approximately $30 million. Morris Decl., ¶6.

*Int'l Corp.*, 506 F. Supp. 311, 315 (E.D. Pa. 1980), held that, despite not normally having an affirmative duty to disclose motive in a transaction, where management chose to proffer a motive, it thereafter became an item that was material to shareholders' deliberations.

Defendants, by drawing the burgeoning delinquent loan deficit to the forefront as a rationale for selling HNC, have created an environment where the failure to update the substantial improvement in delinquent loans renders the Proxy materially misleading. As defendants themselves stated:

> In light of the company's ongoing non-compliance with the IMCRs, a projected loss for the second quarter of approximately $11 million, mounting credit losses and ***non-performing assets*** and ***concerns regarding liquidity*** (including deposit outflows), Harleysville National Corporation's management believed that it was imperative that Harleysville National Corporation announce a capital infusion or sale transaction prior to, or in connection with, the announcement of Harleysville National Corporation's second-quarter financial results, which were scheduled to be announced on July 31, 2009. Management believed that failure to enter into a transaction within that time-frame could substantially impair Harleysville National Corporation's ability to operate in the normal course and its ability to enter into an equity infusion or merger transaction in the future as well as have a significant adverse impact on Harleysville National Corporation's liquidity, deposit base and stock price. Moreover, ***management believed that expeditiously entering into a transaction was necessary to avoid further and more severe regulatory action against Harleysville National Bank by the OCC*** and the consequences of such actions on Harleysville National Corporation and its shareholders.

Morris Decl., Ex. A at 46.

Additionally, the last six months have seen the KBW Bank Index rise by 26% during the pendency of the Proposed Merger, primarily due to a thawing in the credit markets, which was one of the other major precipitating factors defendants have cited for shopping for a suitor. Morris Decl., ¶11. Coupled with this extraordinary sector-based recovery, HNC's unprecedented reduction in delinquent loans renders the fairness opinion materially deficient as a guide to the financial fairness of the Proposed Merger's consideration.

Notwithstanding the fact that defendants drew the delinquent loans to the forefront with their substantial reference to it in the Proxy, the law is also clear that, "'[o]nce a potential merger is

- 8 -

478603_2

disclosed by a [company], there is a duty to "update opinions and projections . . . if the original opinions or projections have become misleading as the result of intervening events."'" *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004). Courts have applied the duty to update specifically in cases that "involved 'a fundamental change in the course the company is likely to take.'" *Weiner v. Quaker Oats Co.*, No. 98 C 3123, 2000 U.S. Dist. LEXIS 16765, at *31-*33 (N.D. Ill. Nov. 9, 2000). The duty to update endures as long as the opinions or projections "'remain[] "alive" in the minds of investors as a continuing misrepresentation.'" *In re Verity, Inc. Sec. Litig.*, No. C 99-5337 CRB, 2000 U.S. Dist. LEXIS 11720, at *15 (C.D. Cal. Aug. 11, 2000). And, the law requires that shareholders be informed when potentially publicly-available information significantly undervalues the Company's assets. *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1121 (9th Cir. 1982).

In *Gould*, in connection with a merger proxy, the defendants told shareholders that they had entered into an agreement to vote in favor of the merger. *Gould v. American Hawaiian S.S. Co.*, 351 F. Supp. 853, 867 (D. Del. 1972). This became inaccurate after the proxy was disseminated, but before the shareholder vote was held. *Id*. The court, in determining defendants were liable for making a materially misleading statement, held that:

> Rule 14a-9 specifically requires that solicitation material which has become false or misleading must be corrected by subsequent materials. Thus, assuming that the . . . proxy materials were accurate when initially approved, the proxy materials should have been amended to reflect subsequent occurrences or changes which rendered the initial disclosure false or misleading. Insofar as they knew or ought to have known that facts originally disclosed subsequently became inaccurate, the directors were under a ***continuing obligation*** to make certain that the proxy materials were amended and remained complete and accurate.

*Id*. at 868.

Defendants disclosed that the pressure of the delinquent loans was impacting HNC's balance sheet and ability to avoid regulatory scrutiny, in connection with making the determination to enter into the Proposed Merger. Morris Decl., Ex. A at 42-47. Subsequently "intervening events" (*i.e.*,

the improvement in the delinquent loans) caused the prior disclosure to become misleading. Therefore, defendants had a duty to update this information in order to make the Proxy not misleading. *See In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1197 (D. Nev. 1999) (summary judgment denied when "triable issues of fact" existed as to whether disclosure of budget estimates were misleading because they did not include variance known to defendants at the time of publication).

The materiality of decreased loan delinquencies is further buttressed by the fact that FNFG saw fit to incorporate an automatic downward revision to the Proposed Merger consideration in the event the delinquent loans increased during the pendency of the approval process. Morris Decl., Ex. A at 39. If the delinquent loan balance was material enough for FNFG to require such a provision in the Merger Agreement, one would be hard pressed to justify that a countervailing *improvement* in delinquent loans would not be material to HNC's shareholders. Thus, it is evident that the failure to update the Proxy and fairness opinion to reflect the decreased loan delinquencies renders HNC's Proxy materially false and misleading.

### 2. The Proxy Omits Material Information Related to JP Morgan's Selection of the Pertinent Discount Rates Used in the Dividend Analysis

JP Morgan's fairness opinion purports to quantifiably support FNFG's offer by performing the Dividend Analysis, through which JP Morgan calculated a range of implied values for HNC by discounting to present values estimates of HNC's future dividend stream . Morris Decl., Ex. A at 58. There is no more material information for shareholders in a merger than the information underlying or supporting the purported "fair value" of their shares. *See In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002). As noted by the *Pure Resources* Court, simply disclosing "the banker's 'fairness opinion' alone and without more, provides stockholders with nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker." *Id*. at 449.

Equipping a shareholder with the information necessary to inform a decision as to the adequacy of the merger consideration requires divulging the underlying data relied upon, the basic valuation exercises that the investment banker undertook, the key assumptions that they used in performing the estimates, and the range of values that were thereby generated. *Id*. at 449.

JP Morgan's rationale for the selection of the discount rates is never provided to HNC's shareholders. Such an omission is facially sufficient to run afoul of the disclosure obligations imposed by *Pure Resources*. However, the choice of these discount rates becomes even more materially determinative given the reduction in the amount of the delinquent loans, especially because the Dividend Analysis is the sole valuation analysis provided to shareholders in the Proxy. Morris Decl., Ex. A at 59; *id*. at ¶6. Additionally, the fact that the Dividend Analysis is so readily impacted by the change in the delinquent loan balance also counsels for a more fulsome discussion of the basis for JP Morgan's selection of the discount rates. *Id*.

### 3. The Proxy Omits Material Information About the Process Leading Up to the Proposed Merger

The Proxy fails to adequately disclose how and why the "third offer," which was purported to bear a range that was 25% above FNFG's offer, was rejected. Morris Decl., Ex. A at 46. Defendants have a fiduciary duty to shareholders to explore all viable alternatives in order to maximize shareholder value. *See QVC Network v. Paramount Commc'ns*, 635 A.2d 1245, 1266 (Del. Ch. 1993); *McMullin v. Beran*, 765 A.2d 910, 919 (Del. 2000).[8] Thus, their failure to disclose

---

[8]   HNC is a Pennsylvania corporation. In the absence of controlling Pennsylvania authority, Pennsylvania courts have demonstrated a propensity to look first to Delaware corporate law in light of Delaware's extensive jurisprudence in the corporate law context. *See First Union Nat'l Bank v. Quality Carriers, Inc.*, No. 2634, 2000 Pa. Dist. & Cnty. Dec. LEXIS 227 (Pa. Com. Pl. Oct. 10, 2000).

this information precludes plaintiff and HNC's other shareholders from determining whether they adequately discharged their duties in this regard.

### 4. The Proxy Omits Material Information about the Preexisting Business Relationships Between HNC, FNFG and JP Morgan

Interrelationships between advisors, target companies and acquirers was analyzed in *David P. Simonetti Rollover IRA v. Margolis*, No. 3694-VCN, 2008 Del. Ch. LEXIS 78 (Del. Ch. June 27, 2008), where UBS' role as an advisor to the transaction was in sharp conflict with the fact that the merger represented an opportunity for UBS to cash out a series of notes and warrants that it held in the target company. The court held that the failure to fully quantify the extent UBS was cashing-out these securities was material to shareholders' determination of whether UBS's fairness opinion could reasonably be relied upon. *Id*. at *23-*29. Similarly, in this case JP Morgan has provided securities, trading, foreign exchange and treasury services to FNFG. Morris Decl., Ex. A at 62. Moreover, JP Morgan and its affiliates may actively hold long or short positions in either or both of HNC and FNFG. To evaluate the potential conflict of interest arising from JP Morgan having both HNC and FNFG as clients, the Proxy must disclose (i) the aggregate amount of fees FNFG has paid to JP Morgan in the last two years, and (ii) a description of any securities positions JP Morgan held in, or contingent fee contracts held with, either company (such as derivatives) as of July 26, 2009. Morris Decl., ¶14. Without this information, shareholders cannot reasonably determine whether JP Morgan has material conflicts of interest.

Given the foregoing discussion, there is a substantial likelihood that plaintiff will prevail on the merits as the Proxy is materially false and misleading because it (i) is stale and fails to incorporate the significantly improved level of delinquent loans, (ii) omits crucial information about JP Morgan's assumptions in the only part of its fairness opinion that deals with the intrinsic value of HNC, (iii) fails to adequately disclose the material details of an alternate bidder who offered a

- 12 -

substantial premium above FNFG's offer, and (iv) omits material information about the preexisting relationships between JP Morgan, HNC and FNFG.

### C. Plaintiff Will Suffer Irreparable Harm if the Requested Relief Is Not Granted

"Forcing shareholders of a target company to make decisions without full and accurate disclosure of material information by the acquiror causes an irreparable injury to them inherent in the nature of the transaction. And relief, if granted, must be given before the takeover is consummated, it being difficult thereafter to 'unscramble the eggs.'" *Irving Bank Corp. v. Bank of New York Co.*, 692 F. Supp. 163, 168-69 (S.D.N.Y. 1988) (quoting *Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.*, 825 F.2d 731, 739 (3rd Cir. 1987)). Disclosure of all material information is essential to the shareholder suffrage process. *See Scattergood v. Perelman*, No. 9003451, 1990 U.S. Dist. LEXIS 6482, at *3 (E.D. Pa. May 29, 1990); *Lichtenberg v. Besicorp Group Inc.*, 43 F. Supp. 2d 376, 391 (S.D.N.Y. 1999) ("In addition, neither of these injuries can be rectified by an action at law. 'Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange.' Besicorp's shareholders would have been deprived of their statutory right to be free from deceptive proxy solicitations and their corresponding right to an informed vote.").

Delaware courts have routinely recognized "that irreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information." *Pure Res.*, 808 A.2d at 452 (granting injunction). "'[T]he irreversible nature of a stockholder vote on a merger supports the argument that any possible harm caused by a tainted voting process would be irreparable.'" *In re MONY Group Inc. S'holder Litig.*, 852 A.2d 9, 32-33 (Del. Ch. 2004) (granting injunction).

That risk of irreparable injury has only been amplified by defendants' failure to update the Proxy in light of the improvement in delinquent loans and the critical role the delinquencies played in the decision to sell HNC. If plaintiff does not receive the material information noted above prior

- 13 -

to the January 22, 2009 shareholder meeting, the approval of the Proposed Merger will be predicated upon the false and misleading Proxy. Once that occurs, plaintiff will be irreparably harmed and this Court will be faced with the daunting task of trying to "unscramble the eggs."

### D. The Balance of Equities Weighs Heavily in Favor of Granting Plaintiff's Requested Relief

The decision to grant injunctive relief is a matter of discretion to be exercised by the Court after balancing the equities. *Lichtenberg*, 43 F. Supp. 2d at 386. When the equities are balanced under the present circumstances, it is manifest that an injunction should issue. Vindication of the recognized right to cast an informed vote "requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages." *Gilmartin v. Adobe Res. Corp.*, No. 12467, 1992 Del. Ch. LEXIS 80, at *43 (Del. Ch. Apr. 6, 1992). No other right would be effective, as once the Proposed Merger is consummated it cannot easily be undone.

On the other hand, there is no conceivable harm to defendants or FNFG in compelling defendants to honor their disclosure obligations. Pursuant to §2.2 of the Merger Agreement, the Proposed Merger has no outside effective date, and the closing may be accomplished at any date agreed to by the parties that is at least five days after the closing conditions in Article IX of the Merger Agreement have been met. Section 9.1.2 makes the absence of any injunctions a condition precedent to closing. Thus, the Proposed Merger can be temporarily enjoined to correct the Proxy without any injury to HNC or FNFG or risk to the Proposed Merger. Accordingly, "the balance of hardships tilts decidedly in favor of the entry of an injunction." *MONY*, 852 A.2d at 33.

### E. Considerations of Public Policy Weigh in Favor of Granting Plaintiff's Requested Relief

The provisions of the 1934 Act serve vital public interests, not just private ones. By providing an adequate remedy for defrauded investors and deterring violations, vigilant enforcement of the 1934 Act guards the greater economic health of the nation by ensuring the stability of capital

markets. *See, e.g.*, *Krull v. SEC*, 248 F.3d 907, 915 (9th Cir. 2001). Thus, full disclosure of all material information is critical to the ability of potentially thousands of HNC public shareholders to determine fair value for their equity interests. Accordingly, considerations of public policy also weigh in favor of granting plaintiff's requested temporary restraining order.

## IV.     CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court temporarily restrain the shareholder vote that is scheduled to occur on January 22, 2010 unless and until the omissions and misstatements in the proxy, including an updated fairness opinion, are cured.

DATED: January 15, 2010

Respectfully submitted,

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS


/s/Deborah R. Gross DG-639
DEBORAH R. GROSS

Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
A. RICK ATWOOD, JR.
DAVID T. WISSBROECKER
AARON W. BEARD
655 W. Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)

- 15 -

478603_2

        KENDALL LAW GROUP, LLP
        JOE KENDALL
        HAMILTON LINDLEY
        3232 McKinney Avenue, Suite 700
        Dallas, TX  75204
        Telephone:  214/744-3000
        214/744-3015 (fax)

        BONI & ZACK LLC
        MICHAEL J. BONI
        15 St. Asaphs Rd.
        Bala Cynwyd, PA 19004
        Telephone:  610/822-0201
        610/822-0206 (fax)

        DONOVAN SEARLES, LLC
        MICHAEL D. DONOVAN
        1845 Walnut Street, Suite 1100
        Philadelphia, PA 19103
        Telephone: 215/732-6067
        215/732-8060 (fax)

        Attorneys for Plaintiff