UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANNY VALERIUS, Derivatively on Behalf of HARLEYSVILLE NATIONAL CORPORATION,<br><br>                  Plaintiff,<br><br>vs.<br><br>PAUL D. GERAGHTY, et al.,<br><br>                  Defendants,<br><br>– and –<br><br>HARLEYSVILLE NATIONAL CORPORATION, a Pennsylvania corporation,<br><br>                  Nominal Defendant. | Civil Action No. 09-6208<br><br>DECLARATION OF MATTHEW MORRIS IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |

**DECLARATION OF MATTHEW MORRIS IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Matthew Morris, declare as follows:

1. I am a Partner in the Dallas office of RGL Forensics, a global accounting and finance advisory firm and am a member of its Valuation and Opinion Committee. I hold masters degrees in both finance and international management and an undergraduate degree in history. I have earned the Chartered Financial Analyst ("CFA") designation, widely regarded as the leading designation in the field of investment analysis. My professional memberships include, among others, the CFA Institute, the American Finance Association and the Institute for the Study of Business Markets. I served as a faculty member at the University of Dallas Graduate School of Management from 2004 through 2007, where I lectured in International Finance, and I am a frequent speaker and author on valuation and related topics in corporate finance. Over the course of my career, I have prepared numerous valuations and other financial analyses of companies operating in the banking and financial services markets. A copy of my curriculum vitae, which outlines my educational background, professional experience and expert testimony I have provided in the last five (5) years is attached as Exhibit C. For my work in this matter, RGL is being compensated at a rate of $345 per hour.

2. My practice specializes in the financial, economic and valuation aspects of transactions, public reporting, taxation and commercial disputes. I have acted as a financial advisor in numerous transactions over the course of my professional career. In doing so, I have provided counsel to individual and corporate buyers and sellers and have also prepared numerous valuation and fairness opinions for a variety of purposes.

3. I submit this declaration in support of Plaintiff's Motion for Temporary Restraining Order in the above-captioned litigation relating to the proposed stock-for-stock merger of Harleysville National Corporation ("HNC" or the "Company") and First Niagara Financial Group, Inc. ("FNFG") (the "Proposed Merger") for consideration of 0.474 FNFG common shares for each HNC common share.[1]

4. As part of my analysis, I reviewed a number of documents and sources of information, including a copy of definitive proxy statement relating to the Proposed Merger filed by HNC with the Security and Exchange Commission on December 17, 2009 (the "Proxy"), which is attached as Exhibit A. A copy of the Agreement of Plan and Merger between HNC and FNFG, dated July 26, 2009, is attached as Exhibit B.

5. The Proposed Merger consideration is subject to reduction based on the amount of delinquent loans held by HNC at the end of the month immediately preceding the completion of the Proposed Merger. As described in the Proxy,[2] the exchange ratio of 0.474 could fall as low as 0.300 if HNC possesses between $237.5 million to $350.0 million of delinquent loans prior to consummating the Proposed Merger.

6. That the Company's delinquent loans totaled only $209.1 million at the end of July 2009[3] (when the Proposed Merger was agreed to) strongly suggests that HNC's loan portfolio was expected to experience additional loan delinquencies prior to consummating the Proposed Merger. This inference is likely reinforced by the Stand Alone Dividend Discount Analysis[4] prepared by J.P. Morgan Securities, Inc. ("JPMorgan") in which it conducted sensitivity analyses assuming an additional $50 million to $150 million loan loss provisions as compared to the base

---

[1] The Proposed Merger consideration is subject to reduction as described in paragraph 5.
[2] Proxy, pp. 39-40
[3] *Ibid*, pp. 5
[4] *Ibid*, pp. 58-59

case. However, rather than continuing to increase, the Company's loan delinquencies have appreciably dropped during the intervening four months, to only $173.6 million as of November 30, 2009.[5]

7. Due to the structure of the Proposed Merger (the consideration can only be reduced and not increased based on loan delinquencies), the improvement in the Company's loan portfolio will not result in improved consideration for HNC's shareholders in the context of the Proposed Merger. All things equal, had the exchange ratio been allowed to "float" with the amount of HNC's delinquent loans rather than being capped at 0.474, the Proposed Merger consideration would be approximately 0.534 as of November 30, 2009,[6] a difference of $0.70 per HNC share. This would translate into aggregate additional consideration for HNC shareholders of approximately $30 million for the 43 million HNC shares outstanding.

8. Based on a review of the Proxy, public information relating to HNC and my knowledge regarding the valuation of depository banks and other lending institutions, it is my opinion that the Proxy omits specific information that is critical to determining whether to support or reject the Proposed Merger.

9. The first element of information omitted from the Proxy relates to the most recent delinquent loan figure for HNC (the most recent information relating to this important metric is currently as of November 30, 2009). HNC's current delinquent loan information is important for two reasons. First, the Proposed Merger consideration is potentially affected by this figure given the dynamic described in paragraph 5 above. Second and more importantly, if HNC's delinquent loan figure continues to decline, it may signal a strengthening in HNC's ability to remain a

---

[5] *Ibid*, pp. 5
[6] Assumes an average exchange ratio increase of 0.005 per $5 million reduction in delinquent loans (the average for each $5 million to an aggregate of $300 million) and $64 million in delinquent loan difference ($237.5 million base under the Proposed Merger and the most recent actual of $173.6 million).

standalone company rather than combine with FNFG under terms that were negotiated during a significantly worse market environment.

10. The second element of information omitted from the Proxy is an updated fairness opinion. Because JPMorgan used what are now known to be incorrect loan delinquency assumptions, the reliability of its July 26, 2009 fairness opinion is questionable. Delinquent loans are an important driver of the valuation of depository banks and other lending institutions. Not only can it lead to changes in the book value of equity, an important valuation measure in its own right, but it also affects provisions for loan losses and therefore the capital available for projected future lending. This is particularly important in the case of JPMorgan's fairness opinion as the Stand Alone Dividend Discount Analysis is the only valuation analysis in which JPMorgan actually concluded values for HNC's shares. JPMorgan's other valuation analyses, namely its Selected Companies Analysis and Selected Transaction Analysis, simply compare metrics and pricing multiples and neither conclude values for HNC's shares nor provide any indication of how these analyses impacted its fairness opinion.

11. The improvement in HNC's delinquent loan estimates described above reflects the improvement in the overall banking sector during the last several months. From March 5, 2009, to July 26, 2009, the KBW Bank Index rose from 18.62 to 37.32,[7] an increase of 100%. Since July 26, 2009, this trend has continued with the KBW Bank Index now standing at 47.00, an increase of another 26% since JPMorgan issued its fairness opinion. Combined with the dwindling loan delinquencies for HNC, the JPMorgan fairness opinion is not a relevant consideration in evaluating the Proposed Merger. Accordingly, an updated fairness opinion is necessary, specifically one that incorporates more recent and relevant financial information for HNC and reflects the significant improvement in the banking sector.

---

[7] KBW Bank Index prices from the Bloomberg database

12. The third element of information omitted from the Proxy relates to the process and assumptions JPMorgan used to select the discount rates applied in its Stand Alone Dividend Discount Analysis. The Proxy describes JPMorgan as having performed this analysis using discount rates ranging from 12% to 14%,[8] but the calculation table subsequently depicted shows valuation ranges using discount rates as high as 16%.[9] As there is no analysis provided in the Proxy describing the process and assumptions JPMorgan used to estimate the discount rate, this discrepancy is irreconcilable. Moreover, as shown in the calculation table, a 2% change in the discount rate results in an approximate $0.55-0.60 per share difference in the valuation conclusions JPMorgan reached. Given the continued, significant improvement in the Company's loan portfolio since the rendering of JPMorgan's fairness opinion nearly six months ago, understanding whether the process and assumptions used in JPMorgan's discount rate calculation are outdated and relevant is essential to evaluating whether the Proposed Merger offers value above HNC's intrinsic value on a standalone basis.

13. The fourth element of information omitted from the Proxy relates to the magnitude of the financial relationship between FNFG and JPMorgan, which is important in determining how objectively JPMorgan could fulfill its role as financial advisor to HNC. As described in the Proxy, JPMorgan has provided securities, trading, foreign exchange and treasury services to FNFG.[10] Moreover, JPMorgan and its affiliates may actively hold long or short positions in either or both of HNC and FNFG. To evaluate the potential financial conflict arising from JPMorgan having both HNC and FNFG as clients, the Proxy should include 1) the aggregate amount of fees FNFG has paid to JPMorgan in the last two years and 2) a description of any

---

[8] Proxy, pp. 58
[9] *Ibid*, pp 59
[10] *Ibid*, pp. 62

securities positions JPMorgan held in, or contingent fee contracts held with, either company[11] (such as derivatives) as of July 26, 2009, along with a description of how the value of such securities or contingent fee contracts would be affected by the Proposed Merger and by how much.

14. The final element of information omitted from the Proxy relates to the nature and price of a proposal received from a third party sometime after July 6, 2009. The upper quartile of this proposal was apparently higher than the FNFG proposal,[12] but the Proxy does not reflect the magnitude by which this proposal range exceeded the FNFG proposal. In addition, JPMorgan and HNC management appear to have had "past experience" with the proposing company, but the nature of this experience is not described, which is important in evaluating the quality of the sales process that led to the Proposed Merger.

15. Based on the above, it is my opinion that the Proxy omits specific information that is critical to determining whether to support or reject the Proposed Merger.

I declare under the penalty of perjury under the laws of the United State that the foregoing is true and correct.

Executed this 14th day of January, 2010.

_____
MATTHEW MORRIS, CFA

---

[11] Other than JPMorgan's engagement with HNC as its financial advisor in the Proposed Merger
[12] Proxy, pp. 46

- 6 -