## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANNY VALERIUS, Individually and On Behalf of Nominal Defendant HARLEYSVILLE NATIONAL CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> PAUL GERAGHTY, LEEANN B. BERGEY, WALTER E. DALLER, JR., HAROLD A. HERR, THOMAS C. LEAMER, STEPHANIE S. MITCHELL, A. ROSS MYERS, BRENT L. PETERS, JAMES A. WIMMER, JOHN J. CUNNINGHAM, III, JAMES E. McERLANE, and DEMETRA M. TAKES, <br><br> Defendants, <br><br> — and — <br><br> HARLEYSVILLE, NATIONAL CORPORATION, a Pennsylvania Corporation, <br><br> Nominal Defendant. | Civ. Action No. 09-6208 |

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SHAREHOLDER COMPLAINT

DECHERT LLP
Joseph A. Tate
Michael L. Kichline
Michael J. Newman
Cira Centre, 2929 Arch Street
Philadelphia PA 19104
(215) 994-4000

*Attorneys for Defendants*

Dated: January 15, 2010

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................ 1

II.     PLEADING STANDARDS ........................................................................... 4

III.    ARGUMENT ................................................................................................ 6

      A.    The Section 14(a) Claim Must Be Dismissed For Failure To State A Claim ........ 6

           1.    Information regarding improvement in delinquent loans was not omitted ........ 7

           2.    The disclosure in the Proxy regarding J.P. Morgan's fairness opinion does not violate Section 14(a) ...................................... 8

           3.    None of the other alleged false and misleading statements violate Section 14(a) ......................................... 11

      B.    Plaintiff's Breach of Fiduciary Duty Claim Fails To State A Claim ................... 16

           1.    The Merger Agreement is the result of the hard work and dedication of the Harleysville board ...................... 17

           2.    Pennsylvania Business Corporation Law grants great deference to corporate directors who make decisions regarding mergers and acquisitions ........................................ 17

           3.    The Harleysville-First Niagara Merger Agreement does not constitute a beach of fiduciary duty by the Harleysville Directors .......... 19

                 a.    Under Pennsylvania law, the Harleysville Directors may take into account all corporate constituencies in discharging their duty to the corporation................................................20

                 b.    The terms of the Merger Agreement do not constitute a breach of fiduciary duty.................21

IV.    CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Anchel v. Shea,
    762 A.2d 346 (Pa. Super. 2000)................................................................16

Ashcroft v. Iqbal,
    __, U.S., __, 129 S. Ct. 1937 (2009)..........................................................5, 17

Borough of W. Mifflin v. Lancaster,
    45 F.3d 780 (3d Cir. 1995)........................................................................15

Brazen v. Bell Atlantic Corp.,
    695 A.2d 43 (Del. 1997)............................................................................22

California Pub. Emples'. Ret. Sys. v. Chubb Corp.,
    394 F.3d 126 (3d Cir. 2004).....................................................................5, 6

Cuker v. Mikalauskas,
    692 A.2d 1042 (Pa. 1997)................................................................. passim

General Elec. Co. v. Cathcart,
    980 F.2d 927 (3d Cir. 1992)........................................................................7

In re NAHC, Inc. Sec. Litig.,
    306 F.3d 1314 (3d Cir. 2002)........................................................... passim

In re Pennaco Energy, Inc. S'holders Litig.,
    787 A.2d 691 (Del. Ch. 2001)...................................................................22

In re Rockefeller Ctr. Props., Inc. Sec. Litig.,
    184 F.3d 280 (3d Cir. 1999)....................................................................4, 5

Kamen v. Kemper Fin. Servs., Inc.,
    500 U.S. 90 (1991)......................................................................................4

Keyser v. Commonwealth Nat'l Fin. Corp.,
    644 F. Supp. 1130 (M.D. Pa. 1986)..........................................................22

Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.,
    729 A.2d 280 (Del. Ch. 1998)...................................................................22

McMillan v. Intercargo Corp.,
   768 A.2d 492 (Del. Ch. 2000)....................................................................22

Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,
   506 A.2d 173 (Del. 1986) ...........................................................................20

Seinfeld v. Becherer,
   461 F.3d 365 (3d Cir. 2006)...............................................................6, 9, 13

Simmons v. Sutherland,
   No. 80-E of 1998, 1998 Pa. Dist. & Cnty. Dec. LEXIS 200 .....................18

Tracinda Corp. v. DaimlerChrysler AG,
   502 F.3d 212 (3d Cir. 2007) .........................................................................6

TSC Indus., Inc. v. Northway, Inc.,
   426 U.S. 438 (1976)............................................................................ passim

Wallerstein v. Primerica Corp.,
   701 F. Supp. 393 (E.D.N.Y. 1988) ...............................................................9

Winer Family Trust v. Queen,
   503 F.3d 319 (3d Cir. 2007).........................................................................7

**Statutes**

15 Pa.C.S. § 1502(18) ........................................................................................21

15 Pa.C.S. § 1712 .........................................................................................20, 23

15 Pa.C.S. §1715 ..................................................................................... passim

15 U.S.C. § 78u-4 .................................................................................... passim

28 USC 1367 .......................................................................................................15

15 U.S.C. § 78d................................................................................... passim

**Other Authorities**

17 C.F.R. § 240.14a-9(a) .....................................................................................6

17 C.F.R. § 240.14a-101 ......................................................................................6

17 CFR 229.1015 ................................................................................................7

Federal Rules of Civil Procedure 8 ..................................................................4, 5

Federal Rule of Civil Procedure 9 .............................................................. passim

Federal Rules of Civil Procedure 12 ...................................................................4

## II.    INTRODUCTION

In July 2009, in the face of mounting regulatory pressure and deepening financial problems, Harleysville National Corporation ("Harleysville") negotiated a merger (the "Merger Agreement") with First Niagara Financial Group ("First Niagara"). If it had closed on July 27, 2009 – the day the parties signed the Merger Agreement – the transaction would have provided a value of $237 million to Harleysville's shareholders in a stock-for-stock exchange. Today, based on the increased value of First Niagara stock, the value of the merger to Harleysville shareholders has improved to nearly $300 million.[1] Plaintiff Danny Valerius ("Plaintiff") now seeks to enjoin the merger, the effect of which would be to return Harleysville to its precarious situation of July 2009 and strip this value away from all of Harleysville's shareholders.

As disclosed in meticulous detail in the "Background to the Merger" section of Harleysville's Filing on Schedule 14A with the SEC, dated December 17, 2009 (the "Proxy") (attached as Ex. B to Newman Declaration),[2] Harleysville's position before the Merger Agreement was signed was indeed unstable. Harleysville was under close regulatory scrutiny: the Office of the Comptroller of Currency ("OCC"), the federal regulator for Harleysville National Bank and Trust Company ("Harleysville National Bank"),[3] had reduced Harleysville National Bank's status from "well-capitalized" to "adequately-capitalized," established

---

[1]    As of January 14, 2010, First Niagara shares closed at $14.46. Based on the fixed exchange ratio of 0.474x, the implied value of each Harleysville share was $6.85 resulting in a total deal value of $295.7 million.

[2]    The "Background to the Merger" section is attached as Ex. A to Newman Declaration. Defendants direct the Court's attention to this exhibit for a more detailed explanation of the context of the Merger Agreement.

[3]    Harleysville is the bank holding company for Harleysville National Bank.

1

individual minimum capital ratios ("IMCRs") for the bank that exceeded the standards for being "well capitalized," and directed Harleysville to obtain a major infusion of capital. Proxy at 42-43. Simultaneously, financial problems continued to beset Harleysville, as capital and liquidity decreased and concerns of a run on the bank by depositors increased. Id. at 45. In response, Harleysville employed J.P. Morgan to conduct an auction involving sixteen private equity firms and nine financial institutions to find a strategic partner. Id. at 44-46. As a result of this process, First Niagara emerged as the best partner for Harleysville and the best value for Harleysville's shareholders. On July 27, 2009, Harleysville and First Niagara entered into the Merger Agreement. Id. at 49.

Plaintiff asserts that injunctive relief is necessary to protect Harleysville's shareholders. What Plaintiff fails to explain – and perhaps fails to realize – is that any delay in the shareholder vote, set for January 22, 2010, or the closing of the merger will have severe repercussions for Harleysville and its shareholders. The dangers posed by any delay to the closing of the merger include:

- An injunction could give First Niagara the right to terminate the merger, leaving Harleysville in the same difficult financial position it found itself facing before the Merger Agreement was signed.
- Delaying the merger also exposes Harleysville and its shareholder to the risk that loan delinquencies could increase, which could result in a decreased price for shareholders in an eventual merger or give First Niagara the right to terminate the Merger Agreement. Harleysville's loan delinquency amount varies on a daily basis and could increase substantially at any time (for instance, if a large real estate creditor failed to pay interest for a month), subjecting Harleysville and its shareholders to significant risk.
- Any delay increases the likelihood that a material adverse event could occur in Harleysville's business or in the banking industry – always a possibility in these uncertain times – before the transaction closes. A material adverse event could also give First Niagara the right to terminate the merger.

- Delaying the merger puts Harleysville in dire regulatory risk. The OCC has set a deadline of March 31, 2010 for Harleysville National Bank to meet its capital requirements – capital requirements that Harleysville was unable to meet in 2009.

Harleysville's board worked exceedingly hard under difficult circumstances to identify and negotiate the terms of a strategic transaction that would be in the best interests of Harleysville and provide good value for its shareholders. Allowing Plaintiff to undermine the merger would require that Harleysville return to square one, but this time under even more difficult circumstances, as even more time has elapsed and the company would be burdened by the public failure of the First Niagara merger.

In this context, Plaintiff's slapdash complaint – stocked with conclusory assertions and factual errors and filed at the eleventh hour – is made even more reprehensible. Plaintiff makes two major allegations, both of which fail as a matter of law. First, Plaintiff alleges that the Proxy is false and misleading. But Plaintiff's conclusory allegations fall far short of the heightened pleading standards required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). As an example of Plaintiff's sloppy pleading, much of the information that Plaintiff claims is omitted from the Proxy is clearly disclosed in the document.

Plaintiff's derivative claim alleging breach of fiduciary duty against the Harleysville directors is even worse. Not only does Plaintiff fail to meet the most basic pleading standards required by federal law and Pennsylvania law governing derivative actions, but Plaintiff routinely misstates Pennsylvania law in his complaint. This is unsurprising, as Plaintiff's basic premise – that the Merger Agreement constitute a bad deal for Harleysville shareholders – is flawed. In fact, as explained above, the Merger Agreement represents an even better deal today than it did at the time the Merger Agreement was signed.

Given the extraordinarily high stakes of this merger, it is especially noteworthy that this complaint has been brought not by a proposed class of shareholders, but by a single individual seeking to stop his fellow shareholders from voting on an issue of extreme significance. This court ought not allow this misguided individual to put the survival of an important strategic transaction at stake. Accordingly, the Court should dismiss Plaintiff's complaint with prejudice and allow Harleysville's shareholders to decide for themselves whether they want accept the merger with First Niagara.

## III.     PLEADING STANDARDS

Plaintiff's complaint includes both a federal securities fraud claim (Count I) and a state law breach of fiduciary duty derivative claim (Count II). As such, his complaint must satisfy the federal pleading standards set forth by Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6), the Private Securities Litigation Reform Act ("PSLRA") and the substantive standards of Pennsylvania state law.[4] The Court may look beyond the four corners of the complaint to make its determination as to whether plaintiffs have met their pleading burden.[5]

Because Plaintiff asserts that the Proxy is false and misleading in violation of Section 14(a) of the Securities and Exchange Act of 1934, he must meet the heightened pleading

---

[4]     Issues concerning corporate governance, including claims brought by shareholders against the corporation's directors for breach of fiduciary duty, are governed by the law of the state in which the corporation is chartered. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98-99 (1991).

[5]     This court may rely on any "document[s] integral to or explicitly relied upon in the complaint" without converting the 12(b)(6) motion into a motion for summary judgment. In re Rockefeller Ctr. Props., Inc. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999) (quotations and citations omitted). In addition, the Court may consider other publicly available documents, such as SEC filings and press releases. See, e.g., In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002).

requirements of Rule 9(b) and the PSLRA.[6]  See California Pub. Employees. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 144-45 (3d Cir. 2004) ("[A]ny claims brought under the 1934 Act must meet the PSLRA particularity requirements quoted above if a plaintiff elects to ground such claims in fraud."); In re NAHC, 306 F.3d at 1329 ("Under the heightened pleading standard of the PSLRA, the complaint in a Section 14(a) action must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, all facts with particularity on which that belief is formed.").

For Plaintiff's state law beach of fiduciary duty claim, he must meet both the notice pleading standard of Rule 8(a) and the substantive standards of Pennsylvania law.  Interpreting Rule 8(a)(2), the Supreme Court recently held that a complaint must allege "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Additionally, a derivative claim for breach of fiduciary duty brought under Pennsylvania law must plead factual allegations "with particularity."  See Cuker v. Mikalauskas, 692 A.2d 1042 (Pa. 1997) (incorporating 2 ALI, Principles of Corporate Governance: Analysis and Recommendations (1994) § 7.04).

---

[6]    Federal Rule of Civil Procedure 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  In addition, "the PSLRA 'imposes another layer of factual particularity to allegations of securities fraud.'"  Chubb, 394 F.3d at 144 (quoting In re Rockefeller, 311 F.3d at 217); see also 15 U.S.C. § 78u-4(b)(1).

## IV.    ARGUMENT

Both Count I and Count II fail to meet federal and state pleadings standards.  Because they each fall dramatically short of adequately stating a claim, Plaintiff's complaint should be dismissed with prejudice.

### A.    The Section 14(a) Claim Must Be Dismissed For Failure To State A Claim.

Plaintiff asserts that the Harleysville directors violated Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9.  To allege a violation of Section 14(a), "a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission[7] which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  Chubb, 394 F.3d at 144; TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 444 (1976); Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 228 (3d Cir. 2007); see also 17 C.F.R. § 240.14a-9(a).  Where, as here, a plaintiff attempts to base a Section 14(a) claim on purported omissions, he must show that "either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading.'"  Seinfeld v. Becherer, 461 F.3d 365, 369 (3d Cir. 2006) (quoting Resnik v. Swartz, 303 F.3d 147, 151 (2d Cir. 2002)).[8]

---

[7]    Information is only material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  Tracinda, 502 F.3d at 228 (quoting Shaev v. Saper, 320 F.3d 373, 379 (3d Cir. 2003)); TSC Indus., 426 U.S. at 449 ("[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

[8]    The SEC regulation that dictates the required disclosures in a proxy statement is SEC Rule 14a-101 ("Schedule 14A").  See 17 C.F.R. § 240.14a-101.  Fairness opinions

In an attempt to undermine a comprehensive and truthful proxy statement, Plaintiff identifies a series of irrelevant details that he claims were omitted or misleading. Plaintiff's 14(a) claim must fail because (1) none of the allegedly misleading statements or omissions are material; (2) the Proxy fully complied with SEC regulations regarding required material information; and (3) Plaintiff does not meet the heightened pleading requirements of Rule 9(b) and the PSLRA. Accordingly, Plaintiff's Section 14(a) claim must fail.[9]

### 1.    Information regarding improvement in delinquent loans was not omitted.

Plaintiff asserts that the Proxy violated Section 14(a) because it failed "to indicate the substantial improvement in [Harleysville's] delinquent loan and balance sheet and the impact this improvement has had on [Harleysville's] standing with regulators and the ability of [Harleysville] to carry on as a going-concern." Compl. ¶43. This contention is facially absurd because the Proxy discloses the improvement in Harleysville's delinquent loans. The Proxy explains that delinquent loans were $209.1 million as of July 31, 2009 and improved to $173.6 million as of November 30, 2009 (roughly two weeks before the Proxy was mailed). Proxy at 5.

---

included in proxy statements are regulated by 17 CFR 229.1015, or Item 10115 of Regulation MA ("Item 1015"), which is referenced by Section 14A(b)(6). The Third Circuit has held that "[a]lthough not determinative, Schedule 14A is persuasive authority as to the required scope of disclosure in proxy materials[.]" General Elec. Co. v. Cathcart, 980 F.2d 927, 937 (3d Cir. 1992). Thus, information not included on the Schedule 14A is usually not the cause of a Section 14(a) violation.

[9]    In addition, Plaintiff's complaint fails to distinguish between Individual Defendants. Instead, Plaintiff relies upon group pleading, which has been rejected by the Third Circuit. Winer Family Trust v. Queen, 503 F.3d 319, 337 (3d Cir. 2007) (Any claims against individual defendants "must be pleaded with the specificity required by the PSLRA with respect to each defendant.") (emphasis added). For this additional reason, Count I should be dismissed.

Indeed, Plaintiff <u>must</u> be aware that these numbers were disclosed because he uses them in his complaint. <u>See</u> Compl. ¶44.

Plaintiff feebly tries to raise the specter of fraud by claiming that the Proxy fails to fully discuss the implications of this improvement with Harleysville's federal regulator. Such information <u>is</u> disclosed in the Proxy. Despite the improvement in loan delinquency levels, Harleysville has continued to come under regulatory pressure from the OCC. For example, the OCC supported the December 4, 2009 loan of $35 million made to Harleysville by First Niagara.[10] <u>See</u> Proxy at 49. Such support – and the regulatory pressure that led to the loan – occurred even after the improvement in the loan delinquency numbers. Thus, Plaintiff's Section 14(a) claim with regard to the improvement of Harleysville loan delinquency numbers must fail.[11]

### 2. The disclosure in the Proxy regarding J.P. Morgan's fairness opinion does not violate Section 14(a).

Plaintiff next attacks the fairness opinion provided by J.P. Morgan on a host of grounds, ranging from the opinion's purported staleness to its omission of information not required by federal securities regulations. Such allegations are insufficient to support a Section 14(a) claim.

---

[10]    In addition, pursuant to the Pledge Security Agreement between Harleysville and First Niagara, Harleysville borrowed an additional $15 million from First Niagara at the end of December 2009. <u>See</u> Harleysville Form 8-K (dated Dec. 23, 2009) (attached as Ex. D to Newman Declaration).

[11]    It is telling that Plaintiff concedes that his assertion regarding the loan delinquency improvement is his "most significant" allegation. If such an utterly meritless claim is his "most significant," all other allegations should be read with a shaker, rather than a grain, of salt.

First, Plaintiff alleges that the disclosures regarding the fairness opinion is false and misleading because the opinon is "stale and unreliable as a guide" because it was drafted five months before the shareholder vote.  Compl. ¶¶ 45, 46(a).  The details of the fairness opinion – including its date – were fully and truthfully disclosed in the Proxy, see Proxy at 53-62; Appendix B, and Harleysville had no duty to have J.P. Morgan update the opinion.  See, e.g., Wallerstein v. Primerica Corp., 701 F. Supp. 393, 398 (E.D.N.Y. 1988) (rejecting allegation that fairness opinion was stale because "there is no legal requirement that a Board of Directors obtain a fairness opinion on the value of the proposed merger and [plaintiffs] cite no authority for the proposition that the Board has an affirmative duty to obtain a more current opinion").  As such, Plaintiff's assertion should be disregarded.

Second, Plaintiff asserts that the Proxy violates Section 14(a) because the fairness opinion does not include the Harleysville and First Niagara management projections, and the assumptions underlying those projections, that J.P. Morgan used in crafting its opinion.  See Compl. ¶¶ 46(b); 46(c).  First, the projections are neither material nor even helpful.  The Proxy discloses that the internal projections provided by Harleysville management to J.P. Morgan were not prepared for public disclosure and were based on largely uncertain variables and assumptions.  Proxy at 56.  Additionally, Plaintiff's contention must be rejected because such projections are not specifically required by Schedule 14A or Item 1015.  See Seinfeld, 461 F.3d at 373 (holding that where SEC regulations did require a disclosure in the proxy, the failure to provide such information did not make the proxy false or misleading).  Finally, Plaintiff fails to adequately allege how these omitted projections make the Proxy false or misleading.  Such pleading fails to meet the heightened standards of Rule 9(b) and the PSLRA.  See 15 U.S.C. §

78u-4(b)(1) (a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"); In re NAHC, 306 F.3d at 1329. Therefore, the projections are not material and their absence does not constitute a violation of Section 14(a).

Third, Plaintiff alleges that the Proxy violates Section 14(a) because the fairness opinion does not include J.P. Morgan's criteria for the selection of comparable companies[12] or comparable transactions[13] to determine the reasonableness of the proposed merger. See Compl. ¶¶ 46(e); 46(f); 46(g). For the same reasons that the opinion's lack of projections does not violate Section 14(a), see supra, this assertion fails.

Finally, Plaintiff charges that the Proxy is false and misleading because the fairness opinion purportedly "used a 16% discount rate to render the Stand Alone Dividend Discount Analysis of [Harleysville], which it erroneously reported in the Proxy at 14% under the included assumptions." See Compl. ¶ 46(d). Plaintiff's allegation is itself misleading. On page 58, the Proxy notes that J.P. Morgan utilized an assumption of "discount rates from 12.0% to 14.0% to calculate the present value of the dividend streams and terminal values," but on page 59, the chart showing the data J.P. Morgan used makes clear that J.P. Morgan actually relied on discount rates of 12%, 14%, and 16%. Proxy at 58-59. Thus, to the extent the 16% was omitted on page 58 of the Proxy, it was clearly disclosed by the data shown on the next page of the document, and it is plainly not material. See TSC Indus., 426 U.S. at 449.

---

[12]    The names of the peer companies are listed in the Proxy. See Proxy at 57; 59. Information on such companies is publicly available for any shareholder who cares to look.

[13]    The Proxy discloses that there were no comparable transactions in 2009. See Proxy at 57. The post-October 2008 time-period is most critical because it captures those transactions that occurred in the wake of the financial/real estate market collapse.

### 3. None of the other alleged false and misleading statements violate Section 14(a).

The other misrepresentations or omissions alleged in this complaint provide no basis for claiming a violation of Section 14(a).

***J.P. Morgan's role in presentations to OCC.*** Plaintiff alleges that the Proxy is false and misleading because it omits or misrepresents the role J.P. Morgan played on behalf of Harleysville in early 2009 "in discussions and presentations to the [OCC]" and asserts, without any support, that this role "directly bears upon J.P. Morgan's potential conflict of interest once it was charged with finding a buyer or equity investor." See Compl. ¶ 47(a). First, the Proxy clearly discloses that J.P. Morgan was hired to help Harleysville increase its capital levels and regain its status as a well-capitalized bank. See Proxy at 42. Next, Plaintiff fails to explain why J.P. Morgan may have had a conflict of interest, or why omissions of this so-called conflict makes the Proxy misleading. Thus, his assertion does not meet the heightened pleading standards of the PSLRA. See 15 U.S.C. § 78u-4(b)(1); In re NAHC, 306 F.3d at 1329. Moreover, Plaintiff fails to show how such information is in any way relevant to a shareholder's consideration of the proposed merger. Because this information would not significantly alter the "total mix" of information available to shareholders, it is not material. TSC Indus., 426 U.S. at 449.

***Harleysville's withdrawal from TARP.*** Plaintiff claims that the Proxy is false and misleading because it omits Harleysville's rationale for withdrawing its TARP application. See Compl. ¶ 47(b). This is incorrect. The Proxy discloses that the Harleysville board authorized the withdrawal of Harleysville's TARP application "based on management's belief, after discussions

11

with the OCC, that Harleysville National Corporation's TARP application was unlikely to be approved." See Proxy at 43.

*Harleysville's response to the OCC's IMCRs.* Plaintiff asserts that the Proxy violates Section 14(a) because it omits information explaining why Harleysville hired J.P. Morgan in the first quarter of 2009 and publicly announced its strategic response to the OCC's IMCRs a week after the OCC formally imposed the IMCRs. See Compl. ¶ 47(c). Plaintiff implies that Harleysville should have publicly announced its strategic plan responding to the OCC's IMCRs before those IMCRs were announced. This is facially nonsensical. More importantly for this analysis, the date that Harleysville responded to the IMCRs has no bearing on whether shareholders should vote for or against the merger with First Niagara. The issue is simply not material. See TSC Indus., 426 U.S. at 449.

*Rationale for initially focusing on private equity investors.* Plaintiff next argues that the Proxy is false and misleading because it omits Harleysville's rationale for initially focusing on private equity transactions to the exclusion of any other strategic initiatives. See Compl. ¶47(d). Again, Plaintiff is incorrect. The Proxy articulates that J.P. Morgan was instructed to contact private equity investors as a means to "improve [Harleysville's] capital position." See Proxy at 44. As disclosed in the Proxy, this step was required by the OCC. Id. at 42-43. Moreover, despite Harleysville's initial focus on public equity firms, the auction for a private equity investor came to naught. As such, more details as to the exact rationale for beginning the auction with private equity firms are immaterial. See TSC Indus., 426 U.S. at 449.

*Criteria for sixteen private equity investors and nine financial institutions.* Plaintiff asserts that the Proxy is false and misleading because it does not include a criteria for how J.P.

12

Morgan selected the sixteen private equity investors and nine financial institutions it initially contacted. See Compl. ¶¶ 47(e); 47(g). Beyond a conclusory assertion that this information is "material to shareholders' consideration of whether the Proposed Merger resulted from a fair process designed to ensure the maximization of shareholder value," id., Plaintiff fails to explain why these so-called omissions makes the Proxy misleading or how such information would impact the "total mix" of information available to a shareholder. Moreover, these allegations implicitly calls into question the validity and truthfulness of J.P. Morgan's efforts to find Harleysville a strategic investor or partner. Such conclusory allegations and innuendo cannot form the basis of a Section 14(a) claim. See 15 U.S.C. § 78u-4(b)(1); In re NAHC, 306 F.3d at 1329. Finally, such criteria are not required by the SEC, see Section 14A and Item 1015, and therefore is not required to be disclosed. See Seinfeld, 461 F.3d at 373.

**_Details regarding Investor X._** Plaintiff claims that the Proxy violates Section 14(a) because it does not detail the amount of the termination fee required by Investor X, one of the private equity funds that ultimately chose not to invest in Harleysville. Compl. ¶47(f). Plaintiff does not explain why the omitted termination fee makes the Proxy false or misleading, as it must under the PSLRA. 15 U.S.C. § 78u-4(b)(1); In re NAHC, 306 F.3d at 1329. Moreover, the amount of the termination fee is immaterial. The Proxy discloses that Harleysville's management, legal advisors, and financial advisors all believed that proposed termination fee was excessive. See Proxy at 44. In addition, the disputed termination fee was not the cause of the failed negotiation with Investor X: "Investor X withdrew its proposal citing Investor X's refusal to participate in an auction process and [Harleysville's] failure to sign a term sheet from Investor X, which proposed terms and conditions that would have limited and dictated the

manner in which Harleysville National Corporation could run a bidding process." Id.  Thus,

there is simply no substantial likelihood that a reasonable shareholder would find the termination

fee – which did not account for the withdrawal of Investor X – important.  TSC Indus., 426 U.S.

at 449.

       *Price range of so-called "third proposal."*  Plaintiff next allege that the Proxy violates

Section 14(a) because it omits "the actual price range of the offer in the 'third proposal' made by

the unnamed financial institution."  See Compl. ¶ 47(h).  In fact, the Proxy explains that this

unnamed financial institution provided an expression of interest <u>without the benefit of due</u>

<u>diligence or a presentation by management</u> by providing a range of prices at which it <u>might</u> be

interested in purchasing Harleysville.  Only 25% of this range was greater than the offer already

made by First Niagara, and Harleysville management and J.P. Morgan representatives both felt

that "it was unlikely that this institution, which had done only limited due diligence and had not

accepted an offer from [Harleysville] management to hear a management presentation, would

offer a per-share price [above First Niagara's offer]."  See Proxy at 46.  Given all of the

information disclosed in the Proxy, the exact price range is not material, and its omission does

not violate Section 14(a).  TSC Indus., 426 U.S. at 449.

       *Justification for an efficient due diligence process.*  Plaintiff charges that the Proxy is

false and misleading because it omits the "justification for conducting a single day of due

diligence on [First Niagara] without the presence of JP Morgan at the due diligence meetings and

permitting JP Morgan to rely on publicly available data to determine [First Niagara's] value."

See Compl. ¶47(i).  This allegation is incorrect.  First, Harleysville management did not conduct

due diligence of First Niagara alone – legal counsel and representatives from J.P. Morgan

participated in the due diligence meetings via teleconference.  See Proxy at 47-48.  Moreover,

the Proxy explains the great need for efficiency in brokering a strategic transaction by the end of

July 2009:  "[M]anagement believed that expeditiously entering into a transaction was necessary

to avoid further and more severe regulatory action against Harleysville National Bank by the

OCC and the consequences of such actions on Harleysville National Corporation and its

shareholders."  Id. at 46 (emphasis in original).  Thus, this so-called omission does not constitute

a violation of Section 14(a).

      ***First Niagara-J.P. Morgan relationship.***  Finally, Plaintiff asserts that the Proxy omits

information regarding the J.P. Morgan-First Niagara relationship and any "potential conflicts of

interest" such a relationship might raise.  See Compl. ¶47(j).  Plaintiff does not explain what

"potential conflicts of interest" might exist between J.P. Morgan, Harleysville and First Niagara,

nor does it explain how they may have impacted J.P. Morgan's credibility and/or performance.

This baseless allegation falls far short of the required pleading standards.  See 15 U.S.C. § 78u-

4(b)(1); In re NAHC, 306 F.3d at 1329.  Moreover, an explanation of the relationship between

J.P. Morgan and First Niagara more detailed than what is already provided on page 62 of the

Proxy is not required by federal regulation.  See Section 14A; Item 1015.  As such, Plaintiff fails

to allege a violation of Section 14(a).

*     *     *     *

For these reasons, Count I should be dismissed.[14]

---

[14]    Plaintiff's sole basis for federal jurisdiction is the Section 14(a) claim.  See Compl. ¶ 12.
If this Court dismisses Count I, the entire complaint must be dismissed for lack of federal
subject matter jurisdiction.  See 28 USC 1367(c)(3); see also Borough of W. Mifflin v.
Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) ("[W]here the claim over which the district
court has original jurisdiction is dismissed before trial, the district court must decline to

15

**B.      Plaintiff's Breach of Fiduciary Duty Claim Fails To State A Claim.**

Harleysville, facing intense pressure from worsening economic conditions and increasing

regulatory scrutiny, needed to enter into some type of strategic transaction to save the company.

In the face of these incredibly difficult circumstances, the Harleysville board steered the

company to a strategic transaction that will save Harleysville and provide good value for its

shareholders.  Now, Plaintiff has attempted to interpose himself in Harleysville's corporate

process by alleging that Harleysville's directors breached their fiduciary duties to the corporation

in their handling of the proposed merger with First Niagara.[15]  To manufacture a breach of

fiduciary duty where none exists, Plaintiff misstates Pennsylvania law with regard to the scope of

the fiduciary duties of a director of a Pennsylvania corporation, impugns Paul Geraghty and the

rest of the Harleysville board with unsupportable accusations of bad faith and self-interest, and

tries to demonize common "deal protection" measures included in the Merger Agreement.

In fact, throughout the intensive process to save Harleysville from ruin, the Harleysville

directors repeatedly fulfilled their fiduciary duty to the company and forged a deal that preserved

value for Harleysville's shareholders.  Given the absence of any factual allegations supporting

Plaintiff's claims of director self-interest or bad faith, the decisions of the Harleysville directors

are protected by the business judgment rule and the even greater deference Pennsylvania law

---

decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.").

[15]    Under Pennsylvania law, "a fiduciary obligation includes both a duty of care and a duty of loyalty." Anchel v. Shea, 762 A.2d 346, 357 (Pa. Super. 2000).  Contrary to Plaintiff's misstatement of law, Compl. ¶32, a Pennsylvania director's fiduciary duty runs solely to the corporation, and not to the corporation and its shareholders as in states like Delaware. See 15 Pa.C.S. § 1712.

16

affords to corporate decisions regarding mergers and acquisitions. In addition, the terms of the

proposed merger, including the "deal protection" measures, are legitimate on their face and do

not constitute a breach of fiduciary duty. As a result, Plaintiff fails to plead allegations sufficient

to meet federal and state pleading standards governing Pennsylvania derivative actions. Iqbal,

129 S. Ct. at 1949; Cuker, 692 A.2d at 1042. Accordingly, Count II must be dismissed.

### 1. The Merger Agreement is the result of the hard work and dedication of the Harleysville board.

Harleysville's board acted admirably in the face of incredibly extremely trying

circumstances. As disclosed in the Proxy, Harleysville held an auction with sixteen private

equity funds and nine financial institutions to raise the capital required by the OCC. See Proxy

at 44-46. Although First Niagara appeared to be the most likely strategic partner, the

Harleysville board told management to continue to cultivate all other offers. Id. at 47. And,

amid increasingly difficult conditions and under strong pressure from the OCC to make a deal,

Harleysville worked with its financial advisors and legal counsel to negotiate the best possible

deal with First Niagara, getting good value for Harleysville's shareholders. Id. at 47-48.

### 2. Pennsylvania Business Corporation Law grants great deference to corporate directors who make decisions regarding mergers and acquisitions.

Given the yeoman's job done by the Harleysville board, the protections afforded to

corporate directors under Pennsylvania law are particularly noteworthy. Pennsylvania law grants

a statutory presumption of good faith to corporate directors. See 15 Pa.C.S. § 1715(d) ("Absent

breach of fiduciary duty, lack of good faith or self-dealing, any act as the board of directors, a

committee of the board or an individual director shall be presumed to be in the best interests of

the corporation."). Pennsylvania corporate directors also are protected by the business judgment

rule, which "insulates an officer or director of a corporation from liability for a business decision made in good faith if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation." Cuker, 547 Pa. at 692. This law's purpose is clear: "[T]he doctrine prevents courts from becoming enmeshed in complex corporate decision-making, a task they are ill-equipped to perform." Id. at 607.

In the context of mergers and acquisitions, "a board's decision is entitled to even greater deference than decisions in the ordinary course of business." Simmons v. Sutherland, No. 80-E of 1998, 1998 Pa. Dist. & Cnty. Dec. LEXIS 200, *17 (Pa. County Ct. Nov. 12, 1998). To wit, "[a] Pennsylvania board's refusal to 'pursue' an acquisition offer, or its refusal to be 'amenable to other offers,' is not a breach of fiduciary duty under Pennsylvania law." Id. at *18 (quoting B.T.Z., Inc. v. Grove, 803 F. Supp. 1019, 1023 (M.D. Pa. 1992)). To overcome the statutory presumption of good faith, Pennsylvania's governing statute provides that a plaintiff challenging a merger or acquisition must show, "by clear and convincing evidence that the disinterested directors did not assent to such act in good faith after reasonable investigation." See 15 Pa.C.S § 1715(d). As the drafters of this statute make clear, "only an affirmative showing at the highest standard of clear and convincing evidence, and only with respect to whether such directors acted in good faith after reasonable investigation as opposed to whether the reviewer believes the action to be reasonable in relation to the threat posed, or prudent – will warrant an overturning of the directors' actions." See Draftmen's Comment to BCL § 1715(d). Where there is no evidence of bad faith, merger-based decisions are not intended to be reviewable by the courts.

Plaintiff fails to meet this high standard. To show bad faith, Plaintiff alleges that "Geraghty along with the other Individual Defendants demonstrated more concern for their reputations, which were at risk as [Harleysville] came under greater regulatory scrutiny, than for maximizing shareholder value by agreeing to the Proposed Merger." See Compl. ¶¶ 50. Plaintiff's proposed theory – that the Harleysville directors breached their fiduciary duties because they were concerned about their reputations – is as completely unsupported as it is ludicrous. Plaintiff also asserts that "Geraghty's self-interest is readily apparent" because, in an article written in July 2009, Gergahty said he hoped he would have a position at First Niagara after the merger. Id. at ¶51. The complaint includes no other allegations to support this unsubstantiated contention.[16] To rebut the presumption of the business judgment rule in a matter involving a merger or acquisition, Plaintiff must make "an affirmative showing at the highest standard of clear and convincing evidence." See Draftmen's Comment to BCL § 1715(d). The conclusory allegations Plaintiff sets forth in his complaint are clearly insufficient to meet this standard. Accordingly, the Harleysville directors should be afforded the great deference due to them under Pennsylvania law, and the Merger Agreement is, as a matter of law, unassailable.

### 3.    The Harleysville-First Niagara Merger Agreement does not constitute a beach of fiduciary duty by the Harleysville Directors.

Plaintiff asserts that the Merger Agreement was a breach of fiduciary duty because (1) it failed to get the "highest value" for shareholders and (2) included fundamentally unfair "deal protection" devices. These assertions are wrong as a matter of law.

---

[16] Paul Geraghty will not continue his employment at First Niagara after the merger closes.

a.    **Under Pennsylvania law, the Harleysville Directors may take into account all corporate constituencies in discharging their duty to the corporation.**

Plaintiff incorrectly asserts that Harleysville directors have "an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium." See Compl. ¶32. First, Pennsylvania directors owe a fiduciary duty solely to the corporation. See 15 Pa.C.S. § 1712. In fulfilling this obligation, directors may consider various corporate constituencies, including "shareholders, employees, suppliers, customers and creditors of the corporation, and upon communities in which offices or other establishments of the corporation are located." 15 Pa.C.S. §1715(a)(1).[17] Contrary to Plaintiff's assertion,[18] Pennsylvania law is clear that directors "shall not be required, in considering the best interests of the corporation or the effects of any action, to regard any corporate interest or the interests of any particular group affected by such action as a dominant or controlling interest or factor." 15 Pa.C.S. §1715(b) (emphasis added).

Here, the Harleysville board approved a merger that will allow Harleysville to stay open, merged with a bank committed to maintaining high standards of excellence and support for the

---

[17]    In addition, directors are entitled to consider "[t]he short-term and long-term interests of the corporation" and, in the case of change of corporate control, "the resources, intent and conduct (past, stated and potential) of any person seeking to acquire control of the corporation." 15 Pa.C.S. §1715(a)(2-3).

[18]    Plaintiff appears to be relying on Delaware law instead of Pennsylvania law. See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173 (Del. 1986). Revlon has been specifically rejected in Pennsylvania. See Draftsmen's Comment to 15 Pa.C.S. § 1715(b) (stating that these provisions expressly "reject the rule articulated in Revlon that in an 'auction' or sale of the corporation the sole obligation of the directors is to obtain the highest possible price for the corporation's shares.").

communities that Harleysville has always served.  Moreover, the terms of the Merger Agreement give Harleysville's shareholders good value for their stock – far more than Harleysville's stock would be worth in the absence of a transaction.  Thus, the conduct of the Harleysville board is, in fact, exemplary and protected by Pennsylvania law.

> **b.    The terms of the Merger Agreement do not constitute a breach of fiduciary duty.**

Plaintiff alleges that the terms of the Merger Agreement constitute a breach of fiduciary duty.  See Compl. ¶53.  Specifically, Plaintiff alleges that the "no solicitation", the "matching rights" and the "termination fee" provisions (collectively, the deal protection provisions), as well as the exchange ratio adjustment provision, render the Merger Agreement flawed and unfair.  See Compl. ¶¶ 53-57; 59-60.  In addition, Plaintiff asserts that the separately negotiated Pledge Security Agreement is likewise a breach of fiduciary duty.  Id. at ¶58.  These claims are wrong as a matter of law and should be dismissed.

The challenged provisions of the Merger Agreement are well within the powers granted to Pennsylvania corporations.  The Harleysville board has the power to "accept . . . a fundamental change" such as a merger, agree to the terms of the merger, and "to reject" a "tender offer" from other parties.  15 Pa.C.S. § 1502(18).  The Committee Comment for § 1502 makes this point clear:  "Subsection (a)(18) is intended to make clear . . . that in the first instance the decision to accept or reject a merger or other similar proposal rests with the directors of the corporation since they are responsible for managing the affairs of the corporation."  Thus, even if the effect of the Merger Agreement is to block an offer from an unknown party, that is precisely within the statutory power given to Harleysville's board.

Section 1715(c)(3) of Pennsylvania Business Corporation Law explicitly envisions the scenario in which an action of a Pennsylvania corporate board is alleged to have blocked certain strategic offers while allowing another one to go through: "[T]he fiduciary duty of directors shall not be deemed to require them to act . . . solely because of the effect such action might have on an acquisition or potential or proposed acquisition of control of the corporation or the consideration that might be offered or paid to shareholders in such an acquisition." 15 Pa.C.S. §1715. Plaintiff argues that the Harleysville board acted unlawfully by including the deal protection and exchange ratio adjustment provisions at the behest of First Niagara. See Compl. ¶59. This argument is answered and refuted in full by §1715(c)(3) – the fiduciary duty of a Pennsylvania board does not require it to act, or refrain from action, as Plaintiff suggests. See also Keyser v. Commonwealth Nat'l Fin. Corp., 644 F. Supp. 1130, 1147 (M.D. Pa. 1986) (holding that business judgment rule protected a merger agreement that included deal protection devices).[19]

In the business judgment of the Harleysville board, these provisions – which were necessary to reach an agreement with First Niagara – were in the best interests of Harleysville.

---

[19]    Even courts in states that provide less deference than Pennsylvania – such as Delaware – have held that the types of deal protection measures used in the Merger Agreement are acceptable. Delaware law recognizes that deal protection devices are often "an integral part of the merits of the transaction." Brazen v. Bell Atlantic Corp., 695 A.2d 43, 50 (Del. 1997). See also McMillan v. Intercargo Corp., 768 A.2d 492, 505 (Del. Ch. 2000) (dismissing claims, noting that "it is difficult to see how a 3.5% [termination] fee [alone] would have deterred a rival bidder who wished to pay materially more . . . ."); Matador Capital Mgmt. Corp. v. BRC Holdings, Inc., 729 A.2d 280, 291 (Del. Ch. 1998) (dismissing claims, noting that termination fee and no shop provisions "do not appear to prevent a third party from making a bona fide offer at a higher price ...."); In re Pennaco Energy, Inc. S'holders Litig., 787 A.2d 691, 707 (Del. Ch. 2001) (rejecting claims that a matching rights provision was improper).

Plaintiff pleads no allegations to suggest that these provisions were the result of bad faith or the failure to conduct a reasonable investigation.[20]  Because these negotiated provisions comes squarely within the protections of Pennsylvania business law regarding mergers and acquisitions, Plaintiff cannot now second-guess the Harleysville board.  See 15 Pa.C.S. §§ 1712; 1715.

Plaintiff's challenge to the Pledge Security Agreement between Harleysville and First Niagara must also fail.  As disclosed in the Proxy, Harleysville remained the focus of close regulatory scrutiny even after entering into the Merger Agreement, and the OCC continued to pressure Harleysville to raise additional capital to satisfy the capital requirements Harleysville National Bank was ordered to meet by June 30, 2009.  See Proxy at 43; 49.  Because of the terms of the Merger Agreement, Harleysville was precluded from seeking capital from institutions other than First Niagara.  Moreover, the auction process had failed to uncover a viable source of capital beyond First Niagara, so a separate source of capital was not possible in any event.  Because of this regulatory pressure, and the danger than the OCC might take regulatory action against Harleysville prior to the closing of the merger, which could have provided First Niagara with the ability to walk away from the transaction, First Niagara agreed to loan $35 million to Harleysville and committed to loaning an additional $15 million if necessary to maintain Harleysville National Bank's ratios.  Id.[21]

---

[20]    To the contrary, the Proxy discloses that, after negotiation with Harleysville's legal counsel, "First Niagara did agree to reduce the economic impact of the [exchange ratio adjustment provision' by modifying the purchase price adjustments triggered by various levels of delinquent loans[.]"  See Proxy at 48.

[21]    Harleysville borrowed the additional $15 million at the end of December 2009.  See footnote 10, supra.

Plaintiff's assertion that this loan "virtually eliminate[s] the likelihood of any other bidder being able to overtake its offer," Compl. ¶58, evinces a misunderstanding of Harleysville's shaky position with its regulator. The OCC demanded that Harleysville improve the capital ratios of Harleysville National Bank or face severe regulatory action. Any unsolicited bidder for Harleysville would have had to immediately loan or invest sizable funds with Harleysville to improve Harleysville National Bank's capital ratios. Thus, a third party would need to spend the $50 million to shore up Harleysville National Bank's capital ratios, regardless of whether it was a loan to Harleysville (in the first instance) or a payment to First Niagara (to pay off its loan in the second instance). Thus, the First Niagara loan has never been an impediment to a third party making an unsolicited bid for Harleysville. More importantly, the Harleysville board's decision to enter the Pledge Security Agreement is protected by the business judgment rule, see 15 Pa.C.S. § 1715, and Plaintiff has no grounds to challenge it.[22]

*     *     *     *

The facts of this case demonstrate the wisdom of Pennsylvania law. The Harleysville board, with its intimate knowledge of Harleysville's financial challenges and regulatory problems, decided that a merger with First Niagara was necessary. In order to successfully negotiate the Merger Agreement with First Niagara, Harleysville consented to a series of provisions designed to give First Niagara comfort that the merger would close. These difficult choices are reserved by statute for corporate leaders, not individual shareholders or even this

---

[22]    Plaintiff also asserts that Harleysville and First Niagara entered into a loan-sale agreement, which Plaintiff characterizes as a scheme which allows First Niagara to "cherry-pick $80 million of [Harleysville's] loans in order to reduce [Harleysville's] outstanding indebtedness." Compl. ¶58. The Proxy discloses merely that such a transaction has been contemplated, but not that it has been entered. Proxy at 21.

Court.  See Cuker, 547 Pa. at 607 (Pennsylvania law is designed to prevent "courts from becoming enmeshed in complex corporate decision-making.").  As such, Count II of Plaintiff's complaint must fail.

## V.    CONCLUSION

Plaintiff's attempt to interrupt Harleysville's corporate process threatens to derail the merger, which would take value away from the very shareholders Plaintiff purports to represent. Despite Plaintiff's protestations to the contrary, Harleysville National Bank's fundamentals have not changed:  it remains under the close scrutiny of the OCC, its capital and liquidity are too low, and the danger of a run on the bank remains.  Without a transaction with First Niagara, Harleysville will lose ground as the bank revists the difficult days of July 2009.  This court should not allow this to happen.  Because Plaintiff fails to state a claim, Defendants respectfully request this Court to dismiss Plaintiff's complaint with prejudice.

Respectfully Submitted,

DECHERT LLP
Joseph A. Tate
Michael L. Kichline
Michael J. Newman
Cira Centre, 2929 Arch Street
Philadelphia PA 19104
(215) 994-4000

*Attorneys for Defendants*

January 15, 2010

25