# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANNY VALERIUS, Individually and On Behalf of Nominal Defendant HARLEYSVILLE NATIONAL CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> PAUL GERAGHTY, LEEANN B. BERGEY, WALTER E. DALLER, JR., HAROLD A. HERR, THOMAS C. LEAMER, STEPHANIE S. MITCHELL, A. ROSS MYERS, BRENT L. PETERS, JAMES A. WIMMER, JOHN J. CUNNINGHAM, III, JAMES E. McERLANE, and DEMETRA M. TAKES, <br><br> Defendants, <br><br> — and — <br><br> HARLEYSVILLE, NATIONAL CORPORATION, a Pennsylvania Corporation, <br><br> Nominal Defendant. | Civ. Action No. 09-6208 |

## <u>DECLARATION PURSUANT TO 28 U.S.C. § 1746</u>

The declarant, Michael J. Newman, deposes and states as follows under penalty of perjury:

1. I am an attorney duly licensed to practice before this Court and am an associate at Dechert LLP, counsel herein for the defendants.

2. I submit this Declaration in support of the Motion of Defendants to Dismiss the Complaint ("Motion") and to place before the Court certain documents relevant to this Motion.

3. Attached hereto as Exhibit A is a true and correct copy of the Background of the Merger Section of Harleysville's Filing on Schedule 14A with the SEC, dated December 17, 2009 (the "Proxy").

4. Attached hereto as Exhibit B is a true and correct copy of the Proxy.

5. Attached hereto as Exhibit C is a true and correct copy of Harleysville's Press Release dated July 27, 2009.

6. Attached hereto as Exhibit D is a true and correct copy of Harleysville's Form 8-K, dated December 23, 2009.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of January, 2010.

Michael J. Newman
Dechert LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
215-994-4000

# Exhibit A

Table of Contents

National Corporation shareholder who has not exchanged shares of Harleysville National Corporation's common stock for the purchase price in accordance with the merger agreement before that time may look only to First Niagara for payment of the purchase price for these shares and any unpaid dividends or distributions after that time. Nonetheless, First Niagara, Harleysville National Corporation, the exchange agent or any other person will not be liable to any Harleysville National Corporation shareholder for any amount properly delivered to a public official under applicable abandoned property, escheat or similar laws.

**Treatment of Harleysville National Corporation Stock Options and Other Equity Arrangements**

In accordance with the merger agreement, at the effective time of the merger, each option to purchase shares of Harleysville National Corporation common stock outstanding and unexercised immediately prior to the effective time of the merger will become vested, to the extent not already vested, and immediately exercisable. At the effective time of the merger, each holder of an option to purchase shares of Harleysville National Corporation common stock will receive an option to purchase the number of shares of First Niagara common stock equal to the product of the number of Harleysville National Corporation common stock shares subject to the Harleysville National Corporation option and the exchange ratio (rounded down to the nearest share) and with an exercise price per share equal to the exercise price per share of the Harleysville National Corporation option divided by the exchange ratio, provided that the exercise price is rounded up to the nearest cent.

Pursuant to the merger agreement, Harleysville National Corporation has agreed to terminate the Harleysville National Corporation Dividend Reinvestment and Stock Purchase Plan as soon as practicable following the date of the merger agreement, but no later than the effective time of the merger.

**Background of the Merger**

In November of 2008, faced with deteriorating economic conditions, the management and board of directors of Harleysville National Corporation concluded that it was in the best interest of Harleysville National Corporation and its shareholders to apply for $120 million of funding from the Troubled Asset Relief Program ("TARP"), which was the maximum amount for which Harleysville National Corporation could apply.

At the end of 2008, Harleysville National Bank's total risk-based capital position fell to "adequately capitalized" from "well-capitalized." As a result of this deterioration, Harleysville National Corporation became subject to greater regulatory scrutiny, was generally prohibited from accepting brokered deposits and its insurance premiums with the FDIC increased. To increase its capital levels and as part of an effort to regain its status as a well-capitalized bank holding company, Harleysville National Corporation decreased the dividend on Harleysville National Corporation common stock from $0.20 to $0.10 per share for the first quarter of 2009 and Harleysville National Corporation retained J.P. Morgan Securities Inc. as its financial advisor. During the first quarter of 2009, Harleysville National Corporation faced a difficult economic environment and continued turmoil in the financial markets, as well as markedly increasing loan losses and non-performing assets, which contributed significantly to Harleysville National Bank's worsening capital position.

During the early months of 2009, the management and board of directors of Harleysville National Corporation engaged in frequent discussions with the OCC about the best manner in

42

Table of Contents

which to restore Harleysville National Bank to "well-capitalized" status under the OCC's regulations as well as potentially higher capital requirements the OCC expected Harleysville National Bank to meet. On March 25, 2009, Harleysville National Corporation's and Harleysville National Bank's management presented to the OCC a broad-based plan to restore the bank to "well—capitalized" status by December 31, 2009.

On April 22, 2009, the OCC notified Harleysville National Bank of regulatory concerns based on credit, capital and earnings concerns, and also advised Harleysville National Bank that the OCC expected to initiate an enforcement action to address Harleysville National Bank's regulatory ratings after completion of its examination activities which were set to begin in June 2009. The OCC also sent to Harleysville National Bank a notice of intent to establish individual minimum capital ratios ("IMCRs") for Harleysville National Bank in excess of those generally required to achieve "well-capitalized" status and in excess of those previously discussed with the OCC. The notice also required Harleysville National Bank to submit a capital plan to the OCC by May 29, 2009 detailing how Harleysville National Bank would achieve and maintain the proposed IMCRs. Representatives of the OCC met with the board of directors of Harleysville National Corporation and Harleysville National Bank on April 23, 2009 to discuss these concerns. The OCC also requested that Harleysville National Bank provide bi-weekly reports to the OCC describing its actions to improve capital levels during each subsequent two-week period. In light of these regulatory actions and in response to Harleysville National Corporation's deteriorating capital position, the board of directors of Harleysville National Corporation determined to further decrease the quarterly dividend on Harleysville National Corporation common stock to $0.01 per share for the second quarter of 2009. The board also instructed Harleysville National Corporation management to continue exploring options to raise capital with assistance from JPMorgan. Additionally, based on management's belief, after discussions with the OCC, that Harleysville National Corporation's TARP application was unlikely to be approved, the board of directors also authorized the withdrawal of Harleysville National Corporation's TARP application.

Harleysville National Corporation retained Paul, Hastings, Janofsky & Walker LLP ("PHJW") as regulatory counsel to assist Harleysville National Corporation with regulatory matters. Throughout May, Harleysville National Corporation's management continued to discuss with the OCC the appropriate capital ratios for the bank.

In a letter dated May 28, 2009, the OCC notified Harleysville National Bank that it had established IMCRs requiring Harleysville National Bank to have a Tier 1 leverage ratio of at least eight percent (8%) of adjusted total assets, a Tier 1 risk-based capital ratio of at least ten percent (10%) and a total risk-based capital ratio of at least twelve percent (12%), each of which exceeded the well-capitalized ratios generally applicable to banks under then-current regulations, and to achieve the IMCRs by June 30, 2009. Furthermore, at a meeting at the OCC's Northeast District Office on June 4, 2009, Harleysville National Bank was again informed by the OCC that Harleysville National Bank may receive a formal enforcement action upon completion of the ongoing OCC examination of Harleysville National Bank, which would address, among other things, any failure by Harleysville National Bank to comply with the IMCRs by June 30, 2009. On June 8, 2009, Harleysville National Corporation publicly-announced strategic initiatives designed to strengthen the capital base and position of the bank in light of the challenging economic environment and regulatory actions. These initiatives included raising additional capital, executing potential asset sales, repositioning Harleysville National Corporation's balance sheet and restructuring funding sources.

43

Table of Contents

Beginning in May 2009, senior management of Harleysville National Corporation instructed JPMorgan to contact private-equity investors regarding a possible transaction designed to improve Harleysville National Corporation's capital position. JPMorgan contacted 16 potential private-equity investors and during May and June 2009, 11 of the 16 private equity investors expressed initial interest in an investment in Harleysville National Corporation and entered into confidentiality agreements. Harleysville National Corporation's management made presentations to nine of these 11 private equity investors. Thereafter, Harleysville National Corporation received four indications of interest from private equity investors. In June 2009, representatives of JPMorgan discussed each of these indications of interest with the Harleysville National Corporation board of directors.

Harleysville National Bank was unable to satisfy with the IMCRs by June 30, 2009 and continued to operate thereafter at capital levels below the mandated IMCRs. Harleysville National Bank continued to report to the OCC, on a bi-weekly basis, and to engage in discussions with the OCC regarding Harleysville National Bank's financial condition and efforts to raise capital. Harleysville National Corporation management was becoming increasingly concerned about the potential impact of future regulatory action, Harleysville National Bank's failure to achieve the OCC-mandated IMCRs and future negative developments in Harleysville National Corporation's operations, any of which would have a severe and adverse effect on Harleysville National Corporation.

On June 26, 2009, John R. Koelmel, the President and Chief Executive Officer of First Niagara, asked to have a phone conversation with Paul D. Geraghty, President and Chief Executive Officer of Harleysville National Corporation, about a potential combination of the companies. During a conversation on June 28, 2009, Mr. Koelmel did not mention, and Messrs. Koelmel and Geraghty did not discuss, any firm offer from First Niagara to acquire or merge with Harleysville National Corporation. On June 29, 2009, during an executive session, the board of directors of Harleysville National Corporation reiterated its desire to pursue a capital infusion transaction from private equity sources, but authorized Mr. Geraghty to meet with Mr. Koelmel to discuss a potential transaction in greater detail. Messrs. Geraghty and Koelmel subsequently met on July 1, 2009 to discuss the opportunity to partner and to share preliminary information regarding a potential acquisition of Harleysville National Corporation by First Niagara.

On July 2, 2009, Harleysville National Corporation retained Dechert LLP as special counsel to assist Harleysville National Corporation in a transaction to satisfy the IMCRs.

On July 2, 2009, the company received a draft term sheet from three of the private equity investors that had previously provided separate indications of interest (collectively, "Investor X"). The term sheet provided by Investor X included, among other terms, a "termination fee" which Harleysville National Corporation's management and legal and financial advisors believed to be excessive. In subsequent discussions and correspondence, Investor X indicated that it would not participate in an auction process in connection with Harleysville National Corporation's solicitation of potential equity investments and Investor X sought to limit the ability of Harleysville National Corporation's board of directors to evaluate competing proposals after a firm bid date mandated by Investor X. On July 10, 2009, Investor X withdrew its proposal citing Investor X's refusal to participate in an auction process and Harleysville National Corporation's failure to sign a term sheet from Investor X, which proposed terms and conditions that would have limited and dictated the manner in which Harleysville National Corporation could run a bidding process.

44

Table of Contents

On July 13, 2009, the Federal Home Loan Bank informed Harleysville National Bank that it required dollar-for-dollar collateral to secure Harleysville National Bank's borrowings. In light of this request for collateral, and because other counterparties to loan agreements with Harleysville National Corporation and Harleysville National Bank also had the right to require collateral from the company to secure their loans, Harleysville National Corporation's management and board of directors became increasingly concerned about Harleysville National Bank's liquidity position. In addition, given the relatively concentrated geographic location of Harleysville National Bank's depositor base, management and the board of directors of Harleysville National Corporation were acutely aware of the negative impact adverse publicity about the bank's liquidity and credit positions could have on its total deposits.

Of the two remaining private equity investors who had provided written indications of interest, both performed on-site due diligence at the company's headquarters in Harleysville, Pennsylvania. One investor ("Investor Y") performed substantial due diligence during the weeks of July 6 and July 13, 2009. On July 20, 2009, after completing due diligence, Investor Y informed Harleysville National Corporation that it was no longer interested in providing capital to Harleysville National Corporation primarily because it had concluded that Harleysville National Corporation's operating infrastructure was insufficient to serve as a platform for Investor Y's expansion plans.

On July 15, 2009 members of the First Niagara senior management team, including Mr. Koelmel, met with members of Harleysville National Corporation's senior management, including Mr. Geraghty, at a Harleysville National Corporation facility to discuss information regarding the companies and a potential transaction.

On July 15, 2009, Harleysville National Bank received written notice from the OCC that it was deemed to be in "troubled condition." Throughout much of July, Harleysville National Corporation's management had frequent conversations with officials from the OCC about Harleysville National Bank's financial condition and regulatory status.

The third private equity investor who had provided an indication of interest ("Investor Z") performed due diligence on site at the company during the week of July 20, 2009. In addition, Harleysville National Corporation's management met with Investor Z on several occasions and certain members of Harleysville National Corporation's board of directors met with Investor Z. As Harleysville National Corporation management evaluated a potential transaction with Investor Z, Harleysville National Corporation's regulatory counsel expressed concerns over Investor Z's ability to obtain the regulatory approvals on a timely basis required for Investor Z to make a significant equity investment in Harleysville National Corporation. Additionally, Harleysville National Corporation's management and board of directors seriously questioned Investor Z's ability to close a transaction with Harleysville National Corporation because Investor Z was not a well-known financial institution with a track record of completing capital infusion transactions with banks. Moreover, Investor Z's failure to present a firm offer for a transaction with Harleysville National Corporation and the extreme negativity expressed by Investor Z about Harleysville National Bank's credit portfolio, investment portfolio and operating platform as Investor Z completed its due diligence led management and the board of directors of Harleysville National Corporation to believe that there was no assurance Investor Z would even submit a firm offer for a transaction. Investor Z had also previously indicated that it would be willing to pay an implied per share price which was less than the then-current trading price of Harleysville National Corporation stock and that it would seek to own a majority of the stock on a post-transaction basis.

45

Table of Contents

In a letter dated July 20, 2009, Visa, provider of Harleysville National Bank's check cards, indicated that it would demand collateral for outstanding transaction volume. Harleysville National Corporation management grew increasingly concerned that future regulatory actions or the passage of time and future Harleysville National Corporation public announcements without a capital infusion satisfying the IMCRs could cause other counterparties to require collateral or otherwise take actions that would constrain Harleysville National Bank's liquidity.

As a result of Harleysville National Corporation's continued need for capital to satisfy the mandated IMCRs, the decreasing likelihood that necessary capital could be obtained through a private equity transaction on attractive terms on a timely basis and the interest expressed by First Niagara, in July Harleysville National Corporation entered into a revised engagement letter with JPMorgan providing for expanded services in connection with a potential sale of Harleysville National Corporation. On or about July 6, 2009, senior management of Harleysville National Corporation instructed JPMorgan to begin contacting financial institutions regarding a possible combination with Harleysville National Corporation. Nine financial institutions were contacted, of which eight expressed initial interest in a proposed combination. Ultimately, four of the nine financial institutions withdrew their indications of interest and three financial institutions (in addition to First Niagara) provided oral or written indications of interest pertaining to a combination with Harleysville National Corporation prior to meetings with Harleysville National Corporation's management and without conducting extensive due diligence. Of these three preliminary indications of interest, two stated a per share price that was lower than that which was offered by First Niagara. The third proposal provided a range of possible price per share, only 25% of which was above the price offered by First Niagara. In analyzing this share price range, representatives of JPMorgan and senior management advised the Harleysville National Corporation board of directors that, based upon past experience, it was unlikely that this institution, which had done only limited due diligence and had not accepted an offer from Harleysville National Corporation management to hear a management presentation, would offer a per-share price at the higher part of the range after the completion of financial due diligence on Harleysville National Corporation, including a review of Harleysville National Corporation's loan portfolio.

In light of the company's ongoing non-compliance with the IMCRs, a projected loss for the second quarter of approximately $11 million, mounting credit losses and non-performing assets and concerns regarding liquidity (including deposit outflows), Harleysville National Corporation's management believed that it was imperative that Harleysville National Corporation announce a capital infusion or sale transaction prior to, or in connection with, the announcement of Harleysville National Corporation's second-quarter financial results, which were scheduled to be announced on July 31, 2009. Management believed that failure to enter into a transaction within that time-frame could substantially impair Harleysville National Corporation's ability to operate in the normal course and its ability to enter into an equity infusion or merger transaction in the future as well as have a significant adverse impact on Harleysville National Corporation's liquidity, deposit base and stock price. Moreover, management believed that expeditiously entering into a transaction was necessary to avoid further and more severe regulatory action against Harleysville National Bank by the OCC and the consequences of such actions on Harleysville National Corporation and its shareholders.

First Niagara performed on-site due diligence at Harleysville National Corporation headquarters during the beginning of the week of July 20, 2009 and Mr. Koelmel met with Mr. Geraghty and certain of Harleysville National Corporation's independent directors on the evening of July 21, 2009.

46

Table of Contents

On the evening of Wednesday, July 22, 2009 First Niagara provided Harleysville National Corporation with a written indication of interest at a price per share of $5.50 in a stock-for-stock transaction with a fixed exchange ratio to be set prior to the signing of definitive documentation. The board of directors of Harleysville National Corporation and Harleysville National Bank met in joint session on the morning of July 23, 2009, at a regularly scheduled meeting attended by representatives of JPMorgan, Dechert LLP and PHJW. The board engaged in extensive discussion of Investor Z and the various potential financial institution acquirers. Members of the company's management and board of directors voiced concerns over a transaction with Investor Z because of the relatively low price implied by Investor Z's preliminary indications as well as Investor Z's proposal that it obtain a majority of the company's stock on a post-transaction basis. Also, the company's management underscored that there was no assurance that Investor Z would put forth a firm offer and that any transaction with Investor Z would be accompanied by relatively high levels of execution risk because of the uncertainty surrounding the receipt of required regulatory approvals and Investor Z's unproven track record in completing similar transactions. The board considered management's concerns over the adverse effects that the second quarter earnings release and the inability to enter into a transaction or otherwise satisfy the IMCRs by the end of July could have on the company's liquidity, deposit base, stock price and its ability to enter into such a transaction in the future. The board also engaged in extensive discussion of the possibility and consequences of further regulatory action by the OCC on Harleysville National Corporation and Harleysville National Corporation's shareholders. The board of directors directed JPMorgan and management to continue diligently cultivating any other possible offers.

Along with its written offer, First Niagara also provided a draft of the proposed merger agreement which the board discussed at its July 23rd meeting. The proposed merger agreement contained a mechanism that would adjust the exchange ratio downward based upon the amount of delinquent loans (as defined by, and calculated pursuant to, the draft merger agreement) Harleysville National Corporation had prior to the closing date (the "Price Adjustment Mechanism"). At this meeting, representatives of JPMorgan also presented a brief overview of First Niagara, including with respect to its recent financial and stock performance, its current branch locations, recent analyst recommendations, its senior management and recent merger and acquisition activity.

After discussions about the draft terms with representatives of JPMorgan, Dechert LLP and PHJW, the board instructed Harleysville National Corporation management and advisors to (i) pursue negotiations with First Niagara to increase the per share purchase price, reduce the termination fee proposed by First Niagara, eliminate or modify the Price Adjustment Mechanism and increase the likelihood that the transaction would be consummated; (ii) conduct due diligence on First Niagara in light of the fact that Harleysville National Corporation shareholders would receive First Niagara stock in the proposed transaction, focusing on First Niagara's ability to integrate multiple transactions (considering First Niagara's then-pending acquisition of branches from PNC) as well as the combined capital base of Harleysville National Corporation and First Niagara; and (iii) continue to pursue aggressively other available alternative transactions or potential acquirers. In light of the board's instructions, Harleysville National Corporation management, Dechert LLP, PHJW and First Niagara, along with its legal counsel Luse Gorman Pomerenk & Schick, P.C., negotiated the merger agreement from July 23rd through July 27th.

On July 25, 2009, members of Harleysville National Corporation's management team traveled to Lockport, New York to meet with representatives of First Niagara. During this meeting, members of Harleysville National Corporation's management team and Harleysville National Corporation's legal counsel and representatives of JPMorgan (participating via

Table of Contents

teleconference) attended business and legal due diligence meetings with management of First Niagara. Over the course of this due diligence trip, Harleysville National Corporation's management team satisfied itself that First Niagara could effectively integrate multiple acquisitions and that the combined capital base of First Niagara and Harleysville National Corporation would benefit Harleysville National Corporation's shareholders, depositor and customer base, and other constituencies. Additionally, Harleysville National Corporation's management noted that First Niagara had access to $150 million in additional capital as a result of the impending consummation of its branch acquisition transaction with PNC.

On July 26, 2009, the board of directors of First Niagara held a special meeting for the purpose of approving the proposed merger. The board of directors of First Niagara unanimously approved the merger transaction.

Late in the afternoon of July 26, 2009, Dechert LLP advised Harleysville National Corporation management that it believed negotiations with First Niagara and its advisors over the draft merger agreement were substantially complete. Accordingly, on the evening of July 26, 2009 the board of directors of Harleysville National Corporation reconvened. Representatives of JPMorgan provided the board with a review of the results to date of the search for a private equity investor or a strategic acquirer. Representatives of JPMorgan then reviewed with the Harleysville National Corporation board the financial terms of the First Niagara proposal, including the implied transaction value, form of consideration and the Price Adjustment Mechanism. Representatives of Dechert LLP then discussed with Harleysville National Corporation's board of directors their legal duties in connection with consideration of a possible strategic transaction and presented an in-depth review of the legal terms of the merger agreement. During this discussion, representatives from Dechert LLP explained that in accordance with the board's instructions, management and its advisors negotiated for, but did not receive, an increase in the per-share purchase price offered by First Niagara. However, First Niagara did agree to reduce the economic impact of the Price Adjustment Mechanism by modifying the purchase price adjustments triggered by various levels of delinquent loans and by increasing the threshold providing a First Niagara termination right from $300 million to $350 million of delinquent loans and that First Niagara also agreed to other modifications that lessened the risk that the closing conditions to the merger would not be satisfied.

Representatives of JPMorgan then made a presentation which included discussion of the matters described under "Fairness Opinion of Harleysville National Corporation's Financial Advisor," including but not limited to an extensive review of the implied per-share valuation range of Harleysville National Corporation's common stock. At the conclusion of the presentation, JPMorgan delivered to Harleysville National Corporation's board of directors its oral opinion, subsequently confirmed in writing, that based upon and subject to the factors and assumptions stated in that opinion, as of such date, the exchange ratio of 0.474 shares of First Niagara stock to be received in respect of each share of Harleysville National Corporation common stock in the transaction was fair to Harleysville National Corporation common shareholders from a financial point of view. The JPMorgan representatives noted that the fairness opinion assumed that the final exchange ratio would be the initial 0.474 exchange ratio and that the level of delinquent loans would not result in any adjustment to that ratio. The board of directors of Harleysville National Corporation and counsel then reviewed and discussed JPMorgan's fairness opinion, including the fact that the fairness opinion would not address any exchange ratio that may result if the Price Adjustment Mechanism were implicated. Following these discussions and extensive review and discussion among Harleysville National Corporation's directors, including consideration of the implied per-share valuations presented by JPMorgan and the other factors described under "—Reasons for the Merger; Recommendation of Harleysville

48

Table of Contents

National Corporation's Board of Directors" and consideration of JPMorgan and Dechert LLP's presentations, Harleysville National Corporation's board of directors unanimously approved the merger agreement and the transactions contemplated thereby and authorized Harleysville National Corporation's officers to negotiate the final form of the agreement.

During the early morning of July 27, 2009, representatives of Harleysville National Corporation and First Niagara management and outside legal advisors worked to finalize the merger agreement and related documents. Thereafter, the parties executed the merger agreement. The transaction was announced prior to the opening of the financial markets in New York City on July 27, 2009.

Subsequent to the signing of the merger agreement, in communications with Harleysville National Corporation's management and directors the OCC reiterated that Harleysville National Bank should continue to seek to raise capital in light of the IMCRs. Due to certain restrictions imposed by the merger agreement on Harleysville National Corporation and its subsidiaries' ability to raise additional capital, Harleysville National Corporation was generally prohibited from seeking capital from sources other than First Niagara. Harleysville National Corporation and First Niagara and their respective counsel discussed various potential transactions between Harleysville National Corporation and First Niagara designed to alleviate any continuing regulatory pressure on Harleysville National Bank. Ultimately, the parties agreed to a loan transaction whereby First Niagara would initially loan $35 million to Harleysville National Corporation that would be downstreamed to Harleysville National Bank as additional capital and would commit to lend an additional $15 million if necessary to maintain the capital ratios of Harleysville National Bank at levels at least equal to those of a "Well Capitalized" bank under applicable regulatory standards. Based upon the analysis of the parties and their respective advisors, this loan transaction, coupled with the sale of various assets from Harleysville National Bank to First Niagara Bank, would increase Harleysville National Bank's capital ratios to ratios consistent with those of a "well capitalized" bank, though still below the IMCRs. When approached by Harleysville National Corporation and First Niagara prior to the consummation of these proposed transactions, representatives of the OCC expressed their support. On December 4, 2009, the $35 million loan from First Niagara to Harleysville National Corporation closed in accordance with its terms, and the stock of Harleysville National Bank was pledged to First Niagara. Also on such date, and based on the foregoing, the OCC extended the deadline for compliance with the previously announced IMCRs from June 30, 2009 to March 31, 2010. The extension for compliance is conditioned upon Harleysville National Bank achieving and maintaining capital ratios at least equal to those of a "well-capitalized" bank under applicable regulations and its continuing progress in addressing certain concerns raised by the OCC in its most recent examination of Harleysville National Bank.

**Recommendation of the Harleysville National Corporation Board of Directors and Reasons for the Merger**

**After careful consideration, Harleysville National Corporation's board of directors determined that the merger agreement and the transactions contemplated by the merger agreement were advisable and in the best interests of Harleysville National Corporation and its shareholders and approved the merger agreement and the transactions contemplated by the merger agreement, including the merger. Accordingly, Harleysville National Corporation's board recommends that Harleysville National Corporation shareholders vote "FOR" adoption of the merger agreement at the Harleysville National Corporation special meeting.**

# Exhibit B

DEFM14A 1 g21599defm14a.htm DEFM14A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# SCHEDULE 14A INFORMATION

**Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No. _)**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material Pursuant to Rule 14a-12

# Harleysville National Corporation

(Name of Registrant as Specified In Its Charter)

Not Applicable

(Name of Person(s) Filing Proxy Statement if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)    Title of each class of securities to which transaction applies:

    (2)    Aggregate number of securities to which transaction applies:

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)    Proposed maximum aggregate value of transaction:

    (5)    Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which

the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)     Amount Previously Paid:

_____

(2)     Form, Schedule or Registration Statement No.:

_____

(3)     Filing Party:

_____

(4)     Date Filed:

_____

Table of Contents



**To the Shareholders of Harleysville National Corporation:**

### A Merger Proposal — Your Vote Is Very Important

On July 26, 2009, the board of directors of Harleysville National Corporation unanimously approved a merger agreement between Harleysville National Corporation and First Niagara Financial Group, Inc. pursuant to which Harleysville National Corporation will be merged with and into First Niagara Financial Group, Inc. Harleysville National Corporation is sending you this document to ask you to vote on the adoption of the merger agreement with First Niagara Financial Group, Inc.

If the merger agreement is adopted and the merger is subsequently completed, each outstanding share of Harleysville National Corporation common stock will be converted into the right to receive 0.474 share of First Niagara Financial Group, Inc. common stock for each share of Harleysville National Corporation common stock, subject to adjustment as described in the merger agreement and this document. The value of the merger consideration will fluctuate with the market price of First Niagara Financial Group Inc.'s common stock and is subject to adjustment based on outstanding loan delinquencies of Harleysville National Corporation prior to the closing and may also be adjusted under a limited set of other circumstances, as more fully described in "The Merger and the Merger Agreement-Merger Consideration." Based on the average five day closing price of First Niagara Financial Group Inc.'s common stock ended July 22, 2009, the 0.474 exchange ratio represented approximately $5.50 in value for each share of Harleysville National Corporation's common stock. Based on the closing price of First Niagara Financial Group, Inc.'s common stock on December 7, 2009, the 0.474 exchange ratio represented approximately $6.29 in value for each share of Harleysville National Corporation's common stock. You should obtain current stock price quotations for First Niagara Financial Group Inc.'s and Harleysville National Corporation's common stock. First Niagara Financial Group, Inc. common stock trades on the Nasdaq Global Select Market under the symbol "FNFG" and Harleysville National Corporation trades on the Nasdaq Global Select Market under the symbol "HNBC."

**Your board of directors has unanimously determined that the merger and the merger agreement are fair and in the best interests of Harleysville National Corporation and its shareholders and unanimously recommends that you vote "FOR" adoption of the merger agreement.** The merger cannot be completed unless a majority of the issued and outstanding shares of common stock of Harleysville National Corporation vote to <u>adopt</u> the merger agreement. Whether or not you plan to attend the special meeting of shareholders, please take the time to vote by completing the enclosed proxy card and mailing it in the enclosed envelope. **If you sign, date and mail your proxy card without indicating how you want to vote, your proxy will be counted as a vote "FOR" adoption of the merger agreement. If you fail to vote, or you do not instruct your broker how to vote any shares held for you in "street name," it will have the same effect as voting "AGAINST" the merger agreement.**

This proxy statement-prospectus gives you detailed information about the special meeting of shareholders to be held on January 22, 2010, the merger and other related matters. You should carefully read this entire document, including the appendices. **In particular, you should carefully consider the discussion in the section entitled "Risk Factors" on page 20.**

On behalf of the board of directors, I thank you for your prompt attention to this important matter.

*Walter E. Daller Jr.*

Walter E. Daller
Chairman of the Board

Table of Contents

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities to be issued in connection with the merger or determined if this document is accurate or complete. Any representation to the contrary is a criminal offense.

The securities to be issued in connection with the merger are not savings accounts, deposits or other obligations of any bank or savings association and are not insured by the Federal Deposit Insurance Corporation or any other governmental agency.

This document is dated December 9, 2009, and is first being mailed on or about December 17, 2009.

Table of Contents

## WHERE YOU CAN FIND MORE INFORMATION

Both First Niagara Financial Group, Inc. and Harleysville National Corporation file annual, quarterly and special reports, proxy statements and other information with the Securities and Exchange Commission. You may obtain copies of these documents by mail from the public reference room of the Securities and Exchange Commission at 100 F Street, N.E., Room 1580, Washington, D.C. 20549, at prescribed rates. Please call the Securities and Exchange Commission at (800) SEC-0330 for further information on the public reference room. In addition, First Niagara Financial Group, Inc. and Harleysville National Corporation file reports and other information with the Securities and Exchange Commission electronically, and the Securities and Exchange Commission maintains a web site located at http://www.sec.gov containing this information.

This document incorporates by reference important business and financial information about First Niagara Financial Group, Inc. and Harleysville National Corporation from documents that are not included in or delivered with this proxy statement-prospectus. These documents are available without charge to you upon written or oral request at the applicable company's address and telephone number listed below:

First Niagara Financial Group, Inc.              Harleysville National Corporation
726 Exchange Street                              483 Main Street
Suite 618                                        Harleysville, Pennsylvania 19438
Buffalo, New York 14210                          Attention: Liz Chemnitz
Attention: John Mineo, Corporate Secretary       (800) 423-3955
(716) 819-5859

**To obtain timely delivery, you must request the information no later than January 15, 2010.**

First Niagara Financial Group, Inc. has filed a registration statement on Form S-4 to register with the Securities and Exchange Commission up to 21,140,400 shares of First Niagara Financial Group, Inc. common stock. This document is a part of that registration statement. As permitted by Securities and Exchange Commission rules, this document does not contain all of the information included in the registration statement or in the exhibits or schedules to the registration statement. You may read and copy the registration statement, including any amendments, schedules and exhibits at the addresses set forth above. Statements contained in this document as to the contents of any contract or other documents referred to in this document are not necessarily complete. In each case, you should refer to the copy of the applicable contract or other document filed as an exhibit to the registration statement. This document incorporates by reference documents that First Niagara Financial Group, Inc. and Harleysville National Corporation have previously filed with the Securities and Exchange Commission. They contain important information about the companies and their financial condition. See "Incorporation of Certain Documents by Reference" on page 92.

First Niagara Financial Group, Inc. common stock is traded on the Nasdaq Global Select Market under the symbol "FNFG," and Harleysville National Corporation common stock is traded on the Nasdaq Global Select Market under the symbol "HNBC."

(ii)

Table of Contents

**HARLEYSVILLE NATIONAL CORPORATION**
**483 MAIN STREET**
**HARLEYSVILLE, PENNSYLVANIA 19438**

**NOTICE OF THE SPECIAL MEETING OF SHAREHOLDERS**
**TO BE HELD ON JANUARY 22, 2010**

NOTICE IS HEREBY GIVEN that a special meeting of the shareholders of Harleysville National Corporation will be held at Best Western, The Inn at Towamencin, 1750 Sumneytown Pike, Kulpsville, Pennsylvania 19443, at 10:30 a.m., New York time, on January 22, 2010, for the following purposes:

1. To consider and vote upon a proposal to adopt the Agreement and Plan of Merger by and between First Niagara Financial Group, Inc., and Harleysville National Corporation, dated as of July 26, 2009, and the transactions contemplated by the merger agreement, as discussed in the attached proxy statement-prospectus.

2. To transact any other business that properly comes before the special meeting of shareholders, or any adjournments or postponements of the special meeting, including, without limitation, a motion to adjourn the special meeting to another time or place for the purpose of soliciting additional proxies in order to adopt the merger agreement and the merger or otherwise.

The proposed merger is described in more detail in this proxy statement-prospectus, which you should read carefully in its entirety before voting. A copy of the merger agreement is attached as Appendix A to this document. Only Harleysville National Corporation shareholders of record as of the close of business on December 7, 2009, are entitled to notice of and to vote at the special meeting of shareholders or any adjournments of the special meeting.

**Your vote is very important. To ensure your representation at the special meeting of shareholders, please complete, execute and promptly mail your proxy card in the return envelope enclosed.** This will not prevent you from voting in person, but it will help to secure a quorum and avoid added solicitation costs. Your proxy may be revoked at any time before it is voted.

BY ORDER OF THE BOARD OF
DIRECTORS

*Walter E. Daller Jr.*

Walter E. Daller, Jr.
Chairman of the Board

Harleysville, Pennsylvania
December 17, 2009

**HARLEYSVILLE NATIONAL CORPORATION'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT YOU VOTE "FOR" ADOPTION OF THE MERGER AGREEMENT.**

**PLEASE MARK, SIGN, DATE AND RETURN YOUR PROXY CARD PROMPTLY, WHETHER OR NOT YOU PLAN TO ATTEND THE SPECIAL MEETING OF SHAREHOLDERS.**

**DO NOT SEND STOCK CERTIFICATES WITH THE PROXY CARD. UNDER SEPARATE COVER, WHICH WILL BE SENT FOLLOWING THE CLOSING OF THE MERGER, YOU WILL RECEIVE INSTRUCTIONS FOR DELIVERING YOUR STOCK CERTIFICATES.**

# TABLE OF CONTENTS

| | Page |
|---|---|
| WHERE YOU CAN FIND MORE INFORMATION | ii |
| QUESTIONS AND ANSWERS ABOUT VOTING AT THE SPECIAL MEETING OF SHAREHOLDERS | 1 |
| SUMMARY | 3 |
| SELECTED HISTORICAL FINANCIAL DATA FOR FIRST NIAGARA FINANCIAL GROUP, INC. AND HARLEYSVILLE NATIONAL CORPORATION | 10 |
| UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION RELATING TO THE HARLEYSVILLE ACQUISITION | 13 |
| COMPARATIVE PRO FORMA PER SHARE DATA | 18 |
| RISK FACTORS | 20 |
| HARLEYSVILLE NATIONAL CORPORATION SPECIAL MEETING OF SHAREHOLDERS | 34 |
| THE MERGER AND THE MERGER AGREEMENT | 36 |
| COMPARISON OF SHAREHOLDERS' RIGHTS | 82 |
| DESCRIPTION OF CAPITAL STOCK OF FIRST NIAGARA FINANCIAL GROUP, INC. | 86 |
| CERTAIN PROVISIONS OF THE FIRST NIAGARA FINANCIAL GROUP, INC. CERTIFICATE OF INCORPORATION AND BYLAWS | 87 |
| EXPERTS | 89 |
| LEGAL OPINIONS | 90 |
| ADJOURNMENT OF THE SPECIAL MEETING | 90 |
| CERTAIN BENEFICIAL OWNERS OF HARLEYSVILLE NATIONAL CORPORATION COMMON STOCK | 90 |
| OTHER MATTERS | 92 |
| INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE | 92 |
| FORWARD-LOOKING STATEMENTS | 94 |

APPENDICES

| | |
|---|---|
| A. Agreement and Plan of Merger by and between First Niagara Financial Group, Inc., and Harleysville National Corporation, dated July 26, 2009 | A-1 |
| B. Opinion of J.P. Morgan Securities Inc. | B-1 |

Table of Contents

## QUESTIONS AND ANSWERS ABOUT VOTING AT THE
## SPECIAL MEETING OF SHAREHOLDERS

*The following are answers to certain questions that you may have regarding the special meeting. We urge you to read carefully the remainder of this document because the information in this section may not provide all that might be important to you in determining how to vote. Additional important information is also contained in the appendices to, and the documents incorporated by reference in, this document.*

WHAT ARE HOLDERS OF HARLEYSVILLE NATIONAL CORPORATION COMMON STOCK BEING ASKED TO VOTE ON?

A. Holders of Harleysville National Corporation common stock are being asked to vote on the adoption of the merger agreement and to approve the adjournment of the special meeting, if necessary or appropriate, to solicit additional proxies in favor of adoption of the merger agreement.

Q: WHAT DO I NEED TO DO NOW?

A: After you have carefully read this document, you may vote using the internet at the address shown on your proxy card, or by telephone using the number on your proxy card or by completing, signing, dating and returning your proxy card in the enclosed prepaid return envelope as soon as possible. This will enable your shares to be represented and voted at the special meeting.

Q: WHY IS MY VOTE IMPORTANT?

A: The merger agreement must be adopted by a majority of the issued and outstanding shares of Harleysville National Corporation common stock. A failure to vote will have the same effect as a vote against the merger agreement.

Q: IF MY BROKER HOLDS MY SHARES IN "STREET NAME" WILL MY BROKER AUTOMATICALLY VOTE MY SHARES FOR ME?

A: No. Your broker will not be able to vote your shares without instructions from you. You should instruct your broker to vote your shares, following the instructions your broker provides.

Q: WHAT IF I FAIL TO INSTRUCT MY BROKER TO VOTE MY SHARES?

A: If you fail to instruct your broker to vote your shares, the broker will submit an unvoted proxy (a broker non-vote) as to your shares. Broker non-votes will count toward a quorum at the special meeting. However, broker non-votes will not count as a vote with respect to the merger agreement, and therefore will have the same effect as a vote against the merger agreement.

Q: CAN I ATTEND THE SPECIAL MEETING AND VOTE MY SHARES IN PERSON?

A: Yes. All shareholders are invited to attend the special meeting. Shareholders of record can vote in person at the special meeting by executing a proxy card. If a broker holds your shares in street name, then you are not the shareholder of record and you must ask your broker how you can vote your shares at the special meeting.

1

Table of Contents

Q: CAN I CHANGE MY VOTE?

A: Yes. If you have not voted through your broker, you can change your vote after you have sent in your proxy card by:

- providing written notice to the Secretary of Harleysville National Corporation;

- submitting a new proxy card or vote again by telephone or internet (any earlier proxies will be revoked automatically); or

- attending the special meeting and voting in person. Any earlier proxy will be revoked. However, simply attending the special meeting without voting will not revoke your proxy.

If you have instructed a broker to vote your shares, you must follow your broker's directions to change your vote.

Q: SHOULD I SEND IN MY STOCK CERTIFICATES NOW?

A: Please **DO NOT** send your stock certificates with your proxy card. Instructions will be sent to you under separate cover following completion of the merger.

Q: WHEN DO YOU EXPECT THE MERGER TO BE COMPLETED?

A: First Niagara Financial Group, Inc. and Harleysville National Corporation currently expect to complete the merger in the first quarter of 2010, assuming all of the conditions to completion of the merger have been satisfied.

Q: WHAT WILL SHAREHOLDERS OF HARLEYSVILLE NATIONAL CORPORATION RECEIVE IN THE MERGER?

A: If the merger agreement is adopted and the merger is subsequently completed, each outstanding share of Harleysville National Corporation common stock will be converted into the right to receive 0.474 share of First Niagara Financial Group, Inc. for each share of Harleysville National Corporation common stock, subject to adjustment as described in the merger agreement and in this document.

Q: WHOM SHOULD I CALL WITH QUESTIONS?

A: You should direct any questions regarding the special meeting of shareholders or the merger to Harleysville National Corporation's proxy solicitor, The Altman Group, who can be contacted at (866) 207-3649, Monday to Friday, 9:00 a.m. to 11:00 p.m. prevailing Eastern Time.

2

Table of Contents

# SUMMARY

This summary highlights selected information included in this document and does not contain all of the information that may be important to you. You should read this entire document and its appendices and the other documents to which we refer you before you decide how to vote with respect to the merger agreement. In addition, we incorporate by reference important business and financial information about Harleysville National Corporation and First Niagara Financial Group, Inc. into this document. For a description of this information, see "Incorporation of Certain Documents by Reference" on page 92. You may obtain the information incorporated by reference into this document without charge by following the instructions in the section entitled "Where You Can Find More Information" on the inside front cover of this document. Each item in this summary includes a page reference directing you to a more complete description of that item.

This document, including information included or incorporated by reference in this document, contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to: (i) statements of goals, intentions and expectations; (ii) statements regarding business plans, prospects, growth and operating strategies; (iii) statements regarding the asset quality of loan and investment portfolios; (iv) statements regarding estimates of risks and future costs and benefits; and (iv) other statements identified by words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning. These forward-looking statements are based on current beliefs and expectations of the management of First Niagara Financial Group, Inc. and Harleysville National Corporation and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond First Niagara Financial Group, Inc.'s and Harleysville National Corporation's control. In addition, these forward-looking statements are subject to assumptions with respect to future business strategies and decisions that are subject to change. Actual results may differ materially from the anticipated results discussed in these forward-looking statements. See "Forward-Looking Statements" on page 94.

## THE MERGER

**The merger agreement is attached to this document as Appendix A. We encourage you to read this agreement carefully, as it is the legal document that governs the merger of Harleysville National Corporation with and into First Niagara Financial Group, Inc.**

**Parties to the Merger**
**First Niagara Financial Group, Inc. (page 36)**
**First Niagara Bank**

First Niagara Financial Group, Inc. ("First Niagara"), a Delaware corporation, provides a wide range of retail and commercial banking as well as other financial services through its wholly-owned, federally chartered savings bank subsidiary, First Niagara Bank. First Niagara is positioned as a leading community-oriented bank in Upstate New York and Western Pennsylvania, providing its retail consumer and business customers with banking services including residential and commercial real estate loans, commercial business loans and leases, consumer loans, wealth management products, as well as retail and commercial deposit products. Additionally, First Niagara offers insurance and employee benefits consulting services through a wholly-owned subsidiary of First Niagara Bank. At September 30, 2009, First Niagara had $14.1 billion of assets, $9.9 billion in deposits and stockholders' equity of $2.4 billion.

First Niagara was organized in April 1998 in connection with the conversion of First Niagara Bank from a New York State chartered mutual savings bank to a New York State chartered stock savings

3

Table of Contents

bank and a reorganization to a two-tiered mutual holding company. In November 2002, First Niagara converted First Niagara Bank and the mutual holding company to a federal charter subject to Office of Thrift Supervision regulation. In January 2003, First Niagara converted the mutual holding company to stock form, with shares of common stock owned by the mutual holding company being sold to depositors and other investors. In connection with the acquisition of Harleysville National Corporation and Harleysville National Bank, First Niagara has applied to the Board of Governors of the Federal Reserve System ("Federal Reserve") to register as a bank holding company. Since 1998, First Niagara deployed the proceeds from several stock offerings through multiple whole-bank and nonbank financial services company acquisitions, as well as the opening of a number of de novo branches in target markets across Upstate New York. This strategy, coupled with its organic growth initiatives, included an emphasis on expanding its commercial operations and financial services businesses.

On April 6, 2009, First Niagara Bank entered into a Purchase and Assumption Agreement with National City Bank ("NatCity") and The PNC Financial Services Group, Inc. ("PNC") pursuant to which First Niagara Bank agreed to acquire certain assets and assume certain liabilities of 57 NatCity branch locations (the "NatCity Branches") in the Pittsburgh, Erie and Warren, Pennsylvania banking markets (the "Branch Acquisition"). The Federal Reserve and the U.S. Department of Justice (the "DOJ") required NatCity to divest these and other branch locations in connection with the merger of PNC and NatCity's former parent company, National City Corporation.

On September 4, 2009, First Niagara Bank completed the Branch Acquisition and assumed approximately $3.9 billion of deposit liabilities, acquired approximately $756.9 million of performing loans and $3.1 billion in cash, as well as the real and personal property associated with the NatCity Branches.

First Niagara's principal executive offices are located at 726 Exchange Street, Suite 618, Buffalo, New York 14210, and our telephone number is (716) 819-5500.

First Niagara Bank was organized in 1870, and is a community-oriented savings bank providing financial services to individuals, families, and businesses through its branch network located across Upstate New York and Western Pennsylvania. As of September 30, 2009, First Niagara Bank and all of its subsidiaries had $14.1 billion of assets, deposits of $9.9 billion, $1.8 billion of stockholder's equity, employed approximately 2,600 people, and operated through 170 branches, including branches acquired in the Branch Acquisition, and several financial services subsidiaries.

First Niagara Bank's subsidiaries provide a range of financial services to individuals and companies in its market areas and include: First Niagara Commercial Bank (the "Commercial Bank"), its New York State chartered bank whose primary purpose is to generate municipal deposits; First Niagara Funding, Inc., a real estate investment trust ("REIT") which primarily holds certain of its commercial real estate and business loans; and First Niagara Risk Management, Inc. ("FNRM"), a full service insurance agency and employee benefits consulting firm engaged in the sale of insurance products, including business and personal insurance, surety bonds, life, disability and long-term care coverage, and other risk management advisory services. FNRM's risk management consulting business includes alternative risk and self-insurance, claims investigation and adjusting services, and third-party administration of self insured workers' compensation plans. FNRM's employee benefits consulting business includes a retirement plan practice, compliance services and benefit plan administration, as well as a compensation consulting practice.

4

Table of Contents

**Harleysville National Corporation (page 38)**
**Harleysville National Bank**

Harleysville National Corporation is the bank holding company of Harleysville National Bank and Trust Company ("Harleysville National Bank"), headquartered in Harleysville, Pennsylvania. Harleysville National Bank operates 83 branch offices and provides a full range of banking services including loans and deposits, investment management and trust and investment advisory services to individual and corporate customers located primarily in Eastern Pennsylvania. Harleysville National Corporation engages in full-service commercial banking and trust businesses, including accepting time and demand deposits, making secured and unsecured commercial and consumer loans, financing commercial transactions, making construction and mortgage loans and performing corporate pension and personal investment and trust services. As of September 30, 2009, Harleysville National Corporation had assets of $5.2 billion, deposits of $3.9 billion and shareholders' equity of $260.7 million. Harleysville National Corporation's principal executive office is located at 483 Main Street, Harleysville, Pennsylvania 19438, and the telephone number is (215) 256-8851.

**What Harleysville National Corporation Shareholders Will Receive In the Merger (page 39)**

If the merger agreement is adopted and the merger is subsequently completed, each outstanding share of Harleysville National Corporation common stock will be converted into the right to receive 0.474 share of First Niagara common stock for each share of Harleysville National Corporation common stock, which is referred to as the exchange ratio. This exchange ratio is subject to a downward adjustment, as described in this document and the merger agreement, in the event that Harleysville National Corporation's delinquent loans are $237.5 million or greater as of the month end prior to the closing date of this transaction and First Niagara will have the right to terminate the merger agreement if such delinquent loans equal or exceed $350.0 million as of any month end on or prior to February 28, 2010. If, however, the closing occurs on or after March 1, 2010, the amount of Harleysville National Corporation delinquent loans will be calculated as of February 28, 2010. As of July 31, 2009 and November 30, 2009, the amount of such delinquent loans was $209.1 million and $173.6 million, respectively. In addition, in the event of certain decreases in the stock price of First Niagara, as described in the merger agreement and this document, Harleysville National Corporation may elect to terminate the merger agreement unless First Niagara elects to increase the exchange ratio. See "The Merger and the Merger Agreement-Merger Consideration" for a more complete discussion of the merger consideration to be paid in this proposed transaction and "-Termination; Amendment; Waiver" for a more complete discussion of the circumstances under which the merger agreement could be terminated.

**Material United States Federal Income Tax Consequences of the Merger (page 77)**

First Niagara and Harleysville National Corporation will not be required to complete the merger unless they receive legal opinions from their respective counsel to the effect that the merger will qualify as a tax-free reorganization for United States federal income tax purposes.

We expect that, for United States federal income tax purposes, you generally will not recognize any gain or loss with respect to your shares of Harleysville National Corporation common stock upon receiving shares of First Niagara common stock in the merger, except with respect to any cash received in lieu of a fractional share interest in First Niagara common stock.

You should read "Material United States Federal Income Tax Consequences of the Merger" starting on page 77 for a more complete discussion of the federal income tax consequences of the merger. Tax matters can be complicated and the tax consequences of the merger to you will depend on your

5

<u>Table of Contents</u>

particular tax situation. You should consult your tax advisor to fully understand the tax consequences of the merger to you.

**Your Board of Directors Unanimously Recommends Shareholder Adoption of the Merger (page 49)**

Harleysville National Corporation's board of directors unanimously approved the merger agreement and all directors have agreed to vote shares of Harleysville National Corporation stock they own as of the record date in favor of the adoption of the merger agreement. Harleysville National Corporation's board of directors believes that the merger and the merger agreement are fair to and in the best interests of Harleysville National Corporation and its shareholders and unanimously recommends that you vote "FOR" adoption of the merger agreement. See "Harleysville National Corporation's Reasons for the Merger-Recommendation of Harleysville National Corporation's Board of Directors."

**Opinion of Harleysville National Corporation's Financial Advisor (page 53 and Appendix B)**

On July 26, 2009, J.P. Morgan Securities Inc. ("JPMorgan") rendered its opinion to the board of directors of Harleysville National Corporation that as of the date of the opinion, and based upon and subject to the factors and assumptions set forth in the opinion, the exchange ratio in the proposed merger was fair, from a financial point of view, to Harleysville National Corporation's common shareholders. JPMorgan's opinion assumed, with Harleysville National Corporation's consent, that the exchange ratio will be 0.474, and that the level of HNC Delinquent Loans (as defined in the merger agreement) will not result in any adjustment thereto. The full text of JPMorgan's written opinion, which sets forth the assumptions made, procedures followed, matters considered and limitations on the review undertaken in connection with the opinion, is attached to this document as Appendix B. Harleysville National Corporation shareholders are urged to read the opinion in its entirety. JPMorgan's written opinion is addressed to the board of directors of Harleysville National Corporation, is directed only to the exchange ratio in the merger and does not constitute a recommendation as to how any holder of Harleysville National Corporation common stock should vote with respect to the merger or any other matter.

**Special Meeting of Shareholders of Harleysville National Corporation (page 34)**

Harleysville National Corporation will hold a special meeting of its shareholders on January 22, 2010, at 10:30 a.m., New York time, at Best Western, The Inn at Towamencin, 1750 Sumneytown Pike, Kulpsville, Pennsylvania 19443. At the special meeting of shareholders, you will be asked to vote to adopt the merger agreement.

You may vote at the special meeting of shareholders if you owned shares of Harleysville National Corporation common stock at the close of business on the record date, December 7, 2009. On that date, there were 43,139,426 shares of Harleysville National Corporation common stock outstanding and entitled to vote at the special meeting of shareholders. You may cast one vote for each share of Harleysville National Corporation common stock you owned on the record date.

Even if you expect to attend the special meeting of shareholders, Harleysville National Corporation recommends that you promptly complete and return your proxy card in the enclosed return envelope.

**Shareholder Vote Required (page 35)**

Adoption of the merger agreement requires the affirmative vote of the holders of a majority of the shares of Harleysville National Corporation common stock issued and outstanding on the record date. A failure to vote or an abstention will have the same effect as a vote against the merger. As of the record

6

Table of Contents

date, directors of Harleysville National Corporation beneficially owned approximately 2,519,000 shares of Harleysville National Corporation common stock entitled to vote at the special meeting of shareholders. This represents approximately 5.8% of the total votes entitled to be cast at the special meeting of shareholders. These individuals have agreed to vote "FOR" adoption of the merger agreement.

**Holders of Harleysville National Corporation Common Stock Do Not Have Dissenters Rights (page 63)**

Dissenters' rights are statutory rights that, if available under law, enable shareholders to dissent from an extraordinary transaction, such as a merger, and to demand that the corporation pay the fair value for their shares as determined by a court in a judicial proceeding instead of receiving the consideration offered to shareholders in connection with the extraordinary transaction. Dissenters' rights are not available in all circumstances, and exceptions to these rights are provided under the Pennsylvania Business Corporation Law of 1988, as amended. As a result of one of these exceptions, the holders of Harleysville National Corporation common stock are not entitled to dissenters rights in the merger.

**Interests of Harleysville National Corporation's Directors and Officers In the Merger (page 64)**

In considering the recommendation of the board of directors of Harleysville National Corporation to adopt the merger agreement, you should be aware that officers and directors of Harleysville National Corporation have employment and other compensation agreements or plans that give them interests in the merger that are somewhat different from, or in addition to, their interests as Harleysville National Corporation shareholders. These interests and agreements include:

- employment agreements that provide for severance payments in connection with a termination of employment without cause or for good reason following a change in control;

- change in control agreements that provide for severance payments in connection with a termination of employment without cause or for good reason following a change in control;

- supplemental executive benefit agreements that provide for full vesting upon any termination of employment within 12 months following a change in control;

- the accelerated vesting of all outstanding unvested stock options held by Harleysville National Corporation officers and directors and the exchange of these stock options for options to purchase a number of shares of First Niagara, appropriately adjusted by the exchange ratio; and

- rights of Harleysville National Corporation officers and directors to indemnification and directors' and officers' liability insurance.

**Regulatory Approvals Required For the Merger (page 73)**

The merger cannot be completed without prior regulatory approval. First Niagara has applied to the Board of Governors of the Federal Reserve System for approval to register as a bank holding company and acquire Harleysville National Bank and Trust Company as a separate banking subsidiary. Ultimately, First Niagara intends to merge First Niagara Bank and Harleysville National Bank and Trust Company. However, the timing of the merger of the banking subsidiaries has not yet been determined. While First Niagara does not know of any reason why it would not be able to obtain the necessary Federal Reserve approval in a timely manner, First Niagara cannot assure you that this approval will occur or

7

Table of Contents

what the timing may be or that this approval will not be subject to one or more conditions that affect the advisability of the merger.

### Conditions to the Merger (page 72)

Completion of the merger depends on a number of conditions being satisfied or waived, including the following:

- Harleysville National Corporation shareholders must have adopted the merger agreement;

- the representations and warranties of the parties to the merger agreement must be, subject to certain limited exceptions, true and correct except to the extent that the failure of the representations and warranties to be so true and correct do not have and are not reasonably expected to have, individually or in the aggregate, a material adverse effect on Harleysville National Corporation or First Niagara, as appropriate;

- the receipt of all regulatory approvals and other necessary approvals of governmental entities (other than those the failure of which to obtain would not cause a material adverse effect);

- there must be no statute, rule, regulation, order, injunction or decree in existence which prohibits or makes completion of the merger illegal;

- there must be no litigation, statute, law, regulation, order or decree by which the merger is restrained or enjoined;

- First Niagara's registration statement of which this document is a part shall have become effective and no stop order suspending its effectiveness shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the Securities and Exchange Commission;

- the shares of First Niagara common stock to be issued to Harleysville National Corporation shareholders in the merger must have been approved for listing on the Nasdaq Global Select Market and such shares must be delivered to the exchange agent before the closing date of the transaction;

- both First Niagara and Harleysville National Corporation must have received a legal opinion from their respective counsels that the merger will qualify as a tax-free reorganization under United States federal income tax laws; and

- all necessary third party consents shall have been obtained.

Although we anticipate the closing will occur during the first quarter of 2010, because the satisfaction of certain of these conditions is beyond our control, we cannot be certain when, or if, the conditions to the merger will be satisfied or waived or whether or not the merger will be completed.

### No Solicitation (page 74)

Subject to certain exceptions, Harleysville National Corporation has agreed not to initiate, solicit, induce or knowingly encourage any inquiries or the making of any proposal or offer from any third party relating to an acquisition of Harleysville National Corporation, or enter into an agreement relating to an

8

Table of Contents

acquisition proposal by a third party. Notwithstanding these restrictions, however, the merger agreement provides that, under specified circumstances, in response to an unsolicited acquisition proposal or inquiry from a third party which, in the good faith judgment of the Harleysville National Corporation board of directors, is or reasonable likely to result in a proposal which is superior to the merger with First Niagara. Harleysville National Corporation may furnish information regarding Harleysville National Corporation and participate in discussions and negotiations with such third party.

### Termination of the Merger Agreement (page 75)

First Niagara and Harleysville National Corporation may mutually agree at any time to terminate the merger agreement without completing the merger, even if the Harleysville National Corporation shareholders have adopted it. Also, either party may decide, without the consent of the other party, to terminate the merger agreement under specified circumstances, including if the merger is not consummated by July 31, 2010, if the required regulatory approval is not received or if the shareholders of Harleysville National Corporation do not approve the merger. In addition, either party may terminate the merger agreement if there is a breach of the agreement by the other party that would cause the failure of conditions to the terminating party's obligation to close, unless the breach is capable of being cured and is cured within 30 days of the notice of breach (provided that the terminating party is not then in material breach of the merger agreement). First Niagara may also terminate the merger agreement if Harleysville National Corporation delinquent loans equal or exceed $350.0 million as of any month end prior to the closing date of the merger, excluding any month end after February 28, 2010. In addition, Harleysville National Corporation may terminate the merger agreement if First Niagara's stock price falls below thresholds set forth in the merger agreement and First Niagara does not increase the exchange ratio pursuant to a prescribed formula or, under certain limited circumstances, if Harleysville National Corporation has received a proposal which its board of directors determines is superior to the merger with First Niagara.

### Termination Fee (page 76)

If the merger is terminated pursuant to specified situations in the merger agreement (and Harleysville National Corporation accepts a "superior proposal," as defined in the merger agreement, or enters into an acquisition proposal under certain circumstances), Harleysville National Corporation may be required to pay a termination fee to First Niagara of $10.0 million. Harleysville National Corporation agreed to this termination fee arrangement in order to induce First Niagara to enter into the merger agreement. The termination fee requirement may discourage other companies from trying or proposing to combine with Harleysville National Corporation before the merger is completed.

### Litigation Related to the Merger (page 68)

Certain litigation is pending in connection with the merger. See "The Merger—Litigation Related to the Merger."

### Comparison of Shareholders' Rights (page 82)

The rights of Harleysville National Corporation shareholders who continue as First Niagara shareholders after the merger will be governed by Delaware law and the certificate of incorporation and bylaws of First Niagara rather than by Pennsylvania law and the certificate of incorporation and bylaws of Harleysville National Corporation.

9

Table of Contents

## SELECTED HISTORICAL FINANCIAL DATA FOR FIRST NIAGARA FINANCIAL GROUP, INC. AND HARLEYSVILLE NATIONAL CORPORATION

### First Niagara Financial Group, Inc. Selected Historical Financial and Other Data

The following tables set forth selected historical financial and other data of First Niagara for the periods and as of the dates indicated. The information at and for the nine months ended September 30, 2009 and 2008 is unaudited. However, in the opinion of management of First Niagara, all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the unaudited periods have been made. The selected operating data presented below for the nine months ended September 30, 2009, are not necessarily indicative of a full year's operations.

| | As of or for the Nine Months Ended September 30, | | | As of or for the Years Ended December 31, | | | |
|---|---|---|---|---|---|---|---|
| | 2009 | 2008 | 2008 | 2007 | 2006 | 2005 | 2004 |
| | | | | (In thousands, except per share data) | | | |
| **Selected financial condition data:** | | | | | | | |
| Total assets | $14,137,504 | $9,008,383 | $9,331,372 | $8,096,228 | $7,945,526 | $8,064,832 | $5,078,374 |
| Loans, net | 7,132,685 | 6,343,814 | 6,385,982 | 5,654,705 | 5,593,512 | 5,216,299 | 3,215,255 |
| Securities available for sale: | | | | | | | |
| Mortgage-backed | 3,076,274 | 891,899 | 1,232,383 | 817,614 | 717,601 | 867,037 | 618,156 |
| Other | 575,987 | 358,175 | 340,718 | 399,550 | 342,821 | 737,851 | 551,973 |
| Securities held to maturity [1] | 1,085,258 | — | — | — | — | — | — |
| Deposits | 9,923,368 | 5,816,720 | 5,943,613 | 5,548,984 | 5,709,736 | 5,479,412 | 3,337,682 |
| Borrowings | 1,515,148 | 1,603,777 | 1,540,227 | 1,094,981 | 747,554 | 1,096,427 | 750,686 |
| Shareholders' equity | $ 2,383,604 | $1,441,022 | $1,727,263 | $1,353,179 | $1,387,197 | $1,374,423 | $ 928,162 |
| Common shares outstanding | 188,151 | 109,992 | 118,562 | 104,770 | 110,719 | 112,808 | 82,318 |
| Preferred shares outstanding | — | — | 184 | — | — | — | — |
| **Selected operations data:** | | | | | | | |
| Interest income | $ 345,401 | $ 331,340 | $ 441,138 | $ 422,772 | $ 415,830 | $ 375,217 | $ 224,578 |
| Interest expense | 93,904 | 134,469 | 172,561 | 198,594 | 169,349 | 125,067 | 68,476 |
| Net interest income | 251,497 | 196,871 | 268,577 | 224,178 | 246,481 | 250,150 | 156,102 |
| Provision for credit losses | 32,650 | 14,500 | 22,500 | 8,500 | 6,456 | 7,348 | 8,442 |
| Net interest income after provision for credit losses | 218,847 | 182,371 | 246,077 | 215,678 | 240,025 | 242,802 | 147,660 |
| Noninterest income | 90,458 | 88,092 | 115,735 | 131,811 | 111,218 | 90,663 | 51,866 |
| Noninterest expense | 231,952 | 170,855 | 228,410 | 222,466 | 211,851 | 188,206 | 120,850 |
| Income before income taxes | 77,353 | 99,608 | 133,402 | 125,023 | 139,392 | 145,259 | 78,676 |
| Income taxes | 26,880 | 33,976 | 44,964 | 40,938 | 47,533 | 52,400 | 26,859 |
| Net income | 50,473 | 65,632 | 88,438 | 84,085 | 91,859 | 92,859 | 51,817 |
| Preferred stock dividend and accretion | 12,046 | — | 1,184 | — | — | — | — |
| Net income available to common shareholders | $ 38,427 | $ 65,632 | $ 87,254 | $ 84,085 | $ 91,859 | $ 92,859 | $ 51,817 |

**Stock and related per share data:**

Earnings per common share[2]:

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Basic | $ 0.29 | $ 0.62 | $ 0.81 | $ 0.82 | $ 0.86 | $ 0.85 | $ 0.66 |
| Diluted | 0.29 | 0.62 | 0.81 | 0.81 | 0.85 | 0.84 | 0.65 |
| Cash dividends | 0.42 | 0.42 | 0.56 | 0.54 | 0.46 | 0.38 | 0.30 |
| Book value | $ 12.90 | $ 13.55 | $ 15.02 | $ 13.41 | $ 12.99 | $ 12.65 | $ 11.86 |
| Market Price (NASDAQ: FNFG): |  |  |  |  |  |  |  |
| High | $ 16.32 | $ 22.38 | $ 22.38 | $ 15.13 | $ 15.43 | $ 15.16 | $ 15.78 |
| Low | 9.48 | 9.98 | 9.98 | 11.15 | 13.38 | 12.05 | 11.49 |
| Close | $ 12.33 | $ 15.75 | $ 16.17 | $ 12.04 | $ 14.86 | $ 14.47 | $ 13.95 |

*(footnotes on following page)*

10

Table of Contents

| | As of or for the Nine Months Ended September 30, [3] | | As of or for the Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2009 [3] | 2008 [3] | 2008 | 2007 | 2006 | 2005 | 2004 |
| | | | (Dollars and share amounts in thousands, except per share data) | | | | |
| **Selected financial ratios and other data:** | | | | | | | |
| **Performance ratios** [2]: | | | | | | | |
| Return on average assets | 0.63% | 0.98% | 0.99% | 1.05% | 1.14% | 1.18% | 1.05% |
| Return on average equity | 3.59 | 6.16 | 5.99 | 6.24 | 6.67 | 6.76 | 5.59 |
| Net interest rate spread | 3.38 | 3.15 | 3.19 | 2.84 | 3.20 | 3.46 | 3.38 |
| Net interest margin | 3.63 | 3.51 | 3.55 | 3.33 | 3.61 | 3.75 | 3.66 |
| As a percentage of average assets: | | | | | | | |
| Noninterest income [4] | 0.85% | 0.99% | 1.29% | 1.45% | 1.39% | 1.15% | 1.05% |
| Noninterest expense | 2.17 | 1.92 | 2.55 | 2.78 | 2.64 | 2.40 | 2.44 |
| Net overhead | 1.32 | 0.93 | 1.26 | 1.33 | 1.25 | 1.25 | 1.39 |
| Efficiency ratio [4] | 67.83 | 59.96 | 59.43 | 65.47 | 59.23 | 55.22 | 58.11 |
| Dividend payout ratio | 144.83% | 67.74% | 69.14% | 65.85% | 53.49% | 44.71% | 45.45% |
| **Capital ratios:** | | | | | | | |
| Total risk-based capital [5] | 11.96% | 11.30% | 12.72% | 11.35% | 12.16% | 12.26% | 17.65% |
| Tier 1 risk-based capital [5] | 10.92 | 10.05 | 11.48 | 10.10 | 10.91 | 11.01 | 16.40 |
| Tier 1 (core) capital [5] | 6.67 | 7.58 | 8.47 | 7.54 | 7.73 | 7.56 | 11.40 |
| Tangible capital [5] | 6.67 | 7.58 | 8.47 | 7.54 | 7.73 | 7.56 | 11.40 |
| Ratio of shareholders' equity to total assets | 16.86 | 16.00 | 18.51 | 16.71 | 17.46 | 17.04 | 18.28 |
| Ratio of tangible common shareholders' equity to tangible assets | 10.95% | 7.77% | 8.96% | 8.21% | 8.88% | 8.40% | 12.31% |
| **Asset quality ratios:** | | | | | | | |
| Total nonaccruing loans | $ 66,806 | $ 44,698 | $46,417 | $28,054 | $15,528 | $21,930 | $12,028 |
| Other nonperforming assets | 8,872 | 2,782 | 2,001 | 237 | 632 | 843 | 740 |
| Allowance for credit losses | 83,077 | 77,664 | 77,793 | 70,247 | 71,913 | 72,340 | 41,422 |
| Net loan charge-offs | $ 27,366 | $ 9,973 | $17,844 | $10,084 | $ 6,883 | $ 7,114 | $ 7,090 |
| Total nonaccruing loans to total loans | 0.93% | 0.70% | 0.72% | 0.49% | 0.27% | 0.41% | 0.37% |
| Total nonperforming assets as a percentage of total assets | 0.54 | 0.53 | 0.52 | 0.35 | 0.20 | 0.28 | 0.25 |
| Allowance for credit losses to nonaccruing loans | 124.36 | 173.75 | 167.60 | 250.40 | 463.12 | 329.87 | 344.38 |
| Allowance for credit losses to total loans | 1.15 | 1.21 | 1.20 | 1.23 | 1.27 | 1.37 | 1.27 |
| Net charge-offs to average loans | 0.56% | 0.25% | 0.28% | 0.18% | 0.12% | 0.14% | 0.23% |

**Other data:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Number of banking centers | 170 | 114 | 114 | 110 | 119 | 118 | 71 |
| Full time equivalent employees | 2,672 | 1,910 | 1,909 | 1,824 | 1,922 | 1,984 | 1,200 |

---

(1) All securities held to maturity are mortgage-backed securities.

(2) Computed using daily averages.

(3) Annualized where appropriate.

(4) Excluded gain on branch sales and loss on sale of securities available for sale in 2007.

(5) Ratios presented for First Niagara Bank.

11

Table of Contents

## Harleysville National Corporation Selected Historical Financial Data

The following tables set forth selected historical financial data of Harleysville National Corporation for the periods and at the dates indicated. The information at and for the nine months ended September 30, 2009 and 2008 is unaudited. However, in the opinion of management of Harleysville National Corporation, all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the unaudited periods have been made. The selected operating data presented below for the nine months ended September 30, 2009, are not necessarily indicative of a full year's operations.

| | (Unaudited) Nine Months Ended September 30, | | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2009[1][2] | 2008 | 2008[2] | 2007[3] | 2006[4] | 2005 | 2004[5] |
| | (Dollars in thousands, except per share information) | | | | | | |
| **Income and expense** | | | | | | | |
| Interest income | $ 178,688 | $ 151,711 | $ 206,294 | $ 194,561 | $ 178,941 | $ 151,739 | $ 127,729 |
| Interest expense | 78,493 | 77,018 | 102,154 | 112,127 | 95,768 | 64,618 | 42,638 |
| Net interest income | 100,195 | 74,693 | 104,140 | 82,434 | 83,173 | 87,121 | 85,091 |
| Provision for loan losses | 53,871 | 7,647 | 15,567 | 10,550 | 4,200 | 3,401 | 2,555 |
| Net interest income after provision for loan losses | 46,324 | 67,046 | 88,573 | 71,884 | 78,973 | 83,720 | 82,536 |
| Noninterest income | 50,145 | 32,873 | 46,217 | 43,338 | 45,348 | 29,990 | 28,158 |
| Noninterest expense | 331,592 | 73,329 | 104,622 | 81,355 | 70,830 | 62,479 | 59,561 |
| (Loss) income before income taxes | (235,123) | 26,590 | 30,168 | 33,867 | 53,491 | 51,231 | 51,133 |
| Income tax (benefit) expense | (12,846) | 5,320 | 5,075 | 7,272 | 14,076 | 12,403 | 12,566 |
| Net (loss) income | $ (222,277) | $ 21,270 | $ 25,093 | $ 26,595 | $ 39,415 | $ 38,828 | $ 38,567 |
| **Per share information[6]** | | | | | | | |
| Basic (loss) earnings | $ (5.16) | $ 0.68 | $ 0.78 | $ 0.91 | $ 1.36 | $ 1.34 | $ 1.35 |
| Diluted (loss) earnings | (5.16) | 0.67 | 0.78 | 0.90 | 1.34 | 1.32 | 1.31 |
| Cash dividends paid | 0.11 | 0.60 | 0.80 | 0.80 | 0.75 | 0.72 | 0.65 |
| Book value | $ 6.04 | $ 9.90 | $ 11.05 | $ 10.83 | $ 10.18 | $ 9.48 | $ 9.34 |
| Basic average common shares outstanding | 43,058,489 | 31,363,779 | 32,201,150 | 29,218,671 | 28,946,847 | 28,891,412 | 28,505,392 |
| Diluted average common shares outstanding | 43,058,489 | 31,531,942 | 32,364,137 | 29,459,898 | 29,353,128 | 29,490,216 | 29,465,613 |
| **Average balance sheet** | | | | | | | |
| Loans | $ 3,502,250 | $ 2,492,498 | $ 2,585,101 | $ 2,123,170 | $ 2,014,420 | $ 1,900,023 | $ 1,625,419 |
| Investments | 1,167,658 | 1,025,241 | 1,037,112 | 944,464 | 925,635 | 903,063 | 941,910 |
| Other interest-earning assets | 320,436 | 56,825 | 48,474 | 72,087 | 79,670 | 51,740 | 41,064 |
| Total assets | 5,444,633 | 3,882,546 | 3,997,972 | 3,371,304 | 3,229,224 | 3,039,186 | 2,773,405 |
| Deposits | 4,040,478 | 2,933,760 | 3,004,070 | 2,557,546 | 2,469,514 | 2,259,831 | 2,094,998 |
| Borrowed funds | 914,339 | 545,701 | 586,088 | 471,296 | 434,938 | 456,599 | 372,141 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Shareholders' equity | 404,603 | 333,554 | 336,654 | 298,393 | 281,847 | 272,974 | 251,963 |
| **Balance sheet at period-end** | | | | | | | |
| Loans | $ 3,250,095 | $ 2,539,037 | $ 3,685,244 | $ 2,460,823 | $ 2,047,355 | $ 1,985,493 | $ 1,845,802 |
| Investments | 1,082,032 | 983,349 | 1,231,661 | 982,915 | 911,889 | 901,208 | 943,563 |
| Other interest-earning assets | 538,189 | 103,966 | 27,221 | 135,473 | 62,975 | 37,455 | 56,291 |
| Total assets | 5,163,359 | 3,949,730 | 5,490,509 | 3,903,001 | 3,249,828 | 3,117,359 | 3,024,515 |
| Deposits | 3,941,908 | 3,018,276 | 3,938,432 | 2,985,058 | 2,516,855 | 2,365,457 | 2,212,563 |
| Borrowed funds | 874,664 | 546,953 | 990,498 | 508,285 | 389,495 | 439,168 | 488,182 |
| Shareholders' equity | 260,656 | 310,994 | 474,707 | 339,310 | 294,751 | 273,232 | 270,532 |
| **Performance ratios** | | | | | | | |
| Return on average assets | (5.46)% | 0.73% | 0.63% | 0.79% | 1.22% | 1.28% | 1.39% |
| Return on average equity | (73.45) | 8.52 | 7.45 | 8.91 | 13.98 | 14.22 | 15.31 |
| Average equity to average assets | 7.43 | 8.59 | 8.42 | 8.85 | 8.73 | 8.98 | 9.08 |
| Dividend payout ratio | — | 89.55 | 100.06 | 88.82 | 55.26 | 53.41 | 48.16 |
| Net interest margin | 2.86 | 3.00 | 3.04 | 2.82 | 2.95 | 3.27 | 3.55 |
| **Asset Quality Ratios** | | | | | | | |
| Nonperforming loans to total loans | 4.79% | 1.50% | 2.12% | 0.90% | 0.87% | 0.42% | 0.31% |
| Net charge offs to average loans outstanding | 1.01 | 0.18 | 0.23 | 0.36 | 0.14 | 0.10 | 0.16 |
| Allowance for loan losses to total loans | 2.38 | 1.25 | 1.36 | 1.11 | 1.03 | 1.00 | 1.00 |
| Allowance for loan losses to nonperforming loans | 50.90 | 84.30 | 65.00 | 124.50 | 119.90 | 238.20 | 324.60 |

---

(1)    The results of operations include a non-cash goodwill impairment charge of $214.5 million during the second quarter of 2009 resulting from the decrease in the market value of Harleysville National Corporation's common stock.

(2)    The results of operations include the acquisition of Willow Financial Bancorp, Inc. effective December 5, 2008.

(3)    The results of operations include the acquisition of East Penn Financial Corporation effective November 16, 2007 and the sale lease-back of bank properties during the fourth quarter of 2007.

(4)    The results of operations include the acquisition of the Cornerstone Companies effective January 1, 2006 and the sale of the Bank's Honesdale branch effective November 10, 2006.

(5)    The results of operations include the acquisition of Millennium Bank effective April 30, 2004.

(6)    Adjusted for a five percent stock dividend effective September 15, 2006, September 15, 2005 and September 15, 2004.

12

Table of Contents

## UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL INFORMATION
## RELATING TO THE HARLEYSVILLE ACQUISITION

The following table shows information about First Niagara's consolidated financial condition and operations, including per share data, after giving effect to the proposed merger with Harleysville National Corporation. The table sets forth the information as if the transaction had become effective on September 30, 2009, with respect to financial condition data, and at the beginning of the periods presented, with respect to operations data. The fair value adjustments contained in the unaudited pro forma condensed consolidated financial information are preliminary estimates based on data as of September 30, 2009. Final fair value adjustments will be determined as of the closing date and could differ significantly. This table should be read in conjunction with, and is qualified in its entirety by, the historical financial statements, including the notes thereto, of First Niagara and Harleysville National Corporation incorporated by reference in this document.

In December 2007, the Financial Accounting Standards Board issued revised guidance which retains the fundamental requirements in prior guidance, that the acquisition method of accounting be used for all business combinations and for an acquirer to be identified for each business combination.

This new guidance revises the definition of the acquisition date as the date the acquirer obtains control of the acquiree. This is typically the closing date and is used to measure the fair value of the consideration paid. When the acquirer issues equity instruments as full or partial payment for the acquiree, the fair value of the acquirer's equity instruments will be measured at the acquisition date. Under this new guidance all loans are transferred at fair value, including adjustments for credit, and no allowance for credit losses is carried over. In addition, the new guidance nullifies Emerging Issues Task Force No. 95-3, "Recognition of Liabilities in Connection with a Purchase Business Combination," and requires costs associated with restructuring or exit activities that do not meet the recognition criteria in Financial Accounting Standards Board Accounting Standards Codification ("ASC") 420, "Exit or Disposal Cost Obligations," as of the acquisition date to be subsequently recognized as post-combination costs when those criteria are met.

While the recording of the acquired loans and leases at their estimated fair value, as required by the new guidance will impact the prospective determination of the provision for credit losses and the allowance for credit losses, for purposes of the Unaudited Pro Forma Condensed Consolidated Statements of Income for the year ended December 31, 2008 and for the nine months ended September 30, 2009, we assumed no adjustments to the historic amount of Harleysville National Corporation's provision for credit losses. If such an adjustment were estimated, there may be a reduction in the historic amounts of Harleysville National Corporation's provision for credit losses, and that adjustment could be significant.

First Niagara anticipates that the merger with Harleysville National Corporation will provide the combined company with financial benefits that include reduced operating expenses. The pro forma information, while helpful in illustrating the financial characteristics of the combined company under one set of assumptions, does not reflect the benefits of expected cost savings or opportunities to earn additional revenue and, accordingly, does not attempt to predict or suggest future results. It also does not necessarily reflect what the historical results of the combined company would have been had our companies been combined during these periods.

13

Table of Contents

**Unaudited Pro Forma Combined Condensed Consolidated Statement of Financial Condition**
**As of September 30, 2009**

| | First Niagara Financial Group, Inc. Historical | Harleysville Merger | | First Niagara Financial Group, Inc. Pro Forma |
| | | Assets Acquired and Liabilities Assumed[1] | Pro Forma Acquisition Adjustments | |
| | | (In thousands) | | |
| **Assets:** | | | | |
| Cash and cash equivalents | $ 823,243 | $ 593,259 | $ (42,166) | $ 1,374,336 |
| Securities available for sale | 3,652,261 | 1,006,898 | — | 4,659,159 |
| Securities held to maturity | 1,085,258 | 32,059 | — | 1,117,317 |
| Loans and leases | 7,215,762 | 3,250,095 | (346,458)[3] | 10,119,399 |
| Less: Allowance for credit losses | 83,077 | 77,276 | (77,276) | 83,077 |
| Net loans and leases | 7,132,685 | 3,172,819 | (269,182) | 10,036,322 |
| Bank-owned life insurance | 131,094 | 89,420 | — | 220,514 |
| Premises and equipment, net | 145,245 | 48,682 | 22,225[4] | 216,152 |
| Goodwill | 879,107 | 22,750 | 123,630[5] | 1,025,487 |
| Core deposit and other intangibles, net | 59,580 | 22,755 | 51,222[6] | 133,557 |
| Other assets | 229,031 | 174,717[2] | 84,674[7] | 488,422 |
| Total assets | $ 14,137,504 | $ 5,163,359 | $ (29,597) | $ 19,271,266 |
| **Liabilities and Stockholders' Equity:** | | | | |
| Savings | $ 913,144 | $ 309,586 | $ — | $ 1,222,730 |
| Interest-bearing checking | 1,062,681 | 629,378 | — | 1,692,059 |
| Money market deposit accounts | 3,457,837 | 895,463 | — | 4,353,300 |
| Noninterest-bearing | 1,213,978 | 495,644 | — | 1,709,622 |
| Certificates of deposit | 3,275,728 | 1,611,837 | 14,000[8] | 4,901,565 |
| Total deposits | 9,923,368 | 3,941,908 | 14,000 | 13,879,276 |
| Short-term borrowings | 750,437 | 89,728 | — | 840,165 |
| Long-term borrowings | 752,339 | 691,130 | — | 1,443,469 |
| Subordinated debt | 12,372 | 93,806 | — | 106,178 |
| Other liabilities | 315,384 | 86,131 | — | 401,515 |
| Total liabilities | 11,753,900 | 4,902,703 | 14,000 | 16,670,603 |
| Stockholders' equity | 2,383,604 | 260,656 | (43,597)[9] | 2,600,663 |
| Total liabilities and stockholders' equity | $ 14,137,504 | $ 5,163,359 | $ (29,597) | $ 19,271,266 |

[1] Represents the assets acquired and liabilities assumed in the merger with Harleysville National Corporation.

[2] Accrued interest receivable on the loans acquired is included in other assets. Accrued interest receivable is not considered to be material to this unaudited pro forma combined condensed consolidated statement of financial condition.

[3] The purchase accounting adjustment on loans relates to the estimated fair value adjustment, which includes both an interest rate component and a credit adjustment for estimated lifetime losses.

[4] The pro forma adjustment includes anticipated capital expenditures.

[5] The pro forma adjustment results from recording the acquired assets and liabilities at fair value. These adjustments are preliminary and are subject to change. The final adjustments will be calculated when the merger is effective and may be materially different than those presented here.

[6] Represents the estimated fair value of the core deposit intangible asset associated with deposit liabilities assumed.

[7] The pro forma adjustment represents the net deferred tax asset associated with the fair value adjustments related to the acquired assets and liabilities.

[8] The purchase accounting adjustment on deposits relates to the estimated fair value adjustment of the certificate of deposit liabilities.

[9] The pro forma adjustment represents the net impact of the issuance of First Niagara common stock in connection with the merger, the elimination of Harleysville National Corporation stockholders' equity, the after-tax integration expenses (approximately $19.9 million), primarily professional, legal and conversion related expenditures and a charitable

contribution to First Niagara Bank Foundation in an effort to maintain an appropriate level of charitable giving in southeastern Pennsylvania.

14

Table of Contents

**Unaudited Pro Forma Condensed Consolidated Statement of Income**
**For the Nine Months Ended September 30, 2009[1]**

| | First Niagara Financial Group, Inc Historical | Harleysville National Corporation Historical | Pro forma Acquisition Adjustments | Pro forma Combined |
|---|---|---|---|---|
| | | | (In thousands, except per share amounts) | |
| **Interest Income:** | | | | |
| Loans and leases | $ 263,742 | $ 136,954 | $ (3,165)[2] | $ 397,531 |
| Investment securities and other | 81,659 | 41,734 | (900)[2] | 122,493 |
| Total interest income | 345,401 | 178,688 | (4,065) | 520,024 |
| **Interest expense:** | | | | |
| Deposits | 56,159 | 56,696 | (1,500)[2] | 111,355 |
| Borrowings | 37,745 | 21,797 | — | 59,542 |
| Total interest expense | 93,904 | 78,493 | (1,500) | 170,897 |
| **Net interest income** | 251,497 | 100,195 | (2,565) | 349,127 |
| Provision for credit losses | 32,650 | 53,871 | — | 86,521 |
| **Net interest income after provision for credit losses** | 218,847 | 46,324 | (2,565) | 262,606 |
| **Noninterest income:** | | | | |
| Banking services | 32,522 | 12,859 | — | 45,381 |
| Insurance and benefits consulting | 37,884 | — | — | 37,884 |
| Wealth management services | 5,900 | 13,953 | — | 19,853 |
| Bank-owned life insurance | 3,931 | 2,337 | — | 6,268 |
| Gain on sales of investment securities, net | — | 8,280 | — | 8,280 |
| Other-than-temporary impairment losses ("OTTI") on available for sale securities | (162) | (13,562) | — | (13,724) |
| Portion of OTTI losses recognized in other comprehensive loss (before taxes) | — | 7,038 | — | 7,038 |
| Gain on mortgage banking sales, net | 2,949 | 6,753 | — | 9,702 |
| Other | 7,434 | 12,487 | — | 19,921 |
| **Total noninterest income** | 90,458 | 50,145 | —[3] | 140,603 |
| **Noninterest expense:** | | | | |
| Salaries and employee benefits | 110,629 | 55,831 | — | 166,460 |
| Occupancy and equipment | 19,987 | 11,667 | — | 31,654 |
| Amortization of core deposit and other intangibles | 6,004 | 3,313 | 3,592[4] | 12,909 |
| Federal deposit insurance premiums | 12,333 | 11,070 | — | 23,403 |
| Goodwill impairment | — | 214,536 | — | 214,536 |
| Litigation settlement, net | 2,845 | — | — | 2,845 |
| Merger and acquisition integration expenses | 27,458 | — | 26,976[5] | 54,434 |
| Other | 52,696 | 35,175 | 5,000[6] | 92,871 |
| **Total noninterest expense** | 231,952 | 331,592 | 35,568[7] | 599,112 |
| **Income (loss) before income taxes** | 77,353 | (235,123) | (38,133) | (195,903) |
| Income tax expense (benefit) | 26,880 | (12,846) | (15,253)[8] | (1,219) |
| **Net income (loss)** | 50,473 | (222,277) | (22,880) | (194,684) |
| Preferred stock dividend | 3,731 | — | — | 3,731 |
| Accretion of preferred stock discount | 8,315 | — | — | 8,315 |
| **Net income (loss) available to common stockholders** | $ 38,427 | $ (222,277) | $ (22,880) | $ (206,730) |
| **Earnings per common share:** | | | | |
| Basic | $ 0.29 | $ (5.16) | $ — | $ (1.34) |
| Diluted | $ 0.29 | $ (5.16) | $ — | $ (1.34) |
| **Weighted average common shares outstanding:** | | | | |
| Basic | 134,022 | 43,058 | 20,440[9] | 154,462 |
| Diluted | 134,386 | 43,058 | 20,440[9] | 154,826 |

*(Notes to Unaudited Pro Forma Condensed Consolidated Statement of Income follow on page 17)*

15

Table of Contents

**Unaudited Pro Forma Condensed Consolidated Statement of Income**
**For the Year Ended December 31, 2008[1]**

| | First Niagara Financial Group, Inc Historical | Harleysville National Corporation Historical | Pro forma Acquisition Adjustments | Pro forma Combined |
|---|---|---|---|---|
| | | | (In thousands, except per share amounts) | |
| **Interest Income:** | | | | |
| Loans and leases | $ 377,037 | $ 153,725 | $ (12,660)[2] | $518,102 |
| Investment securities and other | 64,101 | 52,569 | (3,600)[2] | 113,070 |
| Total interest income | 441,138 | 206,294 | (16,260) | 631,172 |
| **Interest expense:** | | | | |
| Deposits | 118,683 | 78,911 | (6,000)[2] | 191,594 |
| Borrowings | 53,878 | 23,243 | — | 77,121 |
| Total interest expense | 172,561 | 102,154 | (6,000) | 268,715 |
| **Net interest income** | 268,577 | 104,140 | (10,260) | 362,457 |
| Provision for credit losses | 22,500 | 15,567 | — | 38,067 |
| **Net interest income after provision for credit losses** | 246,077 | 88,573 | (10,260) | 324,390 |
| **Noninterest income:** | | | | |
| Banking services | 40,082 | 13,515 | — | 53,597 |
| Insurance and benefits consulting | 49,733 | — | — | 49,733 |
| Wealth management services | 9,922 | 18,644 | — | 28,566 |
| Bank-owned life insurance | 5,449 | 2,777 | — | 8,226 |
| Gain on sales of investment securities, net | — | 2,642 | — | 2,642 |
| Other-than-temporary impairment losses on available for sale securities | (700) | (1,923) | — | (2,623) |
| Other | 11,249 | 10,562 | — | 21,811 |
| **Total noninterest income** | 115,735 | 46,217 | —[3] | 161,952 |
| **Noninterest expense:** | | | | |
| Salaries and employee benefits | 134,195 | 56,108 | — | 190,303 |
| Occupancy and equipment | 24,915 | 14,533 | — | 39,448 |
| Amortization of core deposit and other intangibles | 8,824 | 4,208 | 14,368[4] | 27,400 |
| Merger expenses | — | 3,430 | 28,235[5] | 31,665 |
| Other | 60,476 | 26,343 | 5,000[6] | 91,819 |
| **Total noninterest expense** | 228,410 | 104,622 | 47,603[7] | 380,635 |
| **Income (loss) before income taxes** | 133,402 | 30,168 | (57,863) | 105,707 |
| Income tax expense (benefit) | 44,964 | 5,075 | (23,145)[8] | 26,894 |
| **Net income (loss)** | 88,438 | 25,093 | (34,718) | 78,813 |
| Preferred stock dividend | 1,022 | — | — | 1,022 |
| Accretion of preferred stock discount | 162 | — | — | 162 |
| **Net income (loss) available to common stockholders** | $ 87,254 | $ 25,093 | $ (34,718) | $ 77,629 |
| **Earnings per common share:** | | | | |
| Basic | $ 0.81 | $ 0.78 | $ — | $ 0.61 |
| Diluted | $ 0.81 | $ 0.78 | $ — | $ 0.60 |
| **Weighted average common shares outstanding:** | | | | |
| Basic | 107,531 | 32,201 | 20,440[9] | 127,971 |
| Diluted | 108,174 | 32,364 | 20,440[9] | 128,614 |

*(Notes to Unaudited Pro Forma Condensed Consolidated Statement of Income follow on page 17)*

Table of Contents

*(Notes to Unaudited Pro Forma Condensed Consolidated Statement of Income)*

---

(1)   Assumes the merger of Harleysville National Corporation was completed at the beginning of the periods presented.

(2)   The pro forma acquisition adjustments reflect the amortization/accretion of fair market value adjustments related to loans, investment securities, and deposits utilizing the interest method over the estimated lives of the related asset or liability.

(3)   Noninterest income does not reflect revenue enhancement opportunities.

(4)   Represents amortization of core deposit intangible amortized using the double-declining balance method over 10 years.

(5)   The pro forma acquisition adjustment reflects integration expenses, primarily professional, legal and conversion related expenditures.

(6)   The pro forma acquisition adjustment reflects a charitable contribution to First Niagara Bank Foundation in an effort to maintain an appropriate level of charitable giving in southeastern Pennsylvania.

(7)   Noninterest expenses do not reflect anticipated cost savings.

(8)   Reflects the tax impact of the pro forma acquisition adjustments at First Niagara's statutory income tax rate of 40%.

(9)   The pro forma acquisition adjustment reflects the 20.4 million shares expected to be issued in connection with the merger. However, the merger agreement establishes loan delinquency thresholds and provides for a reduction in the exchange ratio and the ability to terminate the merger agreement in the event of specific increases in Harleysville National Corporation loan delinquencies. As of November 30, 2009, Harleysville National Corporation loan delinquencies were approximately $173.6 million.

17

Table of Contents

## COMPARATIVE PRO FORMA PER SHARE DATA

The table below summarizes selected per share information about First Niagara and Harleysville National Corporation. First Niagara share information is presented on a pro forma basis to reflect the merger with Harleysville National Corporation. The Harleysville National Corporation per share information is presented both historically, and on a pro forma basis to reflect the merger. First Niagara has also assumed that the consideration in the merger will be paid in 20.4 million shares of First Niagara common stock.

The data in the table should be read together with the financial information and the financial statements of First Niagara and Harleysville National Corporation incorporated by reference in this proxy statement-prospectus. The pro forma per share data or combined results of operations per share data is presented as an illustration only. The data does not necessarily indicate the combined financial position per share or combined results of operations per share that would have been reported if the merger had occurred when indicated, nor is the data a forecast of the combined financial position or combined results of operations for any future period. No pro forma adjustments have been included herein which reflect potential effects of merger integration expenses, cost savings or operational synergies which may be obtained by combining the operations of First Niagara and Harleysville National Corporation or the costs of combining the companies and their operations.

It is further assumed that First Niagara will pay a cash dividend after the completion of the merger at the annual rate of $0.56 per share. The actual payment of dividends is subject to numerous factors, and no assurance can be given that First Niagara will pay dividends following the completion of the merger or that dividends will not be reduced in the future.

| | First Niagara Financial Group, Inc. Historical | Harleysville National Corporation Historical | Combined Pro Forma Amounts for First Niagara Financial Group, Inc./ Harleysville National Corporation | Pro Forma Harleysville National Corporation Equivalent Shares[1] |
|---|---|---|---|---|
| | | | (Shares in thousands) | |
| Book value per share at September 30, 2009 | $ 12.90 | $ 6.04 | $ 12.67 | $ 6.01 |
| Book value per share at December 31, 2008 | 15.02 | 11.05 | 14.36 | 6.81 |
| Shares outstanding at September 30, 2009 | 188,151 | 43,123 | 208,591 | — |
| Shares outstanding at December 31, 2008 | 118,562 | 42,946 | 139,002 | — |
| Cash dividends paid per common share for the nine months ended September 30, 2009 | $ 0.42 | $ 0.11 | $ 0.42 | 0.20 |
| Cash dividends paid per common share for the year ended December 31, 2008 | 0.56 | 0.80 | 0.56 | 0.27 |
| Basic earnings (loss) per share from continuing operations: | | | | |
| For the nine months ended September 30, 2009 | $ 0.29 | $ (5.16) | $ (1.34) | $(0.64) |
| For the year ended December 31, 2008 | 0.81 | 0.78 | 0.61 | 0.29 |
| Diluted earnings (loss) per share from continuing operations: | | | | |
| For the nine months ended September 30, 2009 | $ 0.29 | $ (5.16) | $ (1.34) | $(0.64) |
| For the year ended December 31, 2008 | 0.81 | 0.78 | 0.60 | 0.28 |

---

[1]    Calculated by multiplying amounts in the Combined Pro Forma Amounts for First Niagara/Harleysville National Corporation column by a 0.474 exchange ratio which represents the number of shares of First Niagara common stock a Harleysville National Corporation shareholder will receive for each share of stock owned.

18

<u>Table of Contents</u>

The following table shows trading information for Harleysville National Corporation common stock and First Niagara common stock as of market close on July 24, 2009 and December 7, 2009. July 24, 2009 was the last trading date before the parties announced the merger. December 7, 2009 is a recent date before this proxy statement-prospectus was finalized.

| Date | First Niagara Financial Group, Inc. Common Stock | Harleysville National Corporation Common Stock | Equivalent Value for Each Harleysville National Corporation Share |
|------|---|---|---|
| July 24, 2009 | $11.74 | $4.00 | $5.56 |
| December 7, 2009 | 13.26 | 5.97 | 6.29 |

19

Table of Contents

# RISK FACTORS

*In addition to the other information contained in or incorporated by reference into this proxy statement-prospectus, including the matters addressed under the caption "Forward-Looking Statements," you should carefully consider the following risk factors in deciding whether to vote for adoption of the merger agreement.*

## Risks related to the Merger

*Regulatory Approvals May Not be Received, May Take Longer Than Expected or May Impose Conditions That are Not Presently Anticipated or Cannot be Met.*

Before the transactions contemplated in the merger agreement, including the merger, may be completed, various approvals or consents must be obtained from the Federal Reserve to register First Niagara Financial Group, Inc. as a bank holding company and various bank regulatory and other authorities. These governmental entities may impose conditions on the completion of the merger or require changes to the terms of the merger agreement. Although Harleysville National Corporation does not currently expect that any such conditions or changes would be imposed, there can be no assurance that they will not be, and such conditions or changes could have the effect of delaying completion of the transactions contemplated in the merger agreement or imposing additional costs on or limiting First Niagara's revenues, any of which might have a material adverse effect on First Niagara following the merger. There can be no assurance as to whether the regulatory approvals will be received, the timing of those approvals, or whether any conditions will be imposed.

*If the Merger Agreement is Terminated, Certain Pre-Merger Transactions Between First Niagara and Harleysville National Corporation Designed to Alleviate Regulatory Pressure on Harleysville National Bank May Not Have Their Intended Results.*

On May 28, 2009, the Office of the Comptroller of the Currency (the "OCC") imposed an individual minimum capital requirement on Harleysville National Bank, requiring it to increase its regulatory capital ratios. To enable Harleysville National Bank to achieve and maintain capital ratios consistent with those of a "well-capitalized" institution not subject to individual minimum capital ratios pending completion of the merger, and to address the OCC's supervisory concerns, on December 4, 2009, First Niagara loaned $35 million to Harleysville National Corporation, the proceeds of which were contributed to Harleysville National Bank as Tier One capital. The loan is secured by a pledge of all of the stock of Harleysville National Bank, and is part of a $50 million loan facility extended by First Niagara to Harleysville National Corporation. If the merger agreement is terminated, Harleysville National Corporation will have between 30 and 90 days to repay the loan to First Niagara (subject to immediate acceleration if Harleysville National Bank is "significantly undercapitalized" under regulatory standards). If Harleysville National Corporation cannot repay the loan by its due date, First Niagara could foreclose on the stock of Harleysville National Bank under the pledge security agreement. There can be no assurance that Harleysville National Corporation will be able to raise funds sufficient to repay the loan from First Niagara if the merger agreement is terminated (including the requirement that Harleysville National Corporation repay the loan within 30 days if Harleysville National Corporation shareholders fail to adopt the merger agreement). If the merger agreement is terminated, First Niagara could lose all or a portion of the funds loaned to Harleysville National Corporation.

20

Table of Contents

First Niagara is also prepared to purchase up to $80 million in performing commercial loans from Harleysville National Bank and allow Harleysville National Bank to originate residential and home equity loans on behalf of First Niagara via a correspondent relationship, both of which actions would further enhance Harleysville National Bank's regulatory capital ratios and boost lending activities. There can be no assurance that these actions will result in achieving the desired results, or that all of these actions will be implemented.

### *The Merger Agreement May Be Terminated in Accordance With Its Terms and The Merger May Not Be Completed.*

The merger agreement with Harleysville National Corporation is subject to a number of conditions which must be fulfilled in order to close. Those conditions include: Harleysville National Corporation shareholder approval, regulatory approval, the continued accuracy of certain representations and warranties by both parties and the performance by both parties of certain covenants and agreements. In particular, the merger agreement defines the occurrence of $350.0 million or greater in Harleysville National Corporation delinquent loans as of any month end prior to the closing date, excluding any month end subsequent to February 28, 2010, as a material adverse effect which would allow First Niagara to terminate the merger agreement. As of November 30, 2009, the amount of Harleysville National Corporation delinquent loans was $173.6 million. In addition, certain circumstances exist where Harleysville National Corporation may choose to terminate the merger agreement, including the acceptance of a superior proposal or the decline in First Niagara's share price to below $9.28 as of the first date when all regulatory approvals for the merger have been received combined with such decline being at least 20% greater than a corresponding price decline of the Nasdaq Bank Index, with no adjustment made to the exchange ratio by First Niagara. Under such circumstances, First Niagara may, but is not required to, increase the exchange ratio in order to avoid termination of the merger agreement. First Niagara has not determined whether it would increase the exchange ratio in order to avoid termination of the merger agreement by Harleysville National Corporation. See "The Merger and the Merger Agreement-Merger Consideration" for a more complete discussion of the merger consideration to be paid in this proposed transaction and "-Termination; Amendment; Waiver" for a more complete discussion of the circumstances under which the merger agreement could be terminated. There can be no assurance that the conditions to closing the merger will be fulfilled or that the merger will be completed.

### *Harleysville National Corporation's Asset Quality May Deteriorate Prior to Completion of the Merger.*

Harleysville National Corporation's nonperforming assets were $153.7 million at September 30, 2009 and $138.9 million at June 30, 2009, compared to $78.5 million at December 31, 2008. Nonperforming assets as a percentage of total assets were 2.98% at September 30, 2009 and 2.67% at June 30, 2009, compared to 1.43% at December 31, 2008 and 0.98% at September 30, 2008. Net charge-offs for the third quarter of 2009 were $7.8 million, compared to $2.1 million in the same period of 2008. The allowance for credit losses increased to $77.3 million at September 30, 2009, compared to $50.0 million at December 31, 2008, and $31.7 million at September 30, 2008. Should these adverse trends continue, they may have an adverse effect on Harleysville National Corporation's financial and capital positions, and may differ from First Niagara's estimates thereof.

21

Table of Contents

***First Niagara Could Record Future Impairment Losses on Harleysville National Corporation's Holdings of Investment Securities Available For Sale. First Niagara May Not Receive Full Future Interest Payments on These Securities.***

Harleysville National Corporation's investment portfolio of securities available for sale includes trust preferred securities, private label collateralized mortgage obligations and collateralized debt obligations. Harleysville National Corporation recognized an other than temporary impairment charge totaling approximately $6.5 million for the nine months ended September 30, 2009 as a result of impairment charges related to collateralized debt obligations, collateralized mortgage obligations and equity securities. If the merger with Harleysville National Corporation is completed, First Niagara will take ownership of these securities. A number of factors or combinations of factors could cause First Niagara to conclude in one or more future reporting periods that an unrealized loss that exists with respect to these securities constitutes an additional impairment that is other than temporary, which could result in material losses to First Niagara. These factors include, but are not limited to, continued failure to make scheduled interest payments, an increase in the severity of the unrealized loss on a particular security, an increase in the continuous duration of the unrealized loss without an improvement in value or changes in market conditions and/or industry or issuer specific factors that would render First Niagara unable to forecast a full recovery in value. In addition, the fair values of these investment securities could decline if the overall economy and the financial condition of some of the issuers continue to deteriorate and there remains limited liquidity for these securities.

***First Niagara May Fail to Realize the Anticipated Benefits of the Merger.***

The success of the merger will depend on, among other things, First Niagara's ability to realize anticipated cost savings and to combine the businesses of First Niagara Bank and Harleysville National Bank in a manner that permits growth opportunities and does not materially disrupt the existing customer relationships of Harleysville National Bank nor result in decreased revenues resulting from any loss of customers. If First Niagara is not able to successfully achieve these objectives, the anticipated benefits of the merger may not be realized fully or at all or may take longer to realize than expected.

First Niagara and Harleysville National Corporation have operated and, until the completion of the merger, will continue to operate, independently. Certain employees of Harleysville National Corporation will not be employed by First Niagara after the merger. In addition, employees of Harleysville National Corporation that First Niagara wishes to retain may elect to terminate their employment as a result of the merger which could delay or disrupt the integration process. It is possible that the integration process could result in the disruption of Harleysville National Corporation's ongoing businesses or inconsistencies in standards, controls, procedures and policies that adversely affect the ability of First Niagara to maintain relationships with customers and employees or to achieve the anticipated benefits of the merger.

***Harleysville National Corporation Directors and Officers Have Interests in the Merger Besides Those of a Shareholder.***

Harleysville National Corporation's directors and officers have various interests in the merger besides being Harleysville National Corporation shareholders. These interests include:

- the potential payment of certain benefits to Paul Geraghty, the President and Chief Executive Officer of Harleysville National Corporation, George Rapp, the Chief Financial Officer of Harleysville National Corporation and Harleysville National

22

Table of Contents

Bank, Brent Peters, the Executive Vice President of Harleysville National Corporation and the President of East Penn Bank, James McGowan, the Chief Credit Officer of Harleysville National Corporation and Harleysville National Bank, Lewis Cyr, the Chief Lending Officer of Harleysville National Corporation and Harleysville National Bank, Joseph Blair, the President of Millennium Wealth Management, under their existing employment agreements with Harleysville Management Services, LLC;

- the potential payment of certain benefits to Ammon Baus under his existing employment agreement with Willow Financial Bank that was assumed by Harleysville National Corporation;

- the potential payment of certain benefits to Demetra Takes, the President and Chief Executive Officer of Harleysville National Bank under her existing employment agreement with Harleysville National Corporation and Harleysville National Bank;

- the potential payment of certain benefits to Randy McGarry, the Chief Information Technology Officer of Harleysville National Bank and Stephen Murray, a Senior Vice President of Harleysville National Bank, under their existing change in control agreements with Harleysville Management Services, LLC;

- the potential payment of certain benefits to Paul Geraghty and James McGowan under their existing supplemental executive benefit agreements with Harleysville Management Services, LLC, and the potential payment of certain benefits to Demetra Takes under her existing supplemental executive benefit agreements with Harleysville National Bank;

- the payment of the outstanding benefit obligations to the participants in the Harleysville National Bank Directors Fee Deferral Plan, which obligations will be unchanged by the merger;

- the payment of outstanding benefit obligations to Donna Coughey, an Executive Vice President of Harleysville National Bank, under her existing supplemental executive benefit agreement with Willow Financial Bancorp, Inc that was assumed by Harleysville National Corporation, which obligations will be unchanged by the merger;

- the payment of the outstanding benefit obligations to Brent Peters under his existing supplemental executive retirement plan agreement with East Penn Bank, as assumed by Harleysville National Corporation, which obligations will be unchanged by the merger;

- the payment of the outstanding benefit obligations to Walter Daller, Jr., the Chairman of the Board of Directors of Harleysville National Corporation under his existing supplemental executive benefit agreement with Harleysville National Bank, which obligations will be unchanged by the merger;

- the payment of additional amounts to certain other current and former officers and employees and former directors under change in control agreements and deferred compensation arrangements;

23

Table of Contents

- the accelerated vesting of all outstanding unvested stock options under the following equity plans: (i) Harleysville National Corporation 1993 Stock Incentive Plan; (ii) the Harleysville National Corporation 1998 Independent Directors Stock Option Plan, as amended; (iii) the Harleysville National Corporation 1998 Stock Incentive Plan; (iv) the Harleysville National Corporation 2004 Omnibus Stock Incentive Plan (as amended and restated effective November 9, 2006); (v) Harleysville National Corporation 2008-2010 Restricted Stock Incentive Plan; (vi) East Penn Financial Corporation 1999 Stock Incentive Plan, as assumed by Harleysville National Corporation; (vii) Willow Financial Bancorp, Inc. Amended and Restated 1999 Stock Option Plan, as assumed by Harleysville National Corporation; (viii) Willow Financial Bancorp, Inc. Amended and Restated 2002 Stock Option Plan, as assumed by Harleysville National Corporation; (ix) East Penn Financial Corporation 1999 Independent Directors Stock Incentive Plan; (x) Chester Valley Bancorp, Inc. 1997 Stock Option Plan; and (xi) Millennium Bank Stock Compensation Program, and in each case as amended; and

- the agreement by First Niagara to indemnify Harleysville National Corporation directors and officers.

*Harleysville National Corporation Shareholders Cannot Be Certain of the Amount of Nor the Market Value of The Merger Consideration They Will Receive, Because the Market Price of First Niagara Common Stock Will Fluctuate and The Exchange Ratio is Subject to a Downward Adjustment in the Event that Harleysville National Corporation Delinquent Loans are $237.5 Million or Greater.*

Upon completion of the merger, each share of Harleysville National Corporation common stock will be converted into merger consideration consisting of 0.474 of a share of First Niagara common stock. This exchange ratio is subject to downward adjustment, as described in the merger agreement and in this document, in the event that certain of Harleysville National Corporation delinquent loans are $237.5 million or greater as of the month end prior to closing date of this transaction. As of November 30, 2009, the amount of Harleysville National Corporation's loan delinquencies was $173.6 million. See "The Merger and the Merger Agreement-Merger Consideration" for a more complete discussion of the merger consideration to be paid in this proposed transaction and "—Termination; Amendment; Waiver" for a more complete discussion of the circumstances under which the merger agreement could be terminated.

As a result, the amount of merger consideration a shareholder will receive if the merger is consummated is subject to change. In addition, the market value of the merger consideration may vary from the closing price of First Niagara common stock on the date it announced the merger, on the date that this document was mailed to Harleysville National Corporation shareholders, on the date of the special meeting of the Harleysville National Corporation shareholders and on the date it completes the merger and thereafter. Any change in exchange ratio or the market price of First Niagara common stock prior to completion of the merger will affect the amount of and the market value of the merger consideration that Harleysville National Corporation shareholders will receive upon completion of the merger. Accordingly, at the time of the special meeting, Harleysville National Corporation shareholders will not know or be able to calculate with certainty the amount nor the market value of the merger consideration they would receive upon completion of the merger. Stock price changes may result from a variety of factors, including general market and economic conditions, changes in its respective businesses, operations and prospects, and regulatory considerations. Many of these factors are beyond First

24

Table of Contents

Niagara's control. You should obtain current market quotations for shares of First Niagara common stock and for shares of Harleysville National Corporation common stock before you vote.

***Harleysville National Corporation Shareholders Will Have a Reduced Ownership and Voting Interest After the Merger and Will Exercise Less Influence Over Management.***

Harleysville National Corporation's shareholders currently have the right to vote in the election of the Harleysville National Corporation board of directors and on other matters affecting Harleysville National Corporation. When the merger occurs, each Harleysville National Corporation shareholder that receives shares of First Niagara common stock will become a shareholder of First Niagara with a percentage ownership of the combined organization that is much smaller than the shareholder's percentage ownership of Harleysville National Corporation. Because of this, Harleysville National Corporation's shareholders will have less influence on the management and policies of First Niagara than they now have on the management and policies of Harleysville National Corporation.

***Termination of the Merger Agreement Could Negatively Impact Harleysville National Corporation.***

First Niagara may terminate the merger agreement for the reasons set forth in the merger agreement, including if Harleysville National Corporation delinquent loans equal or exceed $350.0 million as of any month end prior to the closing date of the merger, excluding any month end after February 28, 2010. If the merger agreement is terminated, there may be various consequences including:

- Harleysville National Corporation's businesses may have been adversely impacted by the failure to pursue other beneficial opportunities due to the focus of management on the merger, without realizing any of the anticipated benefits of completing the merger; and

- the market price of Harleysville National Corporation common stock might decline to the extent that the current market price reflects a market assumption that the merger will be completed.

If the merger agreement is terminated and Harleysville National Corporation's board of directors seeks another merger or business combination, Harleysville National Corporation shareholders cannot be certain that Harleysville National Corporation will be able to find a party willing to pay an equivalent or more attractive price than the price First Niagara has agreed to pay in the merger.

***If the Merger Agreement is Terminated, Harleysville National Bank and Trust Company May be Forced to Divest Certain of its Financial Subsidiaries.***

Harleysville National Bank and Trust Company (the "Bank") is party to an agreement with the OCC pursuant to which the Bank must take certain mutually-agreed upon actions to address certain of the OCC's concerns about the Bank's management and capital position, as reflected in the OCC's most recent examination report. If the merger agreement is terminated and the Bank subsequently fails to address adequately the OCC's concerns, the Bank could be forced to divest certain of its financial subsidiaries, which could adversely affect Harleysville National Corporation's condition (financial or otherwise), prospects, earnings and business.

Table of Contents

***The Opinion of Harleysville National Corporation's Financial Advisor Will Not Reflect Changes in Circumstances Between Signing the Merger Agreement and the Merger, Including Any Reduction in the Merger Consideration as a Result of Harleysville National Corporation's Loan Delinquencies.***

Harleysville National Corporation's financial advisor, JPMorgan, rendered an opinion dated July 26, 2009, to the Harleysville National Corporation board of directors, that, as of such date, and based upon and subject to the factors and assumptions set forth in its written opinion (including, without limitation, that the exchange ratio would be 0.474, and that the level of Harleysville National Corporation delinquent loans would not result in any adjustment to the exchange ratio), as well as the extraordinary circumstances facing Harleysville National Corporation referred to in such written opinion, the exchange ratio of 0.474 of a share of First Niagara common stock to be received in respect of each share of Harleysville National Corporation common stock pursuant to the merger agreement was fair from a financial point of view to the holders of Harleysville National Corporation common stock. The opinion of JPMorgan, which will not be applicable if the exchange ratio is reduced due to the level of Harleysville National Corporation delinquent loans, was based on economic, market and other conditions as in effect on, and the information made available to it as of, the date thereof. JPMorgan assumed no responsibility for updating, revising or reaffirming its opinion based on circumstances, developments or events occurring after the date thereof.

Changes in the operations and prospects of First Niagara or Harleysville National Corporation, general market and economic conditions and other factors on which Harleysville National Corporation's financial advisor's opinion was based, may significantly alter the value of First Niagara or Harleysville National Corporation or the prices of shares of First Niagara common stock or Harleysville National Corporation common stock by the time the merger is completed. The opinion does not speak as of the time the merger will be completed or as of any date other than the date of such opinion. The Harleysville National Corporation board of directors' recommendation that holders of Harleysville National Corporation common stock vote "FOR" adoption of the merger agreement, however, is as of the date of this document. For a description of the opinion that Harleysville National Corporation received from its financial advisor, please refer to "The Merger — Opinion of Harleysville National Corporation's Financial Advisor". For a description of the other factors considered by Harleysville National Corporation's board of directors in determining to approve the merger, please refer to "The Merger — Harleysville National Corporation's Reasons for the Merger; Recommendation of the Harleysville National Corporation Board of Directors."

***The Merger Agreement Limits Harleysville National Corporation's Ability to Pursue Alternatives to the Merger.***

The merger agreement contains "no shop" provisions that, subject to limited exceptions, limit Harleysville National Corporation's ability to discuss, facilitate or commit to competing third-party proposals to acquire all or a significant part of Harleysville National Corporation. In addition, Harleysville National Corporation has agreed to pay First Niagara a termination fee in the amount of $10.0 million in the event that Harleysville National Corporation terminates the merger agreement for certain reasons. These provisions might discourage a potential competing acquirer that might have an interest in acquiring all or a significant part of Harleysville National Corporation from considering or proposing that acquisition even if it were prepared to pay consideration with a higher per share market price than that proposed in the merger, or might result in a potential competing acquiror's proposing to pay a lower per share price to acquire

26

Table of Contents

Harleysville National Corporation than it might otherwise have proposed to pay. Harleysville National Corporation can consider and participate in discussions and negotiations with respect to an alternative proposal so long as the Harleysville National Corporation board of directors determines in good faith (after consultation with legal counsel) that failure to do so would be reasonably likely to result in a violation of its fiduciary duties to Harleysville National Corporation shareholders under applicable law.

### The Merger is Subject to the Receipt of Consents and Approvals From Government Entities that May Impose Conditions that Could Have an Adverse Effect on the Combined Company Following the Merger.

Before the merger may be completed, various approvals or consents must be obtained from the Federal Reserve and other governmental entities. These government entities, including the Federal Reserve, may impose conditions on the completion of the merger or require changes to the terms of the merger. Although First Niagara and Harleysville National Corporation do not currently expect that any such material conditions or changes would be imposed, there can be no assurance that they will not be, and such conditions or changes could have the effect of delaying completion of the merger or imposing additional costs on or limiting the revenues of First Niagara following the merger, any of which might have a material adverse effect on First Niagara following the merger.

### The Merger is Subject to Closing Conditions, Including Shareholder Approval, that, if Not Satisfied or Waived, Will Result in the Merger Not Being Completed, Which May Result in Material Adverse Consequences to Harleysville National Corporation's Business and Operations.

The merger is subject to closing conditions, including the approval of Harleysville National Corporation shareholders that, if not satisfied, will prevent the merger from being completed. The closing condition that Harleysville National Corporation shareholders adopt the merger agreement may not be waived under applicable law and must be satisfied for the merger to be completed. All directors of Harleysville National Corporation have agreed to vote their shares of Harleysville National Corporation common stock in favor of the proposals presented at the special meeting. If Harleysville National Corporation's shareholders do not adopt the merger agreement and the merger is not completed, the resulting failure of the merger could have a material adverse impact on Harleysville National Corporation's business and operations. In addition to the required approvals and consents from governmental entities and the approval of Harleysville National Corporation shareholders, the merger is subject to other conditions beyond First Niagara's and Harleysville National Corporation's control that may prevent, delay or otherwise materially adversely affect its completion. First Niagara cannot predict whether and when these other conditions will be satisfied. See "The Merger Agreement — Conditions to the Merger."

### The Shares of First Niagara Common Stock to be Received by Harleysville National Corporation Shareholders as a Result of the Merger Will Have Different Rights From the Shares of Harleysville National Corporation Common Stock.

Upon completion of the merger, Harleysville National Corporation shareholders will become First Niagara shareholders and their rights as shareholders will be governed by the certificate of incorporation and bylaws of First Niagara. The rights associated with Harleysville National Corporation common stock are different from the rights associated with First Niagara

27

Table of Contents

common stock. Please see "Comparison of Shareholders' Rights" for a discussion of the different rights associated with First Niagara common stock.

*Several Lawsuits Have Been Filed Against Harleysville National Corporation and the Members of the Harleysville National Corporation Board of Directors, As Well As First Niagara, Challenging the Merger, and an Adverse Judgment in Such Lawsuits May Prevent the Merger From Becoming Effective or From Becoming Effective Within the Expected Timeframe.*

Harleysville National Corporation and the members of the Harleysville National Corporation board of directors are named as defendants in purported class action lawsuits brought by Harleysville National Corporation shareholders challenging the proposed merger, seeking, among other things, to enjoin the defendants from consummating the merger on the agreed-upon terms. First Niagara is also named as a defendant in some, but not all, of these lawsuits. Additionally, the directors of Harleysville National Corporation have been named as defendants in four shareholder derivative lawsuits that also seek, among other things, to enjoin the consummation of the merger. See "Litigation Relating to the Merger" for more information about the class action lawsuits related to the merger that have been filed.

One of the conditions to the closing of the merger is that no order, decree or injunction issued by a court or agency of competent jurisdiction that enjoins or prohibits the consummation of the merger shall be in effect. As such, if the plaintiffs are successful in obtaining an injunction prohibiting the defendants from consummating the merger on the agreed upon terms, then such injunction may prevent the merger from becoming effective, or from becoming effective within the expected timeframe.

## Risks About First Niagara Financial Group, Inc.

*Economic Conditions May Adversely Affect First Niagara's Liquidity and Financial Condition.*

Recent significant declines in the values of mortgage-backed securities and derivative securities by financial institutions, government sponsored entities, and major commercial and investment banks has led to decreased confidence in financial markets among borrowers, lenders, and depositors, as well as disruption and extreme volatility in the capital and credit markets and the failure of some entities in the financial sector. As a result, many lenders and institutional investors have reduced or ceased to provide funding to borrowers. Continued turbulence in the capital and credit markets may adversely affect First Niagara's liquidity and financial condition and the willingness of certain counterparties and customers to do business with First Niagara.

*Commercial Loans Increase First Niagara's Exposure to Credit Risks.*

At September 30, 2009, First Niagara's portfolio of commercial loans totaled $4.6 billion, or 64% of total loans. First Niagara plans to continue to emphasize the origination of these types of loans, which generally exposes First Niagara to a greater risk of nonpayment and loss than residential real estate loans because repayment of such loans often depends on the successful operations and income stream of the borrowers. Additionally, such loans typically involve larger loan balances to single borrowers or groups of related borrowers compared to residential real estate loans. Also, many of First Niagara's borrowers have more than one commercial loan outstanding. Consequently, an adverse development with respect to one loan or one credit

28

Table of Contents

relationship can expose First Niagara to a significantly greater risk of loss compared to an adverse development with respect to a residential real estate loan.

First Niagara targets its business lending and marketing strategy towards small to middle market businesses. These small to middle market businesses generally have fewer financial resources in terms of capital or borrowing capacity than larger entities. If general economic conditions negatively impact these businesses, First Niagara's results of operations and financial condition may be adversely affected.

*Increases to the Allowance for Credit Losses May Cause First Niagara's Earnings to Decrease.*

First Niagara's customers may not repay their loans according to the original terms, and the collateral securing the payment of those loans may be insufficient to pay any remaining loan balance. Hence, First Niagara may experience significant loan losses, which could have a material adverse effect on its operating results. First Niagara makes various assumptions and judgments about the collectibility of its loan portfolio, including the creditworthiness of its borrowers and the value of the real estate and other assets serving as collateral for the repayment of loans. In determining the amount of the allowance for credit losses, First Niagara relies on loan quality reviews, past loss experience, and an evaluation of economic conditions, among other factors. If First Niagara's assumptions prove to be incorrect, First Niagara's allowance for credit losses may not be sufficient to cover losses inherent in First Niagara's loan portfolio, resulting in additions to the allowance. Material additions to the allowance would materially decrease its net income.

First Niagara's emphasis on the origination of commercial loans is one of the more significant factors in evaluating its allowance for credit losses. As First Niagara continues to increase the amount of these loans, additional or increased provisions for credit losses may be necessary and as a result would decrease First Niagara's earnings.

Bank regulators periodically review First Niagara's allowance for credit losses and may require First Niagara to increase its provision for credit losses or loan charge-offs. Any increase in First Niagara's allowance for credit losses or loan charge-offs as required by these regulatory authorities could have a material adverse effect on its results of operations and/or financial condition.

*Concentration of Loans in First Niagara's Primary Market Area May Increase Risk.*

First Niagara's success depends primarily on the general economic conditions in Upstate New York and Western Pennsylvania, as nearly all of First Niagara's loans are to customers in these markets. Accordingly, the local economic conditions in Upstate New York and Western Pennsylvania have a significant impact on the ability of borrowers to repay loans. In addition, the merger will expand First Niagara's market to the Southeastern Pennsylvania area. As such, a decline in real estate valuations in this market would lower the value of the collateral securing those loans. A significant weakening in general economic conditions such as inflation, recession, unemployment, or other factors beyond its control could also negatively affect First Niagara's financial results.

29

Table of Contents

*Changes in Interest Rates Could Adversely Affect First Niagara's Results of Operations and Financial Condition.*

First Niagara's results of operations and financial condition are significantly affected by changes in interest rates. First Niagara's financial results depend substantially on net interest income, which is the difference between the interest income that First Niagara earns on interest-earning assets and the interest expense First Niagara pays on interest-bearing liabilities. Because First Niagara's interest-bearing liabilities generally reprice or mature more quickly than its interest-earning assets, an increase in interest rates generally would tend to result in a decrease in its net interest income. First Niagara has taken steps to mitigate this risk such as holding fewer longer-term residential mortgages as well as investing excess funds in shorter-term investments.

Changes in interest rates also affect the fair value of First Niagara's interest-earning assets and in particular its investment securities available for sale. Generally, the fair value of First Niagara's investment securities fluctuates inversely with changes in interest rates. At September 30, 2009, the fair value of First Niagara's investment securities available for sale totaled $3.7 billion. Unrealized gains on its securities available for sale, net of tax, amounted to $34.1 million and are reported in other comprehensive income as a separate component of stockholders' equity. Decreases in the fair value of First Niagara's investment securities available for sale, therefore, could have an adverse effect on its stockholders' equity or its earnings if the decrease in fair value is deemed to be other than temporary.

Changes in interest rates may also affect the average life of First Niagara's loans and mortgage-related securities. Decreases in interest rates can result in increased prepayments of loans and mortgage-related securities, as borrowers refinance to reduce borrowing costs. Under these circumstances, First Niagara is subject to reinvestment risk to the extent that it is unable to reinvest the cash received from such prepayments at rates that are comparable to the rates on its existing loans and securities. Additionally, increases in interest rates may decrease loan demand and make it more difficult for borrowers to repay adjustable rate loans.

*Conditions in Insurance Markets Could Adversely Affect First Niagara's Earnings.*

As First Niagara has become increasingly reliant on noninterest income, particularly insurance fees and commissions, these revenue levels could be negatively impacted by the fluctuating premiums in the insurance market caused by capacity constraints and losses due to natural disasters. Other factors that affect its insurance revenue are profitability and growth of its clients, continued development of new products and services, as well as its access to markets.

*First Niagara's Ability to Grow May Be Limited if It Cannot Make Acquisitions.*

In an effort to fully deploy First Niagara's capital and to increase its loans and deposits, First Niagara intends to continue to acquire other financial institutions, financial services companies, or branches. First Niagara competes with other financial institutions with respect to proposed acquisitions. First Niagara cannot predict if or when it will be able to identify and attract acquisition candidates or make acquisitions on favorable terms. In addition, First Niagara incurs risks and challenges associated with the integration of acquired institutions in a timely and efficient manner, and it cannot guarantee that it will be successful in retaining existing customer relationships or achieving anticipated operating efficiencies.

30

Table of Contents

*First Niagara's Expanding Branch Network May Affect Its Financial Performance.*

Since 1998, First Niagara has expanded its branch network by both acquiring financial institutions and establishing de novo branches. At September 30, 2009, First Niagara operated 170 branches, and, if the merger is completed, it will acquire approximately 83 branch locations in Southeastern Pennsylvania from Harleysville National Corporation. First Niagara cannot assure that its ongoing branch expansion strategy will be accretive to earnings, or that it will be accretive to earnings within a reasonable period of time. Numerous factors contribute to the performance of a new branch, such as a suitable location, qualified personnel, and an effective marketing strategy. Additionally, it takes time for a new branch to gather sufficient loans and deposits to generate enough income to offset its expenses, some of which, like salaries and occupancy expense, are relatively fixed costs.

*Strong Competition May Limit First Niagara's Growth and Profitability.*

Competition in the banking and financial services industry is intense. First Niagara competes with commercial banks, savings institutions, mortgage brokerage firms, credit unions, finance companies, mutual funds, insurance companies, and brokerage and investment banking firms operating locally and elsewhere. Many of these competitors (whether regional or national institutions) have substantially greater resources and lending limits than First Niagara and may offer certain services that it does not or cannot provide. First Niagara's profitability depends upon its ability to successfully compete in its market area.

*First Niagara Operates in a Highly Regulated Environment and May Be Adversely Affected by Changes in Laws and Regulations.*

Currently, First Niagara is subject to extensive regulation, supervision, and examination by the Office of Thrift Supervision, Federal Deposit Insurance Corporation and the New York State Banking Department. First Niagara has applied to the Federal Reserve to register as a bank holding company and intends to keep First Niagara Bank and Harleysville National Bank as separate subsidiaries for an indeterminate period of time. As such, First Niagara Bank will continue to be regulated by the OTS and Harleysville National Bank will continue to be regulated by the OCC. First Niagara recently applied to the OCC to become a commercial bank and, assuming OCC approval of such application, will be subject to regulation and supervision by the OCC. First Niagara, as a bank holding company, will be subject to regulation by the Federal Reserve. Such regulators govern the activities in which First Niagara may engage, primarily for the protection of depositors. These regulatory authorities have extensive discretion in connection with its supervisory and enforcement activities, including the imposition of restrictions on the operation of a bank, the classification of assets by a bank, and the adequacy of a bank's allowance for credit losses. Any change in such regulation and oversight, whether in the form of regulatory policy, regulations, or legislation, could have a material impact on First Niagara and its operations. First Niagara believes that it is in substantial compliance with applicable federal, state and local laws, rules and regulations. Because First Niagara's business is highly regulated, the laws, rules and applicable regulations are subject to regular modification and change. There can be no assurance that proposed laws, rules and regulations, or any other laws rule or regulation, will not be adopted in the future, which could make compliance more difficult or expensive or otherwise adversely affect First Niagara's business, financial condition or prospects.

31

defm14a

Table of Contents

*The Soundness of Other Financial Services Institutions May Adversely Affect First Niagara's Credit Risk.*

First Niagara relies on other financial services institutions through trading, clearing, counterparty, and other relationships. First Niagara maintains limits and monitor concentration levels of its counterparties as specified in its internal policies. First Niagara's reliance on other financial services institutions exposes it to credit risk in the event of default by these institutions or counterparties. These losses could adversely affect First Niagara's results of operations and financial condition.

*A Substantial Decline in the Value of First Niagara's FHLB of New York Common Stock May Adversely Affect Its Financial Condition.*

First Niagara owns common stock of Federal Home Loan Bank ("FHLB") of New York in order to qualify for membership in the FHLB system, which enables it to borrow funds under the FHLB of New York's advance program. The carrying value and fair market value of First Niagara's FHLB of New York common stock was $46.0 million as of September 30, 2009.

Recent published reports indicate that certain member banks of the FHLB system may be subject to asset quality risks that could result in materially lower regulatory capital levels. In an extreme situation, it is possible that the capitalization of a FHLB, including FHLB of New York, could be substantially diminished or reduced to zero. Consequently, given that there is no market for First Niagara's FHLB of New York common stock, First Niagara believes that there is a risk that its investment could be deemed other than temporarily impaired at some time in the future. If this occurs, it may adversely affect First Niagara's results of operations and financial condition.

If the capitalization of FHLB of New York is substantially diminished and if it further reduces or suspends its dividend, First Niagara's liquidity may be adversely impaired if it is not able to obtain an alternative source of funding.

*First Niagara Holds Certain Intangible Assets that Could Be Classified as Impaired in The Future. If These Assets Are Considered To Be Either Partially or Fully Impaired in the Future, First Niagara's Earnings and the Book Values of These Assets Would Decrease.*

Pursuant to ASC 350, "Intangibles-Goodwill and Other," First Niagara is required to test its goodwill and core deposit intangible assets for impairment on a periodic basis. The impairment testing process considers a variety of factors, including the current market price of its common shares, the estimated net present value of its assets and liabilities, and information concerning the terminal valuation of similarly situated insured depository institutions. The market price for its common shares was below its book value at September 30, 2009. Although the market price of these shares recovered to some extent during the three month period ended September 30, 2009, the shares generally traded below their book value during the first nine months of 2009. If the duration of this decline in the market value of First Niagara's common shares and the decline in the market prices of the common shares of similarly situated insured depository institutions persists during future reporting periods, or if the severity of the decline increases, it is possible that future impairment testing could result in a partial or full impairment of the value of its goodwill or core deposit intangible assets, or both. If an impairment determination is made in a future reporting period, First Niagara's earnings and the book value of these intangible assets will be reduced by the amount of the impairment. If an impairment loss is recorded, it will have little or no impact on the tangible book value of First Niagara's common shares or its regulatory capital levels.

32