**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

DANNY VALERIUS, Individually and On )
Behalf of Nominal Defendant )
HARLEYSVILLE NATIONAL )
CORPORATION, )
)
       Plaintiff, )
)
    vs. )
)
PAUL GERAGHTY, LEEANN B. BERGEY, )
WALTER E. DALLER, JR., HAROLD A. )
HERR, THOMAS C. LEAMER, STEPHANIE )
S. MITCHELL, A. ROSS MYERS, BRENT L. )
PETERS, JAMES A. WIMMER, JOHN J. )
CUNNINGHAM, III, JAMES E. McERLANE, )
and DEMETRA M. TAKES, )
)
       Defendants, )
)
  — and — )
)
HARLEYSVILLE, NATIONAL )
CORPORATION, a Pennsylvania Corporation, )
)
      Nominal Defendant. )
)

Civ. Action No. 09-6208

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

DECHERT LLP
Joseph A. Tate
Michael L. Kichline
Michael J. Newman
Cira Centre, 2929 Arch Street
Philadelphia PA 19104
(215) 994-4000

*Attorneys for Defendants*

Dated: January 18, 2010

## TABLE OF CONTENTS

I.   Introduction ................................................................................................1

II.  Plaintiff's Unwarranted Delay. ..................................................................2

III. Argument ....................................................................................................4

   A.   Plaintiff cannot meet his burden of demonstrating that he is entitled to a temporary
        restraining order. ..................................................................................4

      1.   Plaintiff cannot demonstrate that he enjoys a likelihood of succeeding on the merits of
           his claims. ........................................................................................4

      2.   Plaintiff will not suffer irreparable harm if the injunction is denied. ............8

            a.   Plaintiff's delay weighs against a finding of irreparable harm. ......9

            b.   Plaintiff has not established that money damages would be
                 an insufficient remedy. ..............................................10

      3.   Granting preliminary relief will greatly harm Defendants. .......................11

      4.   The public interest does not favor injunctive relief. ...............................13

   B.   Plaintiff's requested relief is barred by the doctrine of laches. .....................13

   C.   Plaintiff's motion should be denied because he has not demonstrated that he has the
        financial wherewithal to give a security in an amount that would pay the costs and
        damages sustained by Harleysville should Harleysville be wrongfully enjoined. ............14

IV.  Conclusion ...............................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

In re Adams Golf, Inc. Sec. Litig.,
381 F.3d 267 (3d Cir. 2004) ................................................................. 6

Advocacy Org. for Patients & Providers v. Mercy Health Servs.,
987 F. Supp. 967 (E.D. Mich. 1997) ..................................................... 13, 14

Bancroft Convertible Fund, Inc. v. Zico Investment Holding, Inc.,
825 F.2d 731 (3d Cir. 1987) ................................................................ 11

Bieros v. Nicola,
857 F. Supp. 445 (E.D. Pa. 1994) ........................................................ 4

Central Point Software, Inc. v. Global Software & Accessories, Inc.,
859 F. Supp. 640 (E.D.N.Y. 1994) ...................................................... 14

Citibank, N.A. v. Citytrust,
756 F.2d 273 (2d Cir. 1985) ................................................................ 14

Costello v. United States,
365 U.S. 265 (1961) ............................................................................ 13

David P. Simonetti Rollover IRA v. Margolis,
C.A. No. 3694-VCN, 2008 Del. Ch. LEXIS 78 (Del. Ch. June 27, 2008) ............................. 8

FMC Corp. v. Control Solutions, Inc.,
369 F. Supp. 2d 539 (E.D. Pa. 2005) ................................................... 8

Freer v. Mayer,
No. 91 CIV. 2519 (GLG), 1991 WL 355062 (S.D.N.Y. Apr. 26, 1991) ..................... 1

Goadby v. Philadelphia Elec. Co.,
639 F.2d 117 (3d Cir. 1981) ................................................................ 10

Gold Fields Ltd. v. Harmony Gold Mining Co., Ltd.,
No. 04 Civ. 8767 (RMB), 2004 WL 2710030 (S.D.N.Y. Nov. 23, 2004) ................... 10

Hoxworth v. Blinder, Robinson & Co., Inc.,
903 F.2d 186 (3d Cir. 1990) ................................................................ 14

Iavarone v. Raymond Keyes Associates, Inc.,
733 F. Supp. 727 (S.D.N.Y. 1990) ....................................................... 10

<u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>,
   882 F.2d 797 (3d Cir. 1989) ............................................................4, 9

<u>Irving Bank Corp. v. Bank of New York Co., Inc.</u>,
   692 F. Supp. 163 (S.D.N.Y. 1988) ...................................................11

<u>Kershner v. Mazurkiewicz</u>,
   670 F.2d 440 (3d Cir. 1982) ..............................................................4

<u>Klein v. General Nutrition Cos.</u>,
   186 F.3d 338 (3d Cir. 1999) ..............................................................6

<u>Kos Pharms., Inc. v. Andrx Corp.</u>,
   369 F.3d 700 (3d Cir. 2004) ..............................................................4

<u>Lichtenberg v. Besicorp Group, Inc.</u>,
   43 F. Supp. 2d 376 (S.D.N.Y. 1999) ...............................................11

<u>NAACO Indus., Inc. v. Applica, Inc.</u>,
   No. 06-3002, 2006 WL 3762090 (N.D. Ohio Dec. 20, 2006) .....................9, 10, 13

<u>In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.</u>,
   448 F. Supp. 2d 466 (E.D.N.Y. 2006) ...............................................5

<u>Plessey Co. v. General Elec. Co.</u>,
   628 F. Supp. 477 (D. Del. 1986) .......................................................10

<u>In re Pure Res. S'holders Litig.</u>,
   808 A.2d 421 (Del. Ch. 2002) ............................................................7

<u>Romine v. Acxiom Corp.</u>,
   296 F.3d 701 (8th Cir. 2002) ..............................................................5

<u>Ryan v. VHA Enters., Inc.</u>,
   No. 90 Civ. 2656 (PKL), 1990 WL 58969 (S.D.N.Y. May 1, 1990).....................10, 11, 13

<u>Scattergood v. Perelman</u>,
   CIV. A. No. 90-3451, 1990 WL 72801 (E.D. Pa. May 29, 1990) ...................1, 11

<u>Steven B. Golden Assocs. v. Royal Consumer Prods., LLC</u>,
   C.A. No. 09-3890, 2009 U.S. Dist. LEXIS 82883 (E.D. Pa. Sept. 10, 2009) ...........4

<u>Wayne County Employees' Retirement Sys. v. Corti</u>,
   954 A.2d 319 (Del. Ch. 2008) ..........................................................12

<u>Whirlpool Fin. Corp. v. GN Holdings, Inc.</u>,
   67 F.3d 605 (7th Cir. 1995) ..............................................................6

Winter v. National Resources Defense Council, Inc.,
    129 S. Ct. 365 (2008) .............................................................................. 9

W.R. Grace & Co. v. Local Union 759,
    461 U.S. 757 (1983) ............................................................................... 15

In re XM Satellite Radio Holdings Sec. Litig.,
    479 F. Supp. 2d 165 (D.D.C. 2007) ........................................................ 5

Zambelli Fireworks Mfg. Co., Inc. v. Wood,
    --- F.3d ---, 2010 WL 143682  (3d Cir. Jan. 15, 2010) ...................... 2, 14

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 65 ........................................................ 2, 14

## II.    Introduction

Having filed a meritless case, Plaintiff now files a Motion for Temporary Restraining

Order ("TRO Motion") as a last minute attempt to derail a vote on a merger that is essential to

the financial future of Harleysville.  Despite knowing about the Merger Agreement between

Harleysville and First Niagara for over five months, knowing the exact contents of the final

Proxy statement for more than four weeks, and filing a complaint more than two weeks ago, it is

only now, days away from the scheduled January 22, 2010 shareholder meeting, that Plaintiff has

requested the extraordinary relief of a TRO.  Such "strike" suits are routinely rejected by courts.

See, e.g., Freer v. Mayer, No. 91 CIV. 2519 (GLG), 1991 WL 355062, *5 (S.D.N.Y. Apr. 26,

1991) (denying motion for preliminary injunction and noting that courts have "consistently

rejected" unfounded § 14(a) claims); Scattergood v. Perelman, CIV. A. No. 90-3451, 1990 WL

72801 (E.D. Pa. May 29, 1990) (denying shareholder-plaintiffs' motion for preliminary

injunction seeking to postpone the shareholder vote on a merger despite plaintiffs' allegations of

a "false and misleading" proxy statement).[1]

A single, rogue shareholder should not be permitted to hold a merger hostage,

particularly when that merger is of critical importance to Harleysville and its customers,

employees and shareholders.  Indeed, Plaintiff's conduct becomes even more outrageous when

viewed in light of the very real dangers that could result if the shareholder meeting is delayed,

which include the potential termination of the Merger Agreement at the cost of nearly $300

million to Harlesyville's shareholders.  See Geraghty Decl. at ¶¶ 6, 9 (attached hereto as Exhibit

1).  Even apart from the fact that Plaintiff's claims must fail as a matter of law, the potential

---

[1]    Interestingly, Plaintiff cites this case as supporting the proposition that a temporary
restraining order must be granted here to prevent irreparable harm, despite the fact that
the Court actually held the opposite.  See Pl.'s Mem. at 13.

harm to Harleysville that would result from granting Plaintiff's TRO far outweighs any benefit to Plaintiff.

Moreover, even if Plaintiff's TRO Motion had merit and the Court decided to grant the requested relief, the Federal Rules of Civil Procedure require that the party seeking a TRO or injunction protect the nonmoving party from any damages that might arise from a wrongfully granted injunction by posting a bond that will cover those damages. See Fed. R. Civ. P. 65(c); Zambelli Fireworks Mfg. Co., Inc. v. Wood, --- F.3d ---, 2010 WL 143682, *13 (3d Cir. Jan. 15, 2010) (vacating a preliminary injunction when the district court failed to set a bond). Here, because a TRO could put the First Niagara merger in serious jeopardy, the Plaintiff should be required to give security in the amount of the value of that merger, or nearly $300 million.

Because of Plaintiff's inexcusably late filing, the certainty that Plaintiff's claims will fail, see Defs.' Mot. to Dismiss (Docket No. 5), and the threat to Harleysville and its shareholders should Plaintiff succeed on this Motion, Defendants urge the Court to see through Plaintiff's scheme and refuse to grant the extraordinary remedy he seeks.

**III.    Plaintiff's Unwarranted Delay**

Plaintiff's failure to file his TRO Motion until the week before the Harleysville's shareholder meeting is fatal to his case. A brief overview of the past five months shows Plaintiff's deliberate strategy to sit on his hands until the last possible minute:

- After the boards of directors for Harleysville and First Niagara unanimously approved the Merger Agreement on July 26, 2009, the parties issued a joint press release on July 27, 2009, announcing that First Niagara had agreed to acquire Harleysville. The press release stated the specific terms of the agreement and noted that the transaction was expected to close in the first quarter of 2010.[2]

---

[2]    The July 27, 2009 Press Release is attached as Exhibit C to Defendants' Motion to Dismiss.

- Beginning on July 28, 2009 – one day after the Merger Agreement was announced – numerous plaintiffs, including Mr. Valerius, the Plaintiff in this matter, filed seven lawsuits in the Courts of Common Pleas of Montgomery and Philadelphia County. These complaints alleged breaches of fiduciary duty nearly identical to those contained in the complaint filed in this matter.[3] Pursuant to an agreement between the parties, these cases have been stayed pending the outcome of a motion to coordinate, transfer and consolidate all seven actions in the Court of Common Pleas of Montgomery County.

- On October 9, 2009, First Niagara filed a Form S-4 Registration Statement with the SEC in connection with the proposed merger. This document contained a draft of the Proxy that would issue in December 2009. Plaintiff did not take any action.

- On December 7, 2009, Harleysville announced in a press release that First Niagara "will lend up to $50 million as part of a recapitalization plan to ensure that Harleysville and its bank subsidiary meet the general regulatory capital ratios to be designated 'well capitalized' under federal banking laws." Ex. A to Newman Decl. (attached hereto as Exhibit 2), at 1. Still, Plaintiff failed to take any action.

- On December 9, 2009, Harleysville finalized the Proxy, which was then mailed on or about December 17, 2009. For the two weeks following the filing of the Proxy, Plaintiff still took no action. Then, on December 31, 2009 – fourteen days after the Proxy was filed – Plaintiff filed the instant suit. But, Plaintiff still failed to file a motion requesting the injunctive relief discussed in his complaint.

- On January 6, 2010, counsel representing the plaintiffs in the Montgomery County cases filed an emergency motion to lift the stay in order to file a motion for a preliminary injunction, the effect of which would be to enjoin Harleysville from conducting its shareholder meeting on January 22, 2010. A hearing was held on this motion on January 7, 2010. Michael Donovan – one of Plaintiff's counsel – attended this hearing, participated in the arguments, and received an order later that day stating the emergency motion had been denied and the stay remained in place. Inexplicably, Plaintiff continued to sit on his hands.

- Finally, Plaintiff filed his TRO Motion on Friday, January 15, 2010 – fifteen days after filing his complaint and seven calendar days before the Harleysville shareholder meeting. Moreover, Monday, January 18, 2010 is a federal holiday and federal courts are closed, making it that much more difficult to resolve this motion as quickly as possible.

---

[3]    These cases include McAuvic v. Geraghty, et. al., No.09-23764 (July 31, 2009), Shoemaker v. Geraghty, et. al., No. 09-23602 (July 30, 2009) and Seibert v. Geraghty, et. al., No. 09-23331 (July 28, 2009), which were filed in Montgomery County; and Davis v. Geraghty, et. al., No. 090800490 (Aug. 5, 2009), Silver v. Bergey, et. al., No. 090704227 (July 31, 2009), Forbes v. Geraghty, et. al., No. 090800994 (Aug. 10, 2009) and Valerius v. Geraghty, et al., No. 090801172 (Aug. 11, 2009), which were filed in Philadelphia County.

For five months, Plaintiff bided his time, choosing to wait until the eleventh hour to request injunctive relief. This strategy should not be rewarded.

## IV.    Argument

### A.    Plaintiff cannot meet his burden of demonstrating that he is entitled to a temporary restraining order.

A party seeking a temporary restraining order must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).[4] The Third Circuit has held that "the grant of injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) (internal citation omitted). As is set forth below, Plaintiff is not able to establish any – let alone all – of these elements. Accordingly, his TRO Motion should be denied.

#### 1.    Plaintiff cannot demonstrate that he enjoys a likelihood of succeeding on the merits of his claims.

Plaintiff bears the burden of demonstrating that he enjoys a "reasonable probability of eventual success in the litigation." Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir. 1982). Plaintiff's complaint identifies a series of alleged omissions that make the Proxy "false and misleading." In his TRO Motion, Plaintiff emphasizes omissions regarding (1) Harleysville's alleged economic turn-around, (2) the fairness opinion, (3) the so-called "third offer," and (4) a manufactured conflict of interest between J.P. Morgan, Harleysville and First Niagara. These

---

[4]    "The standard for a temporary restraining order is the same as that for a preliminary injunction." Steven B. Golden Assocs. v. Royal Consumer Prods., LLC, C.A. No. 09-3890, 2009 U.S. Dist. LEXIS 82883, *7 (E.D. Pa. Sept. 10, 2009); Bieros v. Nicola, 857 F. Supp. 445, 446 (E.D. Pa. 1994) (same).

asserted omissions are insufficient to make the Proxy false or misleading or to trigger a duty to update the Proxy. Thus, Plaintiff's complaint not only fails to establish any probability of success in the litigation, but it fails to adequately state a claim for relief.

Contrary to Plaintiff's assertion, Harleysville is not in the midst of an economic renaissance. As an initial matter, the delinquent loans that Plaintiff so heavily relies on as the prime indicator of Harleysville's economic health provide no such indication. "HNC Delinquent Loans" is a term specifically defined for the Merger Agreement, see Proxy at A-4,[5] and is not a primary indicator of Harleysville's financial health. Geraghty Decl. at ¶ 7a. Indeed, as Plaintiff concedes in his TRO Motion, the Proxy discloses that, inter alia, mounting credit losses and liquidity concerns, as opposed to delinquent loans levels, were among the many reasons why a strategic transaction was necessary for Harleysville. Pl.'s Mem. at 8. Thus, Plaintiff's argument that there has been a material change to the "motivation" for the merger is unavailing.

Moreover, as explained in Defendants' motion to dismiss, Harleysville disclosed the improved levels of "HNC Delinquent Loans" in the Proxy in connection to their impact on the exchange rate adjustment provision of the Merger Agreement. See Proxy at 5. Harleysville has no duty to provide further analysis of this data. See Romine v. Acxiom Corp., 296 F.3d 701, 708 (8th Cir. 2002) ("analysts and investors can draw their own conclusions about the company's condition" from publicly released "hard" data); In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 181 (D.D.C. 2007) (same); In re N.Y. Cmty. Bancorp, Inc. Sec. Litig., 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006) (same).

Plaintiff next asserts that the Proxy should have been updated to reflect the increase in the KBW Bank Index. Pl.'s Mem. at 8. Again, Harleysville has no duty to disclose such publicly

---

[5]     The Proxy is attached as Exhibit B to Defendants' Motion to Dismiss and as Exhibit A to Plaintiff's TRO Motion.

5

available, industry-wide data. See In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 279 (3d Cir.

2004) ("Adams Golf was not duty-bound to disclose general industry-wide trends easily

discernable from information already available in the public domain."); Klein v. General

Nutrition Cos., 186 F.3d 338, 342 (3d Cir. 1999) (materiality analysis takes into account

"availability [of information] in the public domain"); see also Whirlpool Fin. Corp. v. GN

Holdings, Inc., 67 F.3d 605, 609 (7th Cir. 1995) ("The nondisclosure of . . . industry-wide trends

is not a basis for a securities fraud claim.").

Plaintiff also asserts that the Proxy's disclosures regarding the J.P. Morgan fairness

opinion are false and misleading because the opinion is "stale and unreliable." See Compl. ¶ 45;

Pl.'s Mem. at 10-11. First, the Proxy clearly discloses the scope of the fairness opinion. The

Proxy informs shareholders that (a) the opinion is "as of" July 26; (b) the opinion is based on

conditions in effect and information existing "as of" the date of the opinion; (c) subsequent

events could affect the opinion; (d) J.P. Morgan does not have an obligation to update or revise

the opinion; and (e) the opinion does not speak to either Harleysville or First Niagara's future

trading price. See Proxy at 55. Specifically, the Risk Factor section of the Proxy states:

> ***The Opinion of Harleysville National Corporation's Financial***
> ***Advisor Will Not Reflect Changes in Circumstances Between***
> ***Signing the Merger Agreement and the Merger, Including Any***
> ***Reduction in the Merger Consideration as a Result of***
> ***Harleysville National Corporation's Loan Delinquencies.***
>
> Harleysville National Corporation's financial advisor,
> JPMorgan, rendered an opinion dated July 26, 2009, to the
> Harleysville National Corporation board of directors, that, as of
> such date, and based upon and subject to the factors and
> assumptions set forth in its written opinion (including, without
> limitation, that the exchange ratio would be 0.474, and that the
> level of Harleysville National Corporation delinquent loans would
> not result in any adjustment to the exchange ratio), as well as the
> extraordinary circumstances facing Harleysville National
> Corporation referred to in such written opinion, the exchange ratio
> of 0.474 of a share of First Niagara common stock to be received

6

in respect of each share of Harleysville National Corporation common stock pursuant to the merger agreement was fair from a financial point of view to the holders of Harleysville National Corporation common stock. The opinion of JPMorgan, which will not be applicable if the exchange ratio is reduced due to the level of Harleysville National Corporation delinquent loans, was based on economic, market and other conditions as in effect on, and the information made available to it as of, the date thereof. JPMorgan assumed no responsibility for updating, revising or reaffirming its opinion based on circumstances, developments or events occurring after the date thereof.

Changes in the operations and prospects of First Niagara or Harleysville National Corporation, general market and economic conditions and other factors on which Harleysville National Corporation's financial advisor's opinion was based, may significantly alter the value of First Niagara or Harleysville National Corporation or the prices of shares of First Niagara common stock or Harleysville National Corporation common stock by the time the merger is completed. The opinion does not speak as of the time the merger will be completed or as of any date other than the date of such opinion.

Id. at 26 (emphasis in original). The Proxy leaves no doubt that the fairness opinion reflects an opinion at a specific moment in time, and as such cannot become stale and misleading.

Relying on In re Pure Res. S'holders Litig., 808 A.2d 421 (Del. Ch. 2002), Plaintiff also asserts that the Proxy violates Section 14(a) because it omits certain information underlying J.P. Morgan's fairness opinion. This reliance is misplaced. There, the court held that "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers . . . . The real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result." Id. at 449. Thus, the court held that the company should have disclosed "the basic valuation exercises that [the investment bankers] undertook, the key assumptions that they used in performing them, and the range of values that were thereby generated." Id. Here, Harleysville discloses that information and more, as the Proxy includes: (1) a summary of what J.P. Morgan reviewed and relied on; (2) an overview of the context of the Merger Agreement; (3) companies and transactions that J.P. Morgan used to compare to

7

Harleysville and First Niagara; (4) a summary of J.P. Morgan's Stand Alone Dividend Discount

Analysis, including its assumptions and a range of values it generated; and, finally, (5) J.P.

Morgan's conclusions. See Proxy at 55-61. Thus, Plaintiff's contention is without merit.

Third, Plaintiff asserts that more information involving the so-called "third offer" should

have been disclosed because "Defendants have a fiduciary duty to shareholders to explore all

viable alternatives in order to maximize value." Pl.'s Mem. at 11. As explained in the motion to

dismiss, directors in Pennsylvania, unlike in Delaware, do not have a fiduciary duty to

"maximize value" for shareholders. Defs.' Mem. at 20. Thus, Plaintiff's assertion is baseless.

Finally, Plaintiff tries to fabricate a conflict of interest based on the Proxy's disclosure

that J.P. Morgan has provided miscellaneous financial services for Harleysville and First Niagara

in the two years preceding the date of the fairness opinion. Pl.'s Mem. at 12. To support this

assertion, Plaintiff relies on David P. Simonetti Rollover IRA v. Margolis, C.A. No. 3694-VCN,

2008 Del. Ch. LEXIS 78 (Del. Ch. June 27, 2008), a case in which the investment bank had an

actual financial stake in the merger through notes and warrants to acquire stock. There, the

Court held that "the peculiar benefits of the Merger to [the investment bank], beyond its expected

fee, must also be disclosed to TriZetto's stockholders." Here, there are no "peculiar benefits" to

the Merger for J.P. Morgan outside of its fee, so Margolis is inapplicable.

Because Plaintiff cannot meet even the burden associated with surviving a motion to

dismiss, he certainly fails to meet the higher burden of establishing a likelihood of success on the

merits. Accordingly, his TRO Motion should be denied.

        2.     <u>Plaintiff will not suffer irreparable harm if the injunction is denied.</u>

"An irreparable injury is one that is not remote or speculative, but actual and imminent

and for which monetary damages cannot adequately compensate." FMC Corp. v. Control

Solutions, Inc., 369 F. Supp. 2d 539, 573 (E.D. Pa. 2005) (quotation omitted). Moreover, "[t]he

preliminary injunction must be the *only way* of protecting the plaintiff from harm." Instant Air
Freight, 882 F.2d at 801 (emphasis added). See also Winter v. Natural Resources Defense
Council, Inc., 129 S.Ct. 365, 375-76 (2008) (requiring "a clear showing" of irreparable harm).
Here, Plaintiff cannot show irreparable harm (1) because of his unreasonable delay in filing his
TRO Motion and (2) because he cannot show that monetary damages would not adequately
compensate him for any alleged injury resulting from the merger.

           a.      Plaintiff's delay weighs against a finding of irreparable harm.

      Plaintiff's delays throughout this litigation demonstrate that Plaintiff will not suffer any
irreparable injury should the Court decline to issue a TRO. In NAACO Indus., Inc. v. Applica
Inc., No. 06-3002, 2006 WL 3762090 (N.D. Ohio Dec. 20, 2006), the Court denied the plaintiffs'
request for a TRO enjoining a shareholder meeting called to approve a proposed merger. In
NAACO, like here, the plaintiffs filed a suit in state court well before filing a complaint in
federal court. The NAACO Court noted that the plaintiffs "knew the substance of the proxy
statement well over a month" before filing their federal complaint and that therefore "[t]heir
failure to file federal claims at that time thus speaks volumes as to their present claims of
irreparable harm." Id. at *9.

      Finding that the actual length of the plaintiffs' delay was unimportant, the court noted
that it was "aware that delays cited by courts may often be for months. What is important here is
the relative delay. If [plaintiffs'] federal claims were truly urgent, rather than a try at
gamesmanship, the case could have been prepared and filed at least a number of weeks ago.
Here, Plaintiffs delayed for weeks, only to file a TRO 9 calender [sic] days before the scheduled
meeting." Id. at *9 n.12. Accordingly, the Court denied the motion for injunctive relief, finding
"Plaintiffs' own delays to be the most convincing evidence that they will not experience
irreparable harm" if the shareholder meeting went forward. Id. at *8.

Plaintiff's delay here is nothing more than gamesmanship and demonstrates that Plaintiff is not at risk of suffering irreparable harm. See Gold Fields Ltd. v. Harmony Gold Mining Co. Ltd., No. 04 Civ. 8767(RMB), 2004 WL 2710030, *5 (S.D.N.Y. Nov. 23, 2004) (two week delay in filing suit following the issuance of a proxy suggests failure to establish irreparable harm); Plessey Co. v. General Elec. Co., 628 F. Supp. 477, 500 (D. Del. 1986) ("[A plaintiff's] lack of diligence, standing alone, may preclude granting of preliminary injunctive relief because it goes to the issue of irreparable harm.").

> b.    Plaintiff has not established that money damages would be an insufficient remedy.

Additionally, Plaintiff cannot show irreparable harm because he cannot demonstrate that monetary damages are insufficient to compensate him for any alleged injury that the merger would cause. See Goadby v. Philadelphia Elec. Co., 639 F.2d 117, 121 (3d Cir. 1981) ("[P]reliminary injunctive relief is not available when adequate monetary damages are available."). Contrary to Plaintiff's "scrambled eggs" argument, see Pl.'s Mem. at 13-14, "the fact that the transaction sought to be enjoined may be impossible to reverse after its consummation can only be good cause for the imposition of an injunction where damages could not be a satisfactory remedy." Ryan v. VHA Enters., Inc., No. 90 Civ. 2656 (PKL),1990 WL 58969, at *4 (S.D.N.Y. May 1, 1990). See also Iavarone v. Raymond Keyes Associates, Inc., 733 F. Supp. 727, 732 (S.D.N.Y. 1990) ("The fact that money damages may be 'difficult to quantify' does not necessitate equitable relief.")

Put simply, the heart of Plaintiff's claim is that the proposed transaction does not adequately value his shares in Harleysville. Such a claim is one for which damages – and not

injunctive relief – constitute the appropriate remedy.[6]  See Ryan, 1990 WL 58969, at *4 (denying

preliminary injunction to delay shareholder meeting because monetary damages would

sufficiently compensate the § 14(a) plaintiff).[7]

###### 3. Granting preliminary relief will greatly harm Defendants.

The only irreparable harm at issue in this case is the potential for harm to Harleysville

and its shareholders if Plaintiff's injunctive relief is granted.  As set forth in the Proxy itself,

Harleysville's board took great steps to protect the company and get good value for the

Harleysville shareholders.  By issuing a temporary restraining order and delaying Friday's

shareholder vote, this Court could derail the merger altogether, leaving Harleysville in the same

difficult position it faced before signing the Merger Agreement.

---

[6]    Perhaps most telling as to the availability of money damages is the fact that other
plaintiffs have actually sought such damages in similar actions filed in state court.  Other
complaints based on the Merger Agreement – containing nearly identical state law
allegations as those in the instant matter – request money damages.  See, e.g., Complaint
in McAuvic v. Geraghty, et. al., No.09-23764 (July 31, 2009) at 16 (requesting the Court
to direct Defendants "to account to plaintiff and the Class for their damages sustained
because of the wrongs complained herein.") (Ex. B to Newman Decl.).

[7]    The cases cited by Plaintiff, to the extent they actually discuss federal law rather than
Delaware law, do not support a grant of injunctive relief here.  Most notably, in
Scattergood, 1990 WL 72801, while Plaintiff correctly noted that the plaintiffs in that
case argued that material information was essential to the shareholder suffrage process,
the Scattergood Court ultimately held that irreparable harm would *not* result in the
absence of preliminary injunctive relief.  See id. at *5.  Irving Bank Corp. v. Bank of
New York Co., Inc., 692 F. Supp. 163 (S.D.N.Y. 1988), involved a hostile takeover in
which all parties agreed that irreparable harm was imminent.  See id. at 168.  Bancroft
Convertible Fund, Inc. v. Zico Investment Holding, Inc., 825 F.2d 731 (3d Cir. 1987) did
not involve any issues of inadequate disclosure.  See id. at 738-39.  Finally, in
Lichtenberg v. Besicorp Group, Inc., 43 F. Supp. 2d 376 (S.D.N.Y. 1999), unlike here,
the case involved a cash-out merger, after the consummation of which the plaintiffs
would no longer have standing to pursue a derivative claim.  The most important
distinction between any of these cases and the instant case, however, is that in this case,
no irreparable harm can possibly be shown since the Proxy did not mislead or omit
material information.

There are several specific dangers that Harleysville will face if the shareholder vote or merger is enjoined. First, Harleysville's regulators will be even more aggressive in their scrutiny of Harleysville should the merger be delayed or canceled. The OCC has set a deadline of March 31, 2010 for Harleysville National Bank to meet its capital requirements – capital requirements that Harleysville was unable to meet in 2009. Failure to meet these requirements could result in regulatory action against Harleysville National Bank. Geraghty Decl. at ¶ 7, 9b. Next, under the terms of the Merger Agreement, an injunction could give First Niagara the right to terminate the merger. Id. at ¶ 9c. Even a delay to the merger process could greatly harm Harleysville. Any delay in closing the merger increases the likelihood that a material adverse event could occur in Harleysville's business or in the banking industry – always a possibility in these uncertain times[8] – before the transaction closes. If this occurred, First Niagara could have the right to terminate the Merger Agreement. Id. at ¶ 9d.

The entry of a TRO may also cause confusion to both shareholders and customers. In the case of shareholder confusion, it could cause some shareholders to retract their votes in favor of the merger. In the case of customer confusion, it could cause a run on the bank and exacerbate the bank's liquidity problems. Id. at ¶¶ 9e, f. Finally, delaying the merger also exposes Harleysville and its shareholders to the risk that the HNC Delinquent Loan level could increase, which could result in a decreased price for shareholders in an eventual merger or give First Niagara the right to terminate the Merger Agreement. As the HNC Delinquent Loan level varies

---

[8]    The difficulties imposed by the current economic climate are also relevant when considering what fate will befall Harleysville should this merger fall through. See Wayne County Employees' Retirement Sys. v. Corti, 954 A.2d 319, 331 (Del. Ch. 2008) ("The risk that enjoining the shareholder vote will disrupt the deal and prevent the shareholders from exercising a potentially value-maximizing opportunity is not lost on this Court … [I]t remains very real, particularly in light of current market conditions.").

on a daily basis and could increase substantially at any time, any delay would subject

Harleysville and its shareholders to significant risk. Id. at ¶ 9h.

Allowing Harleysville's corporate process to run its course free of interference will not

irreparably harm Plaintiff, but an injunction could endanger Harleysville and its shareholders.

> 4.    The public interest does not favor injunctive relief.

Because there is no likelihood of a finding that Defendants engaged in a violation of

either securities law or their fiduciary duties, there is no public interest that would be served by

the issuance of injunctive relief. See NAACO, 2006 WL 3762090, at *10. In fact, should this

injunction succeed, Harleysville would return to the difficult position it was in before it signed

the Merger Agreement, a circumstance which would harm not only the bank's shareholders, but

could also affect the hundreds of people who work at the bank and the thousands of customers

who maintain accounts there. Moreover, whatever interest the public might have in the ability of

a private plaintiff to attempt to enforce securities laws "must also be viewed in light of the

courts' general unwillingness to disrupt regular corporate activity absent a significant showing of

necessity." See Ryan, 1990 WL 58969, at *5. Accordingly, the public interest weighs in favor

of allowing the proposed merger to proceed.

**B.    Plaintiff's requested relief is barred by the doctrine of laches.**

Plaintiff's TRO Motion should be denied on the related but independent ground that the

doctrine of laches bars such relief. "Laches requires proof of (1) lack of diligence by the party

against whom the defense is asserted, and (2) prejudice to the party asserting the defense."

Costello v. United States, 365 U.S. 265, 282 (1961). As is set forth above, Plaintiff's lack of

diligence in filing both the complaint and the instant motion exhibits a severe lack of diligence.

See Section III.A.2., supra. See also Advocacy Org. for Patients & Providers v. Mercy Health

Servs., 987 F. Supp. 967, 970 (E.D. Mich. 1997) (characterizing a three-month delay in filing a

lawsuit to enjoin a merger as "inexcusable delay"). Additionally, as is also set forth above, Defendants would be greatly injured should the Court grant the instant motion. See Section III.A.3., supra. See also Advocacy Org., 987 F. Supp. at 970 (requiring defendants to renegotiate merger and suffer the possibility that merger will not be consummated is prejudicial to defendant). Accordingly, because the elements of laches are met, Plaintiff's requested relief should be denied. See id. (denying plaintiffs' request for a temporary restraining order, "find[ing] that plaintiffs are attempting to throw a monkey wrench into the merger at a very late stage in the game").[9]

**C.** **Plaintiff's motion should be denied because he has not demonstrated that he has the financial wherewithal to give a security in an amount that would pay the costs and damages sustained by Harleysville should Harleysville be wrongfully enjoined.**

Fed. R. Civ. P. 65(c) requires that a party seeking a TRO give security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The requirement of setting a bond is "almost mandatory," and the Third Circuit has "never excused a District Court from requiring a bond where an injunction prevents commercial, money-making activities." Zambelli Fireworks Mfg. Co., 2010 WL 143682, at *13 (internal quotation omitted). Indeed, a bond is essential since the bond is Defendants' only source of recovery should the Court later determine that Plaintiff is not entitled to relief. See Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 210 n. 31 (3d

---

[9]    A finding that Plaintiff's delay is insufficient to constitute laches would not preclude a finding that such delay justifies denial of the instant TRO Motion. See Central Point Software, Inc. v. Global Software & Accessories, Inc., 859 F. Supp. 640, 644 (E.D.N.Y. 1994) ("[T]he period allowed to elapse prior to seeking a preliminary injunction need not rise to the level of laches to bar preliminary injunctive relief."). "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985).

Cir. 1990) (citing <u>W.R. Grace & Co. v. Local Union 759</u>, 461 U.S. 757, 770 n. 14 (1983)).  As discussed above, granting the relief Plaintiff seeks would prevent Defendants from holding a vote on a merger and could put Harleysville in danger of First Niagara terminating the Merger Agreement, which is currently valued at close to $300 million.  <u>See</u> Geraghty Decl. at ¶¶ 6; 9c, d, h.  Therefore, if the Court decides to grant Plaintiff's requested relief, Plaintiff should be required to post a bond in the amount of the current value of the merger.

## V.    CONCLUSION

Based on the foregoing reasoning, Defendants request that this Court deny Plaintiff's Motion for Temporary Restraining Order.

Dated: January 18, 2010

By: _____
    Joseph A. Tate
    Michael L. Kichline
    Michael J. Newman
    DECHERT LLP
    Cira Centre
    2929 Arch Street
    Philadelphia, PA  19104-2808
    Telephone:  (215) 994  4000
    Facsimile:  (215) 994  2222


    Attorneys for Defendants

15

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANNY VALERIUS, Individually and On Behalf of Nominal Defendant HARLEYSVILLE NATIONAL CORPORATION,<br><br>       Plaintiff,<br><br>       vs.<br><br>PAUL GERAGHTY, LEEANN B. BERGEY, WALTER E. DALLER, JR., HAROLD A. HERR, THOMAS C. LEAMER, STEPHANIE S. MITCHELL, A. ROSS MYERS, BRENT L. PETERS, JAMES A. WIMMER, JOHN J. CUNNINGHAM, III, JAMES E. McERLANE, and DEMETRA M. TAKES,<br><br>       Defendants,<br><br>       — and —<br><br>HARLEYSVILLE, NATIONAL CORPORATION, a Pennsylvania Corporation,<br><br>       Nominal Defendant. | Civ. Action No. 09-6208 |

## DECLARATION OF
## PAUL D. GERAGHTY IN SUPPORT OF DEFENDANTS' OPPOSITION
## TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

I, Paul D. Geraghty, declare as follows:

1.  I am President and CEO of Harleysville National Corporation ("Harleysville"), as well as

   a member of the Harleysville Board of Directors, positions I have held since July 2007. I

   have personal knowledge of each matter stated in this Declaration based on my regular

   and continuing participation in the management of the affairs of Harleysville and

1

Harleysville National Bank and Trust Company ("Harleysville National Bank"). Harleysville is the bank holding company for Harleysville National Bank.

2.  Beginning in the second quarter of 2008, banks experienced the most challenging time since the Great Depression. The failure of several banks, including IndyMac, Wachovia and Washington Mutual, created industry-wide problems. Harleysville National Bank had a heavy concentration of loans secured by real estate (including residential home builders and home equity exposure to consumers). This concentration caused the impact of the financial crisis to be even more severe for Harleysville National Bank than the industry at large.

3.  Faced with deteriorating economic conditions, in November 2008, Harleysville applied to the OCC for $120 million of TARP funds. Later, the OCC indicated to Harleysville management that it was unlikely to approve Harleysville's TARP application. As a result, Harleysville subsequently withdrew the TARP application in late April 2009.

4.  Harleysville National Bank is regulated by the Office of the Comptroller of the Currency ("OCC"). Since the end of 2008, the OCC has increased its regulatory scrutiny of Harleysville National Bank's capital levels.

   a.  The most significant indicator that the OCC focuses on when evaluating the health and viability of a bank is the level of "criticized and classified loans" in its portfolio. Criticized and classified loans represent loans that have been rated by a bank as other assets especially mentioned ("OAEM"), substandard, doubtful or loss. The categorization of criticized and classified does not correspond to whether an asset is delinquent or not. Instead, it has to do with the overall health

2

of the asset, regardless of the payment status. In the course of its examination of Harleysville National Bank in 2009, the OCC forced Harleysville to downgrade many of its assets to the criticized and classified level. Increased levels of assets which are rated criticized and classified force banks to increase their reserves, which impact earnings. A normal, healthy bank only has criticized and classified assets that are 50% or less of Tier 1 capital plus allowance for loan loss. By July 2009, Harleysville National Bank's criticized and classified loans were 127% of its Tier 1 capital plus allowance for loan loss.

b.  At the end of 2008, the status of Harleysville National Bank's total risk-based capital position deteriorated from "well-capitalized" to "adequately-capitalized."

c.  On May 28, 2009, the OCC imposed individual minimum capital ratios (IMCRs) on Harleysville National Bank, including a requirement that we raise $120 million in capital, and setting a deadline of June 30, 2009 to meet these IMCRs. Thus far, Harleysville National Bank has been unsuccessful in meeting these standards.

d.  Between April 2009 and August 2009, regulators from the OCC were on site at Harleysville's office nearly every day as they conducted an examination of Harleysville National Bank.

e.  In June and July of 2009, I met with the OCC's Examiner in Charge ("EIC") almost every day. In these conversations, we discussed the examination, Harleysville financial position, and our attempts to raise capital.

    f.   We expected an imminent regulatory order if we could not get a capital infusion. Such an order would have likely put severe restrictions on the operations of Harleysville National Bank and damaged the reputation of the bank.

5.  Besides regulatory pressure, Harleysville has also faced serious liquidity problems. As a community bank that primarily serves the suburban counties of Southeastern Pennsylvania and Lehigh Valley, Harleysville National Bank is particularly susceptible to adverse publicity. The majority of Harleysville National Bank's customers keep their money in checking accounts or CDs, and these customers withdraw their money when they worry about the future of the bank. Through the summer of 2009, deposit balances decreased dramatically. Simultaneously, we were concerned that commercial borrowers, focused on Harleysville National Bank's liquidity, would draw down their credit facilities, exacerbating our liquidity problems. Because Harleysville National Bank's liquidity problems are so intertwined with adverse publicity, a regulatory order from the OCC could spark a run on the bank by depositors.

6.  Because the Harleysville shareholders will be compensated based on a fixed exchange ratio, they benefit from the overall market improvements that have increased the value of First Niagara's stock. Thus, the value of the Merger Agreement to Harleysville shareholders has increased since July 2009. At the time the Merger Agreement was signed, based on the value of First Niagara stock, the deal was worth $237 million to Harleysville shareholders. Today, based on the value of First Niagara stock, the deal is worth roughly $293 million. At the date the Merger Agreement was signed, each Harleysville share was worth $5.50. Today, each share is worth $6.79.

7.  Harleysville has continued to face financial problems even after entering the Merger

Agreement.  Contrary to the plaintiff's contentions, Harleysville's financial status has not

improved in recent months.

    a.  Harleysville National Bank's level of criticized and classified loans – the

indicator the OCC is most interested in – have increased.  On March 31, 2009,

Harleysville National Bank had $333 million worth of criticized and classified

loans.  On June 30, 2009, Harleysville National Bank had $431 million worth of

criticized and classified loans.  By September 30, 2009, Harleysville National

Bank had $519 million worth of criticized and classified loans.  By December 31

2009, Harleysville National Bank had $501 million worth of criticized and

classified loans.  Thus, Harleysville's financial health, from a regulatory

perspective, has gotten worse since the Merger Agreement was signed.  The level

of "HNC Delinquent Loans," which is a defined term in the Merger Agreement, is

not a primary measuring stick of the health of the bank.

    b.  The OCC has maintained its regulatory scrutiny of Harleysville National Bank

even after the Merger Agreement was announced.  We continue to provide a

written report to OCC representatives every other week.  To date, Harleysville

National Bank has not met the required capital ratios contained in the IMCRs.

After Harleysville received a $50 million loan from First Niagara to support

Harleysville National Bank's capital ratios, the OCC gave Harleysville National

Bank an extension until March 31, 2010 to meet the IMCRs.  This continuing

regulatory pressure is a major reason that Harleysville must merge with First Niagara as quickly as practicable.

8. The date of January 22, 2010 was specifically selected for the shareholder meeting because of the tremendous amount of work that needs to occur between the shareholder vote and the final conversion of Harleysville into First Niagara. The many things that must occur between the vote and the final conversion include:

   a. First Niagara must give notice to Harleysville National Bank's customers of the change in ownership and the impact of that change on Harleysville National Bank's products. Customers must be notified of these changes before First Niagara and Harleysville move to a legal closing. First Niagara specifically requested Harleysville to have the shareholder meeting on January 22, 2010 to enable them to meet the legal requirements of the aforementioned notice.

   b. In the volatile environment of the current economic climate, closing the merger as quickly as possible is incredibly important. As a result, we have currently targeted February 12, 2010 to close the merger between Harleysville and First Niagara after receiving the necessary shareholder and regulatory approvals.

   c. By March 12, 2010, a tremendous amount of operational work needs to occur. This operational work includes lots of back-end computer work and testing to actually effectuate the conversion. This conversion need to be seamless as to avoid disrupting our services for customers, and a seamless conversion requires much work beforehand.

d. On March 12, 2010, Harleysville and First Niagara will operationally merge, also known as a conversion. We have commitments from vendors and service providers to help us convert on March 12, 2010. Rescheduling these vendors and service providers will push conversion beyond the March 31, 2010 deadline to meet the IMCRs.

e. The entire merger process, from shareholder vote to final conversion, has been meticulously organized. It is essential not to delay the shareholder vote since the extension from the OCC to meet the IMCRs expires on March 31, 2010.

9. If the shareholder meeting is enjoined, Harleysville will face dangerous uncertainty and grievous harm.

a. As a general matter, we do not know how our regulators, acquiror, shareholders, or customers will react to a delay in the shareholder vote

b. Undoubtedly, the OCC will assume an aggressive posture because an injunction or a temporary restraining order ("TRO") will place the deal in doubt. Harleysville National Bank has still failed to meet the OCC's IMCRs, and the likelihood of regulatory action will certainly increase if the deal is delayed in any way.

c. Under the terms of the Merger Agreement, an injunction or TRO could give First Niagara grounds to terminate the Merger Agreement.

d. If the closing of the merger is delayed, it increases the likelihood that a Material Adverse Event could occur, which could give First Niagara the right to terminate the merger.

e. An injunction or TRO delaying the shareholder vote would cause shareholder confusion, which could conceivably cause some shareholders to retract their vote in favor of the merger. Moreover, any delay in the shareholder vote could drive down the value of Harleysville's and First Niagara's stock. Even if the merger did eventually close, such downward pressure on First Niagara's stock would lower the value of the merger to Harleysville's shareholders.

f. An injunction or TRO would cause customer confusion, and could lead to a depositor run on the bank, exacerbating Harleysville National Bank's liquidity problems.

g. Harleysville does not have an alternative source of capital besides First Niagara. If the merger does not go through, any attempt to raise capital will likely be made more difficult, if not impossible.

h. Harleysville's loan delinquencies vary on a daily basis and could increase substantially at any time. If the closing of the merger is delayed, Harleysville and its shareholders will be exposed to the risk that loan delinquencies, as defined in the Merger Agreement, could increase, which could result in a decreased price for shareholders in an eventual merger or give First Niagara the right to terminate the Merger Agreement.

10. I do not anticipate working for First Niagara after the merger and the conversion are completed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

8

Executed this 18th day of January, 2010.

_____
Paul D. Geraghty

# EXHIBIT 2

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DANNY VALERIUS, Individually and On Behalf of Nominal Defendant HARLEYSVILLE NATIONAL CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> PAUL GERAGHTY, LEEANN B. BERGEY, WALTER E. DALLER, JR., HAROLD A. HERR, THOMAS C. LEAMER, STEPHANIE S. MITCHELL, A. ROSS MYERS, BRENT L. PETERS, JAMES A. WIMMER, JOHN J. CUNNINGHAM, III, JAMES E. McERLANE, and DEMETRA M. TAKES, <br><br> Defendants, <br><br> —— and —— <br><br> HARLEYSVILLE, NATIONAL CORPORATION, a Pennsylvania Corporation, <br><br> Nominal Defendant. | Civ. Action No. 09-6208 |

## DECLARATION PURSUANT TO 28 U.S.C. § 1746

     The declarant, Michael J. Newman, deposes and states as follows under penalty of perjury:

1.   I am an attorney duly licensed to practice before this Court and am an associate at Dechert LLP, counsel herein for the defendants.

2.  I submit this Declaration in support of the Defendants' Opposition to Plaintiff's Motion
    for a Temporary Restraining Order ("Opposition") and to place before the Court certain
    documents relevant to this Opposition.

3.  Attached hereto as Exhibit A is a true and correct copy of Harleysville's Press Release
    dated December 7, 2009.

4.  Attached hereto as Exhibit B is a true and correct copy of the Complaint styled McAuvic
    v. Geraghty, et al., No. 09-23764 (July 31, 2009) filed in the Montgomery County Court
    of Common Pleas.

    I declare under penalty of perjury that the foregoing is true and correct.  Executed this
18th day of January, 2010.

Michael J. Newman
Dechert LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
215-994-4000

# EXHIBIT A

EX-99.1 5 dex991.htm PRESS RELEASE

**Exhibit 99.1**

### Harleysville Recapitalized with the Benefit of First Niagara Loan

HARLEYSVILLE, Pa. – December 7, 2009– First Niagara Financial Group, Inc. (NASDAQ: FNFG) which agreed to acquire Harleysville National Corporation (NASDAQ: HNBC) in July 2009 in an all-stock transaction valued at approximately $237 million, will lend up to $50 million as part of a recapitalization plan to ensure that Harleysville and its bank subsidiary meet the general regulatory capital ratios to be designated "well capitalized" under federal banking laws.

Thirty-five million of the $50 million facility was borrowed from First Niagara and contributed to Harleysville National Bank as Tier One Capital, allowing it to meet the ratios of a "well capitalized" bank for the first time since September 2008. Coupled with operational improvements initiated by Harleysville National Bank, as well as an enhanced and strong liquidity position, the capital injection enables the company to better serve the needs of its customers by increasing its lending capacity.

Harleysville's regulatory capital ratios as of December 7, 2009 included total risk-based capital of 10.44%, Tier 1 risk-based capital of 9.17% and a Tier 1 leverage capital of 6.49%. The general regulatory minimums for well capitalized designation are 10% for total risk-based capital, 6% for Tier 1 risk-based capital and 5% for a Tier 1 leverage capital.

In connection with the capital infusion, The Office of the Comptroller of the Currency informed Harleysville that it is extending the deadline for compliance with previously announced "individual minimum capital ratios" from June 30, 2009 to March 31, 2010, subject to continued compliance with "well capitalized" ratios achieved upon receipt of the First Niagara loan proceeds. First Niagara's acquisition of Harleysville is expected to close prior to the IMCR-compliance deadline, subject to regulatory and shareholder approval, in the first quarter of 2010.

First Niagara is also prepared to buy up to $80 million in commercial and commercial real estate loan participations from Harleysville and allow Harleysville to originate loans on behalf of First

Niagara via a correspondent relationship, both of which will further enhance Harleysville's regulatory capital ratios and boost lending activities.

"This capital infusion is significant for our bank, our customers and the communities we serve," Harleysville President and Chief Executive Officer Paul D. Geraghty said. "Boosting our capital places Harleysville National in a strong position to serve its communities until we complete our transaction with First Niagara and reignite the growth of this franchise in Southeastern Pennsylvania and the Lehigh Valley."

First Niagara President and Chief Executive Officer John R. Koelmel said, "After working closely with the Harleysville's team in recent months, we're even more bullish about the value of this transaction, the strength of the franchise, and the opportunity we have in this region. We're pleased to be able to leverage First Niagara's exceptional capital position to immediately ensure the availability of credit for Harleysville's customers in advance of the completion of this acquisition in the first quarter of 2010."

About Harleysville – Harleysville National Corporation, with assets of $5.2 billion, is the holding company for Harleysville National Bank (HNB). Harleysville National Corporation stock is traded under the symbol "HNBC" and is commonly quoted under NASDAQ Global Select Market®. For more information, visit the Harleysville National Corporation website at www.hncbank.com.

About First Niagara – First Niagara Financial Group, Inc., through its wholly owned subsidiary First Niagara Bank, had assets of $14.1 billion and deposits of $9.9 billion at September 30, 2009. First Niagara Bank is a community-oriented bank providing financial services to individuals, families and businesses through 171 branches and five Regional Market Centers across Upstate New York and Western Pennsylvania. In July 2009, First Niagara announced its plans to acquire Harleysville National Corporation and its $5.2 billion in assets and 83 branches in the Philadelphia area, subject to regulatory and Harleysville shareholder approval. Just recently, the thrift holding company applied to the Federal Reserve Board to become a bank holding company and on December 3 announced its application to become a commercial bank. For more information, visit www.fnfg.com.

**Forward-Looking Statements** – This press release contains forward-looking statements with respect to Harleysville National Corporation and its proposed merger with First Niagara. These forward-looking statements involve certain risks and uncertainties. Factors that may cause actual results to differ materially from those contemplated by such forward-looking statements include, among others, the following possibilities: (1) that governmental approvals of the merger may not be obtained, may be delayed, or that adverse regulatory conditions may be imposed in connection with governmental approvals of the merger changes in the interest rate environment; (2) that the growth opportunities and cost savings from the merger may not be fully realized or may take longer to realize than expected; (3) that operating costs, customer losses and business disruption following the merger, including adverse effects of relationships with employees, may be greater than expected; and (4) if the merger agreement is terminated, Harleysville National Corporation will have a limited time to repay the loan from First Niagara and there can be no assurance that Harleysville National Corporation will be able to raise funds sufficient to repay the loan from First Niagara if the merger agreement is terminated.

**Shareholder Information** – First Niagara will file a registration statement, a prospectus that will also serve as the proxy statement for the vote of the stockholders of Harleysville National Corporation, and other relevant documents concerning the proposed transaction with the Securities and Exchange Commission (the "SEC"). Shareholders are urged to read the registration statement and the proxy statement/prospectus when it becomes available and any other relevant documents filed with the SEC, as well as any amendments or supplements to those documents, because they will contain important information. You will be able to obtain a free copy of the proxy statement/prospectus, as well as other filings containing information about First Niagara and Harleysville, at the SEC's Internet site (**http://www.sec.gov**). Copies of the proxy statement/prospectus also can be obtained, when available and without charge, by directing a request to Harleysville National Corporation, 483 Main Street, Harleysville, Pennsylvania 19438, Attention: Noel Devine (215) 256-8851 ext 61703, or to First Niagara Financial Group, Inc., Attention: Anthony M. Alessi, Investor Relations, 6950 South Transit Road, P.O. Box 514, Lockport, New York 14095-0514, (716) 625-7692.

Harleysville, First Niagara and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from the shareholders of Harleysville in connection with the acquisition. Information about the directors and executive officers of Harleysville and their ownership of Harleysville common stock is set forth in Harleysville's most recent proxy statement as filed with the SEC, which is available at the SEC's Internet site (http://www.sec.gov) and at Harleysville's address in the preceding paragraph. Information about the directors and executive officers of First Niagara is set forth in First Niagara's most recent proxy statement filed with the SEC and available at the SEC's Internet site and from First Niagara at the address set forth in the preceding paragraph.

Additional information regarding the interests of these participants may be obtained by reading the joint proxy statement/prospectus regarding the proposed transaction when it becomes available.

-30-

**Harleysville Officer Contacts**

Noel Devine

Director of Marketing
(215) 256-8851 ext 61703,
ndevine@hncbank.com

**First Niagara Officer Contacts**

Anthony M. Alessi

Investor Relations Manager
(716) 625-7692
tony.alessi@fnfg.com

Leslie G. Garrity

Corporate Communications Manager
(716) 819-5921
leslie.garrity@fnfg.com

# EXHIBIT B

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

*Michael McAuvic, Individually +*
*on Behalf of ALL others Similarly*
*situated.*                    VS.                    : NO. *09 23704*

*Haeleysville National Corp.,*
*et al.*                                             :

## CIVIL COVER SHEET

Local Rule 205.2(b) requires this form be attached to any document <u>commencing an action</u> in the Montgomery County Court of Common Pleas. The information provided herein is used solely as an aid in tracking cases in the court system. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

| **Commencement of Action:** *(check one)* | **Amount in Controversy:** |
|---|---|
| ☒ Complaint    ☐ Petition    ☐ Notice of Appeal | ☐ $50,000 or less |
| ☐ Writ of Summons    ☐ Transfer From Other Jurisdiction | ☒ More than $50,000 |
| ☐ Declaration of Taking | |

**Case Type and Code** *(check the most specific classification ONLY):*

**Appeals**
☐ DJ – Money Judgment
☐ DJ – Landlord/Tenant
☐ Drivers License Suspension
☐ Vehicle Registration Suspension
☐ Local Agency
☐ Board of Assessment
☐ Zoning/Land Use

**Contract**
☐ Construction
☐ Employment
☐ Other

**Intentional Tort**
☐ Assault/Battery
☐ Libel/Slander
☐ Fraud
☐ Other

**Real Property**
☐ Ejectment
☐ Quiet Title
☐ Mechanics Lien
☐ Mortgage Foreclosure
☐ Partition
☐ Replevin
☐ Other

**Professional Liability**
☐ Medical
☐ Dental
☐ Legal
☐ Other

**Equitable Relief**
☐ Declaratory Judgment
☐ Mandamus
☐ Other

**Negligence**
☐ Motor Vehicle
☐ Premises Liability
☐ Product Liability
☐ Asbestos
☐ Other Toxic Tort
☐ Other

**Miscellaneous**
☐ Appointment of Arbitrator
☒ Class Action
☐ Confession of Judgment
☐ Debt Collection
☐ Eminent Domain
☐ Name Change
☐ Wrongful Death

☒ **Other** : *Breach of Fiduciary Duties*
     (specify)

3: 23

**JURY TRIAL DEMANDED.**
**THIS IS NOT AN ARBITRATION CASE.**
**ASSESSMENT OF DAMAGES IS REQUIRED.**

KENNEY EGAN MCCAFFERTY & YOUNG, P.C.
Eric L. Young (PA ID No. 84109)
Brian P. McCafferty (PA ID No. 66257)
3031C Walton Road, Suite 202
Plymouth Meeting, PA 19462
Tel.: (610) 940-9099

RIGRODSKY & LONG, P.A.
Seth D. Rigrodsky
Brian D. Long (PA ID No. 82370)
Timothy J. MacFall
919 North Market Street, Suite 980
Wilmington, DE 19801
Tel.: (302) 295-5310

GLANCY BINKOW & GOLDBERG, LLP
Lionel Z. Glancy
Richard A. Maniskas (PA ID No. 85942)
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Tel.: (310) 201-9150

Attorneys for Plaintiff

**TO DEFENDANTS:**
YOU ARE HEREBY NOTIFIED TO
FILE A WRITTEN RESPONSE TO
THE ENCLOSED COMPLAINT
WITHIN TWENTY (20) DAYS
FROM THE SERVICE HEREOF OR
A JUDGMENT MAY BE ENTERED
AGAINST YOU.

---

| | |
|---|---|
| MICHAEL MCAUVIC, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>HARLEYSVILLE NATIONAL CORPORATION, LEEANN B. BERGEY, JOHN C. CUNNINGHAM, III, WALTER E. DALLER, JR., PAUL D. GERAGHTY, HAROLD A. HERR, THOMAS C. LEAMER, JAMES E. McERLANE, STEPHANIE S. MITCHELL, A. ROSS MYERS, BRENT L. PETERS, DEMETRA M. TAKES, JAMES A WIMMER, and FIRST NIAGARA FINANCIAL GROUP, INC.,<br><br>Defendants. | MONTGOMERY COUNTY<br>COURT OF COMMON PLEAS<br><br><br><br>NO. 09-03764 |

---

**VERIFIED SHAREHOLDER'S CLASS ACTION COMPLAINT**

1

Plaintiff, by his undersigned attorneys, for his verified class action complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based, *inter alia*, upon the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this shareholder class action on behalf of himself and all other public shareholders of Harleysville National Corporation ("Harleysville" or the "Company"), against Harleysville and its Board of Directors (the "Board" or the "Individual Defendants") arising out of a transaction in which First Niagara Corporation ("First Niagara"), will acquire each share of Harleysville's common stock for 0.474 shares of First Niagara, representing a consideration worth approximately $5.50 per share or approximately $237 million (the "Proposed Transaction") as of the time the Proposed Transaction was announced.

2.    In approving the Proposed Transaction, the Individual Defendants breached their fiduciary duties of loyalty, good faith, and due care to Harleysville's shareholders by, *inter alia*, (i) agreeing to sell Harleysville without first taking steps to ensure that plaintiff and Class members (defined below) would obtain adequate, fair, and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or First Niagara without regard for Harleysville's public shareholders.  As alleged herein, First Niagara aided and abetted the Individual Defendants' breaches of fiduciary duty.  Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Harleysville's shareholders, or, alternatively, rescission of the

Proposed Transaction in the event defendants are able to consummate it.

## THE PARTIES

3.      Plaintiff is and has been the owner of Harleysville common stock continuously since prior to the wrongs complained of herein.

4.      Defendant Harleysville is a Pennsylvania corporation and maintains its principal executive offices at 483 Main Street, Harleysville, Pennsylvania, 19438. Harleysville is the holding company for Harleysville National Bank and Trust Company ("HNB") and provides banking and financial products and services to individual and corporate clients primarily in eastern Pennsylvania. Harleysville engages in the commercial banking and trust businesses; finances commercial transactions; makes construction and mortgage loans; as well as provides investment management services. Through its other subsidiaries, the Company also provides reinsurance services, accident and health insurance, investment advisory services in estate and succession planning, and life insurance for high-net-worth construction and aggregate business owners, wealthy families, and institutional clients. The Company's common stock trades on the NASDAQ under the ticker "HNBC." As of May 4, 2009, Harleysville had approximately 43,105,939 shares of common stock outstanding.

5.      Defendant Walter E. Daller, Jr., ("Daller") serves as the Chairman of the Board at both Harleysville and HNB and has been a director of the Company since 1977. According to the Company's Annual Proxy Statement filed with the United States Securities and Exchange Commission ("SEC") on March 24, 2009 on Form DEF 14A (the "2009 Proxy"), Daller is the retired Chief Executive Officer for both Harleysville and HNB and served as Chairman, President, and Chief Executive Officer of Harleysville

3

and Chairman of HNB from 1981 to 2004. Additionally, Daller serves as Chairman of the Executive Committee and is a member of HNB's Western Regional & Northern Regional Advisory Boards.

6.     Defendant LeeAnn B. Bergey ("Bergey") has served as a Harleysville and HNB director since 1999. According to the 2009 Proxy, Bergey is a member of the Audit and Executive Committees.

7.     Defendant John J. Cunningham, III ("Cunningham") has served as a director of Harleysville and HNB since 2008.

8.     Defendant Paul D. Geraghty ("Geraghty") has served as President, Chief Executive Officer, and a director of Harleysville since 2007. According to the 2009 Proxy, Geraghty also has served as Executive Vice President and a director of HNB since 2007.

9.     Defendant Harold A. Herr ("Herr") has been a director of Harleysville and HNB since 1987. According to the 2009 Proxy, Herr is Chairman of the Compensation Committee and a member of the Executive Committee.

10.    Defendant Thomas C. Leamer ("Leamer") has been a director of Harleysville and HNB since 2003. According to the 2009 Proxy, Leamer is Chairman of the Nominating and Corporate Governance Committee and a member of the Audit Committee.

11.    Defendant James E. McErlane ("McErlane") has served as a director of Harleysville and HNB since 2008.

12.    Defendant Stephanie S. Mitchell ("Mitchell") has been a director of Harleysville and HNB since 2002. According to the 2009 Proxy, Mitchell is a member of

4

the Compensation and Executive Committees and is a member of HNB's Western Regional Advisory Board.

13.    Defendant A. Ross Myers ("Myers") has been a director of Harleysville and HNB since 2006.  According to the 2009 Proxy, Myers is a member of the Compensation and Nominating and Corporate Governance Committees.

14.    Defendant Brent L. Peters ("Peters") has been a director of Harleysville and HNB since 2007. According to the 2009 Proxy, Peters is President, East Penn Bank Division of HNB and Executive Vice President and Chief Administrative Officer of Harleysville and HNB.  Peters also currently serves as Chairman of HNB's Regional Advisory Boards: Northern and East Penn Bank Division and is the former President and Chief Executive Officer of East Penn Financial Corporation.

15.    Defendant Demetra M. Takes ("Takes") has served as a director of Harleysville and HNB since 2005. According to 2009 Proxy, Takes serves as President and Chief Executive Officer of HNB.  Additionally, Takes served as Interim President and CEO of the Company from September 2006 to July 2007 and is currently a member of HNB's Regional Advisory Boards for the Western, Northern, and East Penn Bank Divisions.

16.    Defendant James A. Wimmer ("Wimmer") has been a director of Harleysville and HNB since 2000. According to the 2009 Proxy, Wimmer is a member the Executive Committee and serves on HNB's Northern Regional Advisory Board.

17.    Defendant First Niagara is a Delaware corporation and maintains its principal executive offices at 6950 South Transit Road, P.O. Box 514, Lockport, New York, 14095.  First Niagara operates as the holding company for First Niagara Bank that

provides retail and commercial banking, and financial services to individuals, families, and businesses. In addition, First Niagara provides risk and wealth management services and employee benefits plan and compensation consulting services, as well as other investment products, such as individual retirement accounts, education savings plans, and retirement plans.

18.    The defendants identified in ¶¶ 5-16 are collectively referred to herein as the "Individual Defendants." By reason of their positions as officers and/or directors of the Company, the Individual Defendants are in a fiduciary relationship with plaintiff and the other public shareholders of Harleysville, and owe plaintiff and Harleysville's other shareholders the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure.

19.    Each of the Individual Defendants at all times had the power to control and direct Harleysville to engage in the misconduct alleged herein. The Individual Defendants' fiduciary obligations required them to act in the best interest of plaintiff and all Harleysville shareholders.

20.    Each of the Individual Defendants owes fiduciary duties of good faith, fair dealing, loyalty, candor, and due care to plaintiff and the other members of the Class. They are acting in concert with one another in violating their fiduciary duties as alleged herein, and, specifically, in connection with the Proposed Transaction.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over defendants because they conduct business in Pennsylvania and/or are citizens of Pennsylvania.

22.    Venue is proper in this Court because the conduct at issue took place and

had an effect in this County.

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action pursuant to Rule 1702 of the Pennsylvania Rules of Civil Procedure, on his own behalf and as a class action on behalf of the public shareholders of Harleysville common stock (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24.    This action is properly maintainable as a class action.

25.    The Class is so numerous that joinder of all members is impracticable. As of May 4, 2009, there were approximately 43,105,939 publicly held shares of Harleysville common stock outstanding, held by scores, if not hundreds, of individuals and entities scattered throughout the country.

26.    Questions of law and fact are common to the Class, including, among others:

    a.    Whether the Individual Defendants have breached their fiduciary duties owed to plaintiff and the Class;

    b.    Whether defendants Harleysville and First Niagara aided and abetted the Individual Defendants' breaches of fiduciary duty; and

    c.    Whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the

other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

28.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

29.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, and final injunctive relief on behalf of the Class as a whole is appropriate.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

30.    On July 27, 2009, First Niagara issued a press release wherein it announced that it had entered into the Proposed Transaction to acquire all of Harleysville's outstanding common stock in an all stock transaction. Under the terms of the merger agreement, Harleysville shareholders are to receive 0.474 shares of First Niagara common stock for each share of Harleysville stock they own. The deal valued Harleysville stock at $5.50 per share based upon First Niagara's five-day average closing price of $11.60 on July 22, 2009. Additionally, the exchange ratio is subject to adjustment under certain circumstances if loan delinquencies at the Company exceed certain specified amounts. The Proposed Transaction is worth approximately $237 million to Harleysville's shareholders and has already been approved by both companies' boards of directors.

8

31.    A July 27, 2009 *Philadelphia Business Journal* article highlighted that the Proposed Transaction was ultimately an alternative to private equity infusion. Harleysville had failed to meet a June 30, 2009 deadline imposed by federal regulators to improve its capital ratios.  The *Philadelphia Business Journal* article states that the Company was in the midst of exploring opportunities with private equity firms, until Geraghty received a call from First Niagara's Chief Executive Officer, John Koelmel ("Koelmel").    According to the same article, Geraghty met with Koelmel on a Wednesday and then, that next Monday, Geraghty recommended to the Company's Board that it pursue a deal with First Niagara.

32.    The Company's announcement of the Proposed Transaction also discloses that Geraghty will stay-on with First Niagara after the Proposed Transaction closes to "continue to lead his in-market team."

33.    Moreover, to the detriment of Harleysville's shareholders, the Merger Agreement's terms substantially favor First Niagara and are calculated to unreasonably dissuade potential suitors from making competing offers.

34.    The Individual Defendants have agreed to a "No Solicitation" provision in Section 6.10 of the Merger Agreement with First Niagara that unfairly restricts the Board from soliciting alternative proposals by, among other things, constraining its ability to communicate with potential buyers, and in some circumstances, even consider competing proposals.  This "no-shop" provision also prohibits the Individual Defendants from initiating contact with possible buyers, even if the Board believes that communicating with a potential bidder could reasonably lead to a superior offer or an offer more closely

aligned with the interests of Harleysville's shareholders.  The relevant portion of Section

6.10(a) of the Merger Agreement states:

>  *(a) HNC shall not*, and shall cause its Subsidiaries and the respective
>  officers, directors, employees, investment bankers, financial advisors,
>  attorneys, accountants, consultants, affiliates and other agents
>  (collectively, the "Representatives") not to, *directly or indirectly, (i)*
>  *initiate, solicit, induce or knowingly encourage, or take any action to*
>  *facilitate the making of, any inquiry, offer or proposal which constitutes,*
>  *or could reasonably be expected to lead to, an Acquisition Proposal; (ii)*
>  *participate in any discussions or negotiations regarding any Acquisition*
>  *Proposal or furnish, or otherwise afford access, to any Person (other*
>  *than FNFG) any information or data with respect to HNC or any of its*
>  *Subsidiaries or otherwise relating to an Acquisition Proposal; (iii)*
>  *release any Person from, waive any provisions of, or fail to enforce any*
>  *confidentiality agreement or standstill agreement to which HNC is a*
>  *party; or (iv) enter into any agreement, agreement in principle or letter*
>  *of intent with respect to any Acquisition Proposal or approve or resolve*
>  *to approve any Acquisition Proposal or any agreement, agreement in*
>  *principle or letter of intent relating to an Acquisition Proposal.* Any
>  violation of the foregoing restrictions by HNC or any Representative,
>  whether or not such Representative is so authorized and whether or not
>  such Representative is purporting to act on behalf of HNC or otherwise,
>  shall be deemed to be a breach of this Agreement by HNC. HNC and its
>  Subsidiaries shall, and shall cause each of HNC Representatives to,
>  immediately cease and cause to be terminated any and all existing
>  discussions, negotiations, and communications with any Persons with
>  respect to any existing or potential Acquisition Proposal.

[Emphasis added].

35.     Furthermore, Section 6.10 goes on to state that Harleysville must, within

twenty-four hours, notify First Niagara of any proposals or offers from any overtures of

interest from other potential suitors.  The relevant portion of Section 6.10(c) of the

Merger Agreement states:

>  *(c) HNC shall promptly (and in any event within twenty-four (24) hours)*
>  *notify FNFG in writing if any proposals or offers are received by, any*
>  *information is requested from, or any negotiations or discussions are*
>  *sought to be initiated or continued with, HNC or any HNC*
>  *Representatives, in each case in connection with any Acquisition*
>  *Proposal,* and such notice shall indicate the name of the Person initiating

such discussions or negotiations or making such proposal, offer or information request and the material terms and conditions of any proposals or offers (and, in the case of written materials relating to such proposal, offer, information request, negotiations or discussion, providing copies of such materials (including e-mails or other electronic communications) unless (i) such materials constitute confidential information of the party making such offer or proposal under an effective confidentiality agreement, (ii) disclosure of such materials jeopardizes the attorney-client privilege or (iii) disclosure of such materials contravenes any law, rule, regulation, order, judgment or decree. HNC agrees that it shall keep FNFG informed, on a current basis, of the status and terms of any such proposal, offer, information request, negotiations or discussions (including any amendments or modifications to such proposal, offer or request).

[Emphasis added].

36.    Section 6.10 of the Merger Agreement also requires Harleysville to give

First Niagara notice of a *bona fide* superior proposal.  This "Notice of Superior Proposal"

ostensibly allows First Niagara to counter the superior proposal and amend its offer

before the Merger Agreement can legally be broken.  The relevant portion of Section

6.10(e) of the Merger Agreement states:

(e) Notwithstanding Section 6.10(d), prior to the date of HNC Shareholders Meeting, *the HNC Board may approve or recommend to the shareholders of HNC a Superior Proposal and withdraw, qualify or modify the HNC Recommendation in connection therewith (a "HNC Subsequent Determination") after the third (3rd) Business Day following FNFG's receipt of a notice (the "Notice of Superior Proposal") from HNC advising FNFG that the HNC Board has decided that a bona fide unsolicited written Acquisition Proposal that it received (that did not result from a breach of this Section 6.10) constitutes a Superior Proposal (it being understood that HNC shall be required to deliver a new Notice of Superior Proposal in respect of any revised Superior Proposal from such third party or its affiliates that HNC proposes to accept and the subsequent notice period shall be two (2) business days) if, but only if, (i) the HNC Board has reasonably determined in good faith, after consultation with and having considered the advice of outside legal counsel and a financial advisor, that the failure to take such actions would be reasonably likely to be inconsistent with its fiduciary duties to HNC's shareholders under applicable law, and (ii) at the end of such three (3) Business Day period or the two (2) Business Day Period (as the case may be), after taking into account any*

11

*such adjusted, modified or amended terms as may have been committed to in writing by FNFG since its receipt of such Notice of Superior Proposal (provided, however, that FNFG shall not have any obligation to propose any adjustments, modifications or amendments to the terms and conditions of this Agreement),* HNC Board has again in good faith made the determination (A) in clause (i) of this Section 6.10(e) and (B) that such Acquisition Proposal constitutes a Superior Proposal. Notwithstanding the foregoing, the changing, qualifying or modifying of the HNC Recommendation or the making of a HNC Subsequent Determination by the HNC Board shall not change the approval of the HNC Board for purposes of causing any Takeover Laws to be inapplicable to this Agreement and the HNC Voting Agreements and the transactions contemplated hereby and thereby, including the Merger.

[Emphasis added].

37.    The Merger Agreement also contains a termination fee of $10 million ("Termination Fee") as another deal protection device.  Moreover, it appears that the Termination Fee is payable even in the event the Board terminates the Merger Agreement pursuant to the lawful exercise of its fiduciary duty, which reinforces the notion that the Termination Fee is an improper deterrent to the Board's seeking the best possible price for Harleysville's shareholders.  Section 11.2 of the Merger Agreement states in relevant part:

*(C) As a condition of FNFG's willingness, and in order to induce FNFG, to enter into this Agreement,* and to reimburse FNFG for incurring the costs and expenses related to entering into this Agreement and consummating the transactions contemplated by this Agreement, *HNC hereby agrees to pay FNFG, and FNFG shall be entitled to payment of a fee of $10.0 million* (the "FNFG Fee").

[Emphasis added].

38.    These acts, combined with other defensive measures the Company has in place, effectively preclude any other bidders that might be interested in paying more than First Niagara for the Company and have the effect of limiting the ability of the Company's stockholders to obtain the best price for their shares.

## COUNT I

### (Breach of Fiduciary Duty against the Individual Defendants)

39.     Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

40.     In approving the Proposed Transaction on behalf of Harleysville, the Individual Defendants have not taken adequate steps to protect the interests of the Company's public shareholders.

41.     The unfairness of the terms of the Proposed Transaction is compounded by the gross disparity between the knowledge and information possessed by defendants by virtue of their positions of control of Harleysville and that possessed by the Company's public shareholders.

42.     The inherent unfairness in the Proposed Transaction's consideration thus also is manifest in the uncertainty and inadequacy of the purchase price.

43.     Under the circumstances alleged herein, the Individual Defendants are obligated to explore all alternatives to maximize shareholder value.  To accomplish this obligation, the Individual Defendants had a duty to:

(a)     Fully inform themselves of Harleysville's market value before taking, or agreeing to refrain from taking, action;

(b)     Act in the interests of the equity owners;

(c)     Maximize shareholder value;

(d)     Obtain the best financial and other terms when the Company's independent existence will be materially altered by the transaction; and

(e)    Act in accordance with the fundamental duties of loyalty, care, and good faith.

44.    Because of their respective positions with the Company, the Individual Defendants are also required to:

(a)    Act independently to ensure that the best interest of the corporation and its shareholders takes precedence over any other interest; and

(b)    Ensure that if there are conflicts of interest between the defendants' interests and their fiduciary obligations of loyalty, they are resolved in the best interest of the Harleysville public shareholders.

45.    Because of the foregoing, defendants have breached, and will continue to breach, their fiduciary duties owed to the public shareholders of Harleysville, and are engaging in, or facilitating the accomplishment of, an unfair and coercive transaction in violation to their fiduciary duties to the public shareholders of Harleysville.

46.    Plaintiff and the Class will suffer irreparable harm unless defendants are enjoined from breaching their fiduciary duties and carrying out the previously mentioned wrongful transaction.

47.    Plaintiff and the Class have been and will be damaged in that they will not receive a fair proportion of the value of Harleysville's assets and business and will be prevented from benefiting from a value-maximizing transaction.

48.    Plaintiff and the other Class members are immediately threatened by the acts and transactions complained of herein.

49.    The Individual Defendants have clear and material conflicts of interest in connection with First Niagara's attempt to acquire the Company for a financially unfair

price. These defendants are acting to better their own, personal interests at the expense of the Company's public shareholders. The Individual Defendants are engaging in self-dealing and not acting in good faith toward plaintiff and the other members of the Class. Defendants thus have breached and are breaching their fiduciary duties to plaintiff and the Class.

50.     In unanimously approving the Proposed Transaction on behalf of the Company, the Individual Defendants have not taken any steps to protect the interests of the Company's minority shareholders, including the utilization of procedural safeguards such as providing for approval of the Proposed Transaction by a majority of the Company's minority shareholders.

51.     Absent injunctive relief, plaintiff and the Class will be irreparably harmed because of defendants' breaches of their fiduciary duties.

52.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

**(Aiding and Abetting the Board's Breaches of Fiduciary Duty against Harleysville and First Niagara)**

53.     Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

54.     Defendants Harleysville and First Niagara knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred. In connection with discussions regarding the Proposed Transaction, Harleysville provided, and First Niagara obtained, sensitive non-public information concerning Harleysville's operations and thus had unfair advantages which enabled it to acquire the Company at an unfair and

15

inadequate price.

55.     As a result of this conduct, plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their Harleysville shares.

56.     Plaintiff and the members of the Class have no adequate remedy at law.

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.      Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them, from proceeding with, consummating, or closing the Proposed Transaction;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to plaintiff and the Class;

D.      Directing defendants to account to plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

Dated: July 31, 2009

KENNEY EGAN McCAFFERTY
& YOUNG, P.C.

By: _____
Eric L. Young (PA ID No. 84109)
3031C Walton Road, Suite 202
Plymouth Meeting, PA 19462
Tel.: (877) 879-6922
Fax: (610) 940-0284

*Attorney for Plaintiff*

OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long (PA ID No. 82370)
Timothy J. MacFall
919 North Market Street, Suite 980
Wilmington, DE 19801
Tel.: (302) 295-5310
Fax: (302) 654-7530

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Richard A. Maniskas (PA ID No. 85942)
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160

## VERIFICATION

I, Michael McAuvic, hereby verify that the statements made in the forgoing Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

DATED: _____7/29/2009_____        _Michael McAuvic_

Michael McAuvic

## VERIFICATION

I, Michael McAuvic, hereby verify that the statements made in the forgoing Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

DATED: ___7/29/2009___          ___Michael McAuvic___
                                        Michael McAuvic

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| DANNY VALERIUS, Individually and On Behalf of Nominal Defendant HARLEYSVILLE NATIONAL CORPORATION,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>PAUL GERAGHTY, LEEANN B. BERGEY, WALTER E. DALLER, JR., HAROLD A. HERR, THOMAS C. LEAMER, STEPHANIE S. MITCHELL, A. ROSS MYERS, BRENT L. PETERS, JAMES A. WIMMER, JOHN J. CUNNINGHAM, III, JAMES E. McERLANE, and DEMETRA M. TAKES,<br><br>　　　　　　　Defendants,<br><br>　　— and —<br><br>HARLEYSVILLE, NATIONAL CORPORATION, a Pennsylvania Corporation,<br><br>　　　　　　　Nominal Defendant. | Civ. Action No. 09-6208 |

## ORDER

AND NOW, this _____ day of _____, 2010, upon consideration of Plaintiff's Motion for a Temporary Restraining Order and Defendants' Opposition thereto, it is hereby ORDERED that Plaintiff's Motion is DENIED.

　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　Hon. Juan R. Sánchez

## CERTIFICATE OF SERVICE

The foregoing Opposition to Plaintiff's Motion for Temporary Restraining Order has been filed electronically and is available for viewing and downloading from the ECF system.

I, Michael J. Newman, do hereby certify that a true and correct copy of the foregoing Opposition to Plaintiff's Motion for Temporary Restraining Order has been served electronically on the following:

Joshua D. Snyder
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004

Deborah R. Gross
LAW OFFICES OF
BERNARD M. GROSS, P.C.
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA 19107

Darren J. Robbins
Randall J. Baron
A. Rick Atwood, Jr.
David T. Wissbroecker
Aaron W. Beard
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 W. Broadway, Suite 1900
San Diego, CA 92101

Hamilton Lindley
KENDALL LAW GROUP, LLP
3232 McKinney, Suite 700
Dallas, TX 75204

Michael D. Donovan, Esquire
DONOVAN SEARLES, LLC
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103

January 18, 2010                                    _____ /s/ Michael J. Newman